Paul, Jeffery
Reg. No. 10517-042
Unit: SCU

CF

## INMATE REQUEST TO STAFF MEMBER RESPONSE

Your correspondence to the North Central Regional Office has been referred to this office for response. You request to be immediately released and provided restitution for your confinement.

Records indicate you were sentenced to Death on June 25, 1997, in the United States District Court, Western District of Arkansas. Your sentence can not be changed unless an amended criminal judgment, or some other type of order, is issued by the appropriate court. A review of Administrative Remedies you recently filed reveals you have received responses from the Institution and Regional level concerning your rights. If you are unsatisfied with these responses you may further utilize the Administrative Remedy Program.

I trust this has been responsive to your request.

9/10/09
Date

H. J. Marberry
Complex Warden

1

Doc 1

WESTERN DISTRICT ARKANSAS
FILED
SEP 24 1996
CHRIS R. JOHNSON, CLERK
BY [signature] DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 6:96CR60022-001 |
| vs. | ) | 18 U.S.C. § 1111(a) |
| | ) | 18 U.S.C. § 924(c) |
| JEFFERY WILLIAM PAUL | ) | 18 U.S.C. § 924(i)(1) |
| | | 18 U.S.C. § 2 |

## INDICTMENT

The Grand Jury charges:

### COUNT 1

On or about the 22nd day of June, 1995, in the Western District of Arkansas, Hot Springs Division, the defendant, JEFFERY WILLIAM PAUL, and another person known to the grand jury, while aiding and abetting each other, did, within the confines of Hot Springs National Park, a place within the special maritime and territorial jurisdiction of the United States, pursuant to Title 18 U.S.C. § 7(3), kill Sherman Williams, by means of gunshot wounds, in the perpetration of a robbery, in violation of 18 U.S.C. § 1111(a) and § 2.

### COUNT 2

On or about the 22nd day of June, 1995, in the Western District of Arkansas, Hot Springs Division, the defendant, JEFFERY WILLIAM PAUL, and another person known to the grand jury, while aiding and abetting each other, within the confines of Hot Springs National Park, a place within the special maritime and territorial jurisdiction of the United States, pursuant

1

Doc. 2

to Title 18 U.S.C. § 7(3), during and in relation to a crime of violence, did knowingly use a firearm which caused the death of Sherman Williams, in violation of 18 U.S.C. §§ 924(c), 924(i)(1) and § 2.

A True Bill.

Foreperson

P. K. Holmes III
United States Attorney

By:
William M. Cromwell
FAUSA/Criminal Chief
Ark. Bar No. 76023
P. O. Box 1524
Fort Smith, AR 72902-1524
(501) 783-5125



Doc-3

# Habeas Hints: Actual Innocence

*by Kent Russell*

*This column provides "habeas hints" to prisoners who are considering or handling habeas corpus petitions as their own attorneys ("in pro per"). The focus of the column is on the Antiterrorism and Effective Death Penalty Act (AEDPA), the federal habeas corpus law which now governs habeas corpus practice in courts throughout the United States.*

In *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013), the U.S. Supreme Court held that "actual innocence," if proved, is a gateway through which a habeas petitioner can make it into federal court even though the AEDPA statute of limitations has run. *McQuiggin* is an important case because it potentially opens the door to the federal courthouse for prisoners who claim they are innocent but whose convictions are so old that they otherwise would have been barred by AEDPA's one-year statute of limitations. On the other hand, the standard of proof for actual innocence claims is so demanding that only a handful of prisoners will be able to satisfy it.

*McQuiggin* involved a habeas corpus petitioner (Floyd Perkins) who had been convicted of first-degree murder and sentenced to death in 1977. The prosecution's star witness at trial, Damarr Jones, was present at the scene of the crime but testified that Perkins alone had committed the murder while he looked on. Other prosecution witnesses testified that Perkins had told them he planned to kill the victim beforehand and admitted afterward to being the killer. Perkins, however, denied killing the victim, and testified at trial that he was not present when the victim was killed and had seen Jones later that night with blood on his hands.

Between the time that Perkins' conviction became final in 1997 and July 2002, he obtained three affidavits which pointed to Jones as the murderer. However, Perkins did nothing with them until June 2008, when he filed a federal habeas corpus petition alleging that the affidavits constituted "newly discovered evidence of actual innocence," and that his trial attorney had been ineffective in failing to present this exonerating evidence at trial.

The U.S. District Court denied Perkins habeas relief on two separate grounds.

First, as to the affidavits Perkins presented in support of his actual innocence claim, the court reasoned that, even assuming they qualified as newly discovered evidence of innocence, Perkins could only get past the AEDPA statute of limitations if he could establish *equitable tolling*. Equitable tolling, however, requires not only a showing of extraordinary circumstances justifying the delay in obtaining the new evidence, but also "diligence" in bringing the case to court promptly after its discovery. Because Perkins had waited 11 years from the time of his conviction and almost 6 years after the date of the most recent affidavit before filing his habeas corpus petition, he "had failed utterly to demonstrate the necessary diligence in exercising his rights." Therefore, the district court denied any relief from the statute of limitations because Perkins could not possibly satisfy the diligence requirement for equitable tolling.

Second, the court found that Perkins had failed to meet the strict standard by which pleas of actual innocence are measured because he had not shown that, taking into account all the evidence, it was "more likely than not that no reasonable juror would have convicted him."

Perkins appealed to the Sixth Circuit, which granted a certificate of appealability on the single issue embraced by the first reason for the district court's denial: Is reasonable diligence a pre-condition to relying on actual innocence as a gateway to adjudication of a federal habeas corpus petition on the merits? The Court of Appeals answered "no" to this question, and on that basis reversed the district court's dismissal of Perkins' habeas petition. The U.S. Supreme Court then granted review.

The Court began by reminding everyone that although it had never decided whether a prisoner can obtain habeas relief based on a "free-standing" actual innocence claim (that is, a petition arguing solely that the petitioner is innocent without any allegation that he was denied a specific right under the Constitution), the Court had permitted petitioners to overcome procedural barriers to relief under the "fundamental miscarriage of justice" exception, which applies where a constitutional violation "has probably resulted in the conviction of one who is actually innocent."

Applying this fundamental miscarriage of justice exception, which the Supreme Court equated with a claim of actual innocence, it had permitted petitioners to be heard on the merits who otherwise would have been barred from relief by procedural defaults, such as a violation of the successive petition rule, or being barred from an evidentiary hearing in federal court after failing to develop the claim fully in state court.

The *McQuiggin* court explained that, in these and other situations where the miscarriage of justice exception applied, Congress had specified additional requirements that had to be met in order to obtain relief: For example, to overcome the successive-petition rule or obtain an evidentiary hearing on an undeveloped claim, a petitioner also had to establish diligence and meet a higher standard of proof ("clear and convincing evidence" rather than just a probability). Yet Congress had not placed any additional requirements on overcoming the AEDPA statute of limitations. Thus, a petitioner could do *that* solely by alleging and establishing actual innocence. Conversely, lack of diligence was not a make-or-break requirement for relief from the statute of limitations, but rather a single factor to be considered in evaluating the overall sufficiency of the actual innocence claim.

In sum, *McQuiggin* held that a federal habeas court, faced with a first habeas petition that alleged actual innocence but which, on its face, showed that the AEDPA statute of limitations had run, should not treat lack of diligence as an absolute barrier to relief but rather as one factor to be taken into account in determining whether the petitioner had alleged and proved that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."

Applying this principle, the *McQuiggin* court found that the district court had erred by barring Perkins from entering the gateway to the federal courts on the basis that he had not shown diligence in bringing the newly discovered evidence to the court's attention. Nevertheless, the district court had also based its dismissal on Perkins' failure to meet the demanding actual inno-

Due Diligence not A MAKE or break

cence standard – which requires "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error" – and the Supreme Court found no reason to question the district judge's decision in this regard. Thus the Supreme Court vacated the Sixth Circuit's reversal of the dismissal order and remanded the case, thereby reinstating the dismissal of Perkins' habeas petition in the district court.

In short, Perkins won on the law but lost his case on the facts.

### Habeas Hints

• *McQuiggin* carved out an actual innocence exception to the AEDPA statute of limitations that stands on its own, separate and apart from the exception that already exists based on equitable tolling. The difference between the two is that the *McQuiggin* exception does not require a diligence showing but does require actual innocence; whereas equitable tolling requires diligence but not a showing of actual innocence. However, keep in mind that it will be easier in many cases to demonstrate equitable tolling rather than actual innocence. Therefore, when you set out the facts and law that would justify the federal court hearing the petition on the merits despite the lapse of AEDPA's statute of limitations – which you will have to do in the petition itself and/or in response to the Attorney General's motion to dismiss for untimeliness – consider the following recommendations: 1) If you missed the statute of limitations because of prison restrictions or other outside impediments that made it impossible for you to file on time, and you were diligent in filing relatively soon after the restrictions ended, then seek to be heard based solely on equitable tolling and do not rely on *McQuiggin*. 2) If you were late because you hired an attorney for habeas corpus who took your money and never did anything for you, then allege that the default is excusable due to attorney "abandonment" [see: *Maples v. Thomas*, 132 S.Ct. 912 (2012)], a legitimate basis for equitable tolling, and don't bother with *McQuiggin*. 3) If you don't have any legally acceptable reason for waiting as long as you did to file for federal habeas relief (e.g., not having money to hire an attorney is not a valid legal excuse for delay), but you have a strong claim of actual innocence, then rely on *McQuiggin* and don't argue equitable tolling.

• The majority's reasoning in *McQuiggin* makes clear that actual innocence can be used not only to excuse a violation of the AEDPA statute of limitations, but also to overcome any other kind of procedural default as well. Hence, for example, if you filed a state habeas petition to exhaust but it was denied for violating some state procedural rule, this would ordinarily prevent you from being heard on the merits in federal court. However, under *McQuiggin* you could attempt to avoid the state procedural default problem by alleging actual innocence in your federal petition even if you could not show diligence. Nevertheless, because the actual innocence standard is so hard to satisfy, you should only use *McQuiggin* as a last resort; i.e., in those situations where you cannot overcome the procedural default in any other way.

• *McQuiggin* did not invalidate current law, which provides that actual innocence cannot, standing alone, be the basis for a federal court to grant habeas corpus relief. See, e.g., *Herrera v. Collins*, 506 U.S. 390 (1993). Therefore, although *McQuiggin* does allow a petitioner to get to the door to the federal courthouse if he has a strong claim of actual innocence, it doesn't get him successfully through the door unless he also can allege a separate claim of prejudicial error arising from a violation of the Constitution. However, this challenge can almost always be met by alleging ineffective assistance of counsel (IAC), which is a recognized Constitutional violation under the Sixth Amendment, along with actual innocence to excuse the default in question. The reasoning proceeds as follows: "By definition, newly discovered evidence is evidence that was *not* obtained and presented at trial by trial counsel. Newly discovered evidence sufficiently compelling to meet the very difficult actual innocence standard was necessarily so vital to the defense that it certainly *should* have been located and


**Never Eat Baloney Again!**

Taoists eat meat in its natural state but cannot consume processed meats.

Taoists must have organic vegetables, one egg daily and green tea daily.

2 hours of outdoor rec is also required.

Prepackaged meals are available at: www.theorganicbistro.com

To exercise these and other religious rights under the 1st Amendment and RLUIPA, obtain explicit scriptural authority for Taoism from:

**THE HOLY BOOK OF MODERN TAOISM**, by Lao Xue

for sale now at: www.createspace.com






**The Other Death Penalty Project**
is proud to announce the publication of *Too Cruel, Not Unusual Enough,* the first and only anthology of writings by and about life without parole prisoners!

Praised by notables including Professors Michelle Alexander, Austin Sarat, and Robert Johnson, *Too Cruel, Not Unusual Enough* won a gold medal for best anthology in the 2013 Independent Publisher Awards.

Buy your copy today—order now for the holidays! All proceeds from book sales support the vitally important work of The Other Death Penalty Project.

Visit www.createspace.com/3949760 or www.theotherdeathpenalty.org to order. The Other Death Penalty Project can be contacted by email at todp@live.com, or by regular mail at PO Box 1486, Lancaster CA 93584.

## Habeas Hints (cont.)

introduced at trial by competent defense counsel. Hence, counsel's failure to do so is IAC." In other words, in any case where you can credibly argue actual innocence based on newly discovered evidence pursuant to *McQuiggin*, you should also be able to allege, as a substantive habeas corpus claim, that trial counsel was ineffective in failing to obtain and present that evidence at trial.

• While *McQuiggin* potentially opens the door to consideration of old claims that otherwise would have clearly violated the statute of limitations, establishing actual innocence amounts to proving beyond a reasonable doubt that the petitioner is innocent. Put another way, to prove actual innocence, a defendant who has been found *guilty* despite the most demanding standard under American law – proof beyond a reasonable doubt – must establish his *innocence* according to that same tough standard, applied in reverse! Thus, in evaluating whether a *McQuiggin*-type claim has any real chance of success on habeas, remember that, although actual innocence breathes life into claims that before *McQuiggin* would have been DOA in federal court, as a practical matter only a very, very few petitioners will ultimately be able to make the extremely difficult showing that *McQuiggin* requires.

• Although I've repeatedly emphasized the immense difficulty of successfully making the showing of actual innocence required by *McQuiggin*, it may not be too much harder to do so than to succeed on a more conventional IAC claim. The Supreme Court has recently made federal habeas corpus relief for IAC so extremely difficult [see, e.g., *Harrington v. Richter*, 131 S.Ct. 770 (2011), requiring "double deference" to state-court denials of IAC claims and refusing to set them aside so long as *any* reasonable judge could have denied the claim for *any* reason], that one has to wonder whether, practically speaking, having habeas corpus granted on an IAC claim in federal court can ever be accomplished without ultimately showing, beyond a reasonable doubt, that the petitioner is "actually innocent."

*Kent A. Russell specializes in habeas corpus and is the author of the* California Habeas Handbook, *which thoroughly explains state and federal habeas corpus under AEDPA. The 5th Edition, completely revised in September 2006 and updated in 2012, can be purchased for $49.99, which includes priority mail postage. An optional order form can be obtained from Kent's website (www.russellhabeas.com), or simply send a check or money order to: Kent Russell, "Cal. Habeas Handbook," 3169 Washington St., San Francisco, CA 94115.*

# Second Circuit Establishes Property Seizure Standards for Civilly Committed Persons

As a matter of first impression, the Second Circuit Court of Appeals has undertaken a Fourth Amendment balancing analysis with regard to the right of a civilly committed person to be free from unreasonable seizures under the Fourth Amendment.

Karl Ahlers, a convicted sex offender, was civilly committed by the State of New York after serving 23 years in prison for multiple sex offenses involving children. He filed a civil rights complaint in 2008 alleging First and Fourteenth Amendment violations and denial of procedural due process after staff at the Manhattan Psychiatric Center (the Center) seized and withheld his personal DVDs and CDs and his incoming mail.

Over time, Ahlers had collected 163 DVDs and 86 CDs (collectively, discs) with the Center's permission. On April 21, 2008, staff entered his room without warning and seized all of his discs. Most were returned, but some were permanently confiscated for containing inappropriate sexual content. The district court dismissed Ahlers' complaint for failure to state a claim.

On appeal, the Second Circuit held the reasonableness of the seizure was dependent on a balancing of interests: the state's interest in order, security and treatment, and Ahlers' property interest in retaining his discs. The appellate court held it was not unreasonable to seize the discs to examine them for prohibited sexually explicit material, and the fact that the Center had permitted Ahlers to initially receive the discs did not diminish its interest in assuring they were appropriate.

The Court of Appeals, in reaching this conclusion, recognized that involuntarily committed persons are entitled "to more considerate treatment and conditions of confinement than convicted criminals" (even though, in practice, civil commitment facilities are often prison-like). Nevertheless, the state has an interest in maintaining order, security and treatment of people who are civilly committed.

Turning to Ahlers' procedural due process claim, the Second Circuit found his allegations were insufficient to support a claim that the Center's pre-deprivation procedures were constitutionally inadequate. The appellate court held the Center's interest "in quick and efficient searches militates against requiring that a detailed explanation or a written receipt be given at the time of seizure." Nor was a written policy concerning such seizures necessary, the Court of Appeals said. Further, the Court wrote that staff needed sufficient time to screen the discs, and Ahlers had failed to allege whether post-deprivation procedures were available to him.

The Second Circuit also noted that it had not articulated a standard to analyze censorship of mail in the civil commitment context. In doing so, it held that a "patient must show regular and unjustifiable interference with incoming legal mail; the actions of facility staff in restricting civilly committed individuals' access to legal mail are justified if they advance or protect the state's interest in security, order, or treatment and the restrictions imposed are no greater than necessary to advance the governmental interest involved."

The Court of Appeals did not establish a standard as to non-legal mail because Ahlers had not alleged that the interference with his non-legal mail was "regular" or "unjustifiable." Lastly, the Court construed Ahlers' complaint as one seeking damages and held the defendants were entitled to qualified immunity because they had reason to believe they were not violating Ahlers' rights.

Accordingly, the district court's order of dismissal was affirmed. See: *Ahlers v. Rabinowitz*, 684 F.3d 53 (2d Cir. 2012), *cert. denied.*

OFFICE OF THE
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF DELAWARE

800 KING STREET. SUITE 200
WILMINGTON. DE 19801

X 63-417L

$0.46 0
US POSTAGE
FIRST-CLASS
062S0007246923
19801
B16341.16

**Jeffery Paul, # 10517-042**
**United States Penitentiary**
**P.O.Box 33**
**Terre Haute, IN 47808-0033**

SPECIAL MAIL - OPEN ONLY IN THE
PRESENCE OF THE INMATE PERSON
ENTITLED TO INVOKE PROTECTION OF
SPECIAL MAIL 28 C.F.R. § 540.18

47808X0033

SPECIAL MAIL - OPEN ONLY IN THE
PRESENCE OF THE INMATE PERSON
ENTITLED TO INVOKE PROTECTION OF
SPECIAL MAIL 28 C.F.R. § 540.18

Evid.Doc.1.

Evid.Doc.2.

OFFICE OF THE FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF DELAWARE

EDSON A. BOSTIC
FEDERAL PUBLIC DEFENDER

KARL D. SCHWARTZ
CHIEF, CAPITAL HABEAS UNIT

JENNIFER A. MERRIGAN
ASSISTANT DEFENDER,
CAPITAL HABEAS UNIT

July 11, 2013

Jeffery Paul, # 10517-042
United States Penitentiary
P.O.Box 33
Terre Haute, IN 47808-0033

Jeff,

It was good to talk to you today. I am enclosing the affidavit you requested. I ordered you the Almanac and Dictionary, you should receive them soon. I know that you have requested other books, and I have let the team know.

Sincerely,

[signature]

Jennifer Merrigan

Enclosures

Ms. Jennifer Merrigan
800 King Street, Suite 200
Wilmington, DE. 19801

(Cell Ph) 302/573/6010

Western District of
Arkansas; Hot Springs Division
U.S. v. Ingle
Case no. 97 3443
157 F3d 1147
(8th Cir. 1998)

County of Jefferson

State of Texas

Declaration of Trinity E. Ingle

My name is Trinity Ingle. I am over the age of 18 and competent to make the declarations contained herein.

On June 22, 1995 me and Jeff were downtown in Hot Springs by the Arlington Hotel. I was wanting to rob a shop downstairs. Jeff was high and was pretty much just following me where I was going to. I was high too otherwise I would not have been wanting to rob a shop in broad daylight. But so we're standing outside of the mall when Mr. Williams drove by. I had not slept for days and was high on Methamphetamine which can make you paranoid and was making me paranoid after ten days of it and not sleeping. It was one of those times where if things had gone different, if a cop car had come by or something like that, I would have just left, but when Mr. Williams drove by he looked at me and I just locked in on him. In my paranoia I knew he had seen the gun in my waistband and knew that now he knew what I was thinking to do by robbing the shop downstairs. So when he got out of the car I told Jeff to come on and follow me. At this point Jeff did not know what I was doing and so he wasn't arguing any about it yet. As far as I knew, Jeff did not know that I had a gun. I didn't tell Jeff about my suspicions of Mr. Williams, nor did I say anything to him about what I planned to do.

I followed Mr. Williams up the trail and Jeff was following me. I stopped him by asking him if he had the time. After he told us the time I pulled the gun out and told him to give up everything he had. When he didn't, I hit him and kicked him on the ground. By this time, Jeff was getting very nervous. He was trying to get me to leave, saying, "come on, let's go." But I wasn't about to leave, but I still had the gun in my hand and Jeff knew it.

I told Jeff to keep quiet and I tied the guy up with the tape. Then Jeff and I started back down the trail but when I looked back at him the guy was looking right at me. I turned to go back but Jeff grabbed me by the arm and said, "let's just leave him and get out of here." Jeff kept arguing with me but I yanked free of him holding me. I still had the gun in my hand and Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what it was I was going back up the mountain for, I made sure he knew if he put his hands on me again trying to stop me I would have shot him, too, and it would have been two people left up on that mountain.

So I walked back up the trail and asked the guy if he was going to call the cops. He said no but of course I knew he was lying. So I stood over him and shot him in the chest but one shot was rat shot which I had forgot was in the chamber. I heard Jeff yelling at me to stop, but I turned back around and shot Mr. Williams

with the real bullet in the head.

Everything else I believe is already known which followed that.

The gun I got from a burglary off Higden Ferry Road, New Oscar Point and Amity. It was a brown and yellow house and part of the yard was fences. It was in the morning that I broke into the house and found the guns in a closet. I think I recall that they were in a box on the closet floor. I also took some things out of the ice box and some change and silver dollars. Actually I had gotten two guns from there, a .357 and the .38 I used to shoot Mr. Williams. The .357 I had already sold.

Under penalty of perjury I hereby swear that the foregoing is true and correct to the best of my information and belief.

Trinity E. Ingle

Dated this 11 day of February, 2005.