In The Southern District of INDIANA

Jeffery William Paul
Plaintiff

Rule 43(c),7(b)/RCP

V.

-Affidavit to Support Exhibit included-

---

SECTION 1/ONE- Pages 1 - 17 *

---

Comes now,The Petitioner/Plaintiff does herein Affidavit in Support of Claim to be suffering injury of Civil Rights violations by persons acting under color of law,authority of the Office of

The United States of America-U.S.C.28 §1346,1402

(1.)Petitioner claims that on or about 9/2/95,Attorneys contacted by the Western District of Arkansa,Hot Springs Division-Garland County were contacted to Represent an Indigent Defendant being accused of Accomplice to Murder under USC 18,Ch.1,§2-Aiding(&)Abetting-Ch.51,§1111 with some aggravating factors on the indictment,(non-sexual)...

(2.)The defendant had clearly asserted that he was only a witness to the incident(&)Plead NOT GUILTY to felony Murder...see Pg.1...

(3.)The defendant had been charge with circumstantial crimes(&)was allowed to assist Counsel in defence(&)found NOT GUILTY of Attempted Armed Robbery(&)Murder relevant to Plans allegedly Motivating The Aiding(&)Abetting Allegations,see Pg.2...

(4.)Petitioner does include Pg.3-13,of this Affidavit section,which is excerpt of Trial Transcripts,defence Counsel,Mr.Steven D.Oliver...Pgs. 489-99 of Case no#6:96-cv-60022-USA-V-Paul-(JLH/TLB)-claiming that the Appointed Counsel sabotaged my Trial by refusing to assert my Innocence (&)repeatedly Incriminating me(&)arguing I was already Guilty by verdict in Joint Indictment against Co-Defendant...

(5.)Please review,Pg.3...during initial comments he omits the instructions for the Jury to Consider lesser Culpability...of Innocence claims...

(6.)On Pg.4,he impugns the credibility of my Plea,(&)slanders my character(&)cedes that is factual...

(7.)On Pg.5,he refuses to correct the record,slandering my father,who was a Truck Driver,not abandoning his family,(&)impugns the credibility of my mother who was a Defence witness,indicating she would lie for her son(&)implying I may not be innocent(or)could be lying about who the shooter was.

(8.)On Pg.6,he provides motive for the Robbery(&)attempts to undermine my alibi,by establishing precedent for psychological arguements...

(9.)On Pg.7,he defames my father again(&)establishes grounds to argue or support claims that I was a Fugitive(&)Psychologically unstable...

(10.)On Pg.8,he impugns the origin(&)nature of my relationship with Trinity Ingle,who was a former schoolmate(&)friend,associate during my Early Entry/Armed Service(Jrotc)program...at Hot Springs High School.

***- Also,he asserts that I WAS involved or complicit/aware of any Plans to commit Robberies,which I denied...Paragraph 23-line 21-25(&)immediately above that in OMITTED(#)Paragraph -Line 16-20,he impugnes alibi option I raised in Pretrial consultation,by allowing Possibility that I would commit that type...spontaneous crime(&)undermines my assertion that if I had been Planning a Robbery there wouldve been Preparation...which was my defence for the Alleged Attempted Robbery(&)Murder of Tri-Lakes Liquour Store...

(11.)On Pg.9,he claims that I intended to not dispute what US Attorney Snyder/Webb had alleged...fails to deny the statements attributed to me (&)attempts to discredit Witnesses who had indicated that they were inclined to offer favorable defence Testimony in Cross...Admits Guilt to a felony murder(&)excludes Obligation for Jury to Consider lesser offense(&) culpability...see Paragraph 26-Line 19-24,where he cedes Guilt to felony flight to avoid Prosecution(&)asks for one of only two choices...

(12.)On Pg.10,he cedes flight to avoid Prosecution(&)Guilt to Felony Murder again...comments on statement to FBI,fails to assert I claimed to only be a Witness...(&)actually admits PERPETRATION,which I expressly denied...

(13.)On Pg.11,he admits felony murder(&)argues jury may not need to consider Innocence Claim,because codefendant was Guilty(&)so is defendant...

(14.)On Pg.12,he instructs Jury to consider that Aiding(&)Abetting a murder requires Knowledge(&)Perpetration...(&)then admits to knowledge of Plan,that resulted in death during an Armed Robbery...

(15.)Petitioner asserts that he was charged with,A&A Murder,during the Commission of a Violent crime...superseded for Robbery...see Pg.14..(&) thats what I was Convicted of,see Pg.15...(&)Trial Counsels arguements were why,see Pg.16...Murder,is the Unlawful Killing of Person...during the attempt to Perpetrate,or Perpetration of any Robbery...

(16.)Petitioner asserts that but for Counsels fraud,I wouldve hired a private Attorney(&)received the benefit of the doubt...like I did in the other trial,(&)that all through Pretrial Proceedings,both T.Lynn Williams Steven D.Oliver,told my Parents(&)I that they intended to Present a defence including Presentations of Physical/Forensic Reports(&)Cross Points... they betrayed my wife,my family,implicating my Parents(&)brothers as accessories...(&)Perjured the record on review for collateral counsel... leaving me on Death Row...for almost 18 Yrs.to date.

Respectfully Submitted,

(7/7/14)

Signed [signature]

Jeffery W.Paul(10517042)
P.O.box 33
Terre Haute,IN.47808

Certificate of service-I,Jeffery W.Paul do hereby swear a true(&)correct copy of this affidavit with exhibit was include with petition to the US District Court-Southern District of Indiana-

Special Agent / FBI



Q Okay. Was the interview video taped?
A No, it was not. By rules and regulations of the F.B.I., we do not, I do not videotape without proper authorization.
Q And was it taped at all, audio taped?
A No, it was not.

Q Okay. Did you tell him that the more he cooperated the better it would be for him?
A I don't recall saying that to him.
Q Did you ever tell him that if he didn't do this murder that he wouldn't have to worry about going to jail?
A No, sir.
Q Did he tell you that he was worried about staying in jail, that he wanted out of jail?
A The following day -- this would have been August 23rd, when I went back to the Marshal Service to see him -- he told me that he couldn't do 20 years in prison for a murder that he only witnessed.

(2) That the defendant has committed, attempted to commit, and/or threatened to commit other acts of violence in addition to the capital offenses committed in this case, including but not limited to the following:

(a) An attempted armed robbery/murder at the Tri-States Liquor Store, Hot Springs, Arkansas on or about June 8, 1995.

YES ______

NO ___✓___

viol. 1st, 5th, 14th 6th, 7th

FOREPERSON

1st Conspiracy allegation, after T.I. confesses (?) Refuses to Testify, Inculpate Paul

Not Guilty

FOREPERSON



(pg. 37) (page B5) (A2)

BY MR. OLIVER: Yes, Your Honor.

BY THE COURT: Ladies and gentlemen, we've been out here about 45 minutes and if anybody needs to take a break, we'll certainly take one because we may be here that long on this one as well. Does anybody need to take a break?

All right. Go ahead.

BY MR. OLIVER: Members of the jury, it is late in the afternoon and I'm going to try to be brief. I don't believe I'm going to take 45 minutes so if there's anybody who just hesitated when the judge said do you want to break, don't worry; I don't think I'm going to keep you here 45 more minutes.

Attorneys who frequently try criminal cases, and I'm one of those attorneys, I'm afraid that we get into a predictable fashion as to how we approach a case and how we do opening statements and closing statements and quite frankly, how we organize a case. And I'm very guilty of that. But in this case, since if you return a verdict of guilt as to murder in the first degree, you will be asked by the Government to put my client, Jeffery Paul, to death. And just as important, if convicted of murder in the first degree, I will be asking you to exercise mercy and sentence him to life imprisonment without the possibility of release.

And because of the serious nature of this case and with some of you who we've talked to individually, myself and Mr. Webb were guilty of coming up with this jury questionnaire that was exhaus-

tive. But that jury questionnaire was very, very important because it allowed myself in the defense of Jeffery, it allowed the Government, Mr. Snyder and Mr. Webb, to know a lot about you As a matter of fact, a little bit more than you probably wanted us to know. And I also believe that -- and as I've said this in many, many cases and this is where I'm predictable; that I also think and I do believe that it's just as important for you and each and every one of you jurors to know a little something about my client, Jeffery; a little bit about his background and a little bit about what transpired before this incident that occurred on June 22, 1995.

But I will honestly state to you that I've had some reservations as to exactly how much I want to tell you about my client. Why is that? Because it is a tendency of a prosecutor, in this case, a U.S. Attorney, and it's the tendency of the defense to, quite frankly, frequently skip over those things that are not that pleasant; things that do not frequently support our position.

But in this case, the stakes are too high because I believe strongly that if somewhere along the line, myself or Mr. Williams, during this trial loses credibility with you, that my client will suffer. So I think it's important to deal with these unpleasant facts now instead of you hearing about them through the Government or inadvertently through a defense witness because if we make a mistake, if Mr. Williams and I make a mistake, if we

lose credibility with you jurors, then the ultimate could happe and our client could be sentenced to death.

Now Jeffery was born on September 2, 1976, the second of tl four children of Dennis and Paula Paul in Pontitot Community Hospital in Calhoun County, Mississippi. Today he is 20 years c age. At the time of this incident, he was 18 years old.

In his early years, Jeffery was primarily raised by his mother, Paula Paul, with a great deal of assistance from her father, Hubert Massey - financial and otherwise because Dennis Paul was a sometime absentee parent. He would frequently, unannounced, leave the residence, whereabouts unknown; and just as unannounced, would show back up.

Because of this, the family suffered financially. As a single mother - a sometimes single mother - Paula Paul did her best to raise her family. She was immature, the family was suffering financially, and unfortunately she became self-protective frequently of her children; in particular, Jeffery. And when she had a tendency to be overprotective, she would have the tendency to rescue him and blame others for her son's difficulties.

Now the father would leave and he would come back. His absenteeism was always unannounced and always unplanned, and never with any consideration for the family's emotional or financial situation. When things got rough, when things got tough, Dennis Paul dealt with it forthrightly; he left. He

didn't stick around, he didn't support his family, he did not give that family the emotional, financial support they needed.

But during one of the times he was back in town, he did mov his wife and children to Malvern to be closer to his family. An while there, Dennis enrolled Jeffery in school where he was frequently described as being a pleasant child but he was diagnosed with a learning disability and hyperactivity.

Eventually, the family moved to Hot Springs. Now the impact of this move would be significant because while in Hot Springs, the family lived in at least a dozen different places and Jeffery attended at least five different school districts. He was in at least five different school districts. In addition, this family of four increased. There was now two additional children, we then have a family of six.

Dennis Paul's behavior did not change. The family was left numerous times and the family suffered financially and emotionally with little or no stability in the household. Jeffery went into his teenage years with no money. He would frequently go to school in clothes that did not fit, that were dirty, and this would frequently subject him to ridicule.

With each move that took him from neighborhood to neighborhood, from house to house, to friend to friend, Jeffery's self-esteem, which was already very low, became lower.

At times, his father would attempt to be a real father but every attempt he made was a disaster and an embarrassment to his

children. Jeffery, at one time, was in a boy scout group here in Hot Springs and the scout leader felt compelled to tell Paula Paul, the mother that, my heavens, keep your husband away from these scout meetings. He's telling these kids he's a navy seal, that he's a tenth degree black belt, he's a war hero and killed a lot of japs.

Now we haven't been at the war with the Japanese since 1945, but these are the kind of tales that he would tell these children. And it would be an embarrassment to Jeffery. But one thing Jeffery did learn from his father - actually two things he learned from his father - is, Number 1; when one does not feel good about oneself, when one feels inferior, lie about your exploits to make yourself feel better and maybe that person, until they get to know you better, will believe you. And if you feel bad and you want somebody to feel sorry for you, make up some story.

And the second thing he learned from his father was, by George, when you're in trouble, when you're backed up in a corner, when you've got some problems and you need to face it; run away from it, don't face it.

Now Jeffery, as anticipated with these constant moves, he began to abuse the use of drugs and alcohol as a teenager. He roamed the street, constantly in trouble at school and as a result of the constant moving around of the family and changing school districts, lack of parental guidance, he dropped out of

school. And like so many of his friends and peers at the age of 17 years of age, he was convicted of a felony and he was sentenced to the Arkansas Department of Corrections.

Paroled, Jeffery was a teenager, he was 18 years of age and a convicted felon. What life he had before him now would come even harder. He had few coping skills on how to deal with life, once again without little parental guidance, but yet at 18 years of age, he was still a kid.

While in the penitentiary, Jeff met Trinity Ingle. Now Trinity Ingle, at that time, was a five time convicted felon. By the age of 18, Trinity Ingle was a five time convicted felon. He was a year older than Jeff and Jeff looked up to him and they became close friends. Little did Jeff know that his association with Trinity would have a profound effect on the course of the rest of his life.

But at the age of 18, immature, it was certainly not in Jeffery's personality nor in his upbringing to look ahead. Jeffery and even Trinity Ingle approached life to live for the day with little or no planning or little or no thoughts of the consequences of their actions.

But on June 22, 1995, Jeffery and Trinity Ingle made a plan. Now their plan was to rob someone of money. They did not plan to kill anyone and Jeffery, in particular, did not plan to kill anyone. But as reflected of his immaturity, his age, he did not anticipate the risk inherent in robbing someone. He did not plan

any further than his immediate goal of obtaining money.

Now you've heard Mr. Snyder's version of the facts and quit frankly much of what he's said we will not dispute. And I said much of what he's said we will not dispute. You've been told -- and Mr. Snyder's told you that you would hear testimony that after the incident, Jeffery was compelled to talk about it with several people.

During the course of the trial and through cross-examination, the defense will challenge the reliability of these statements from witnesses and their accounts and their motive for making such statements. But Jeffery, having been involved in this crime that started out as a robbery and ended in the tragic and senseless death of Mr. Williams, Jeffery with the help of his family, left the state and eluded capture. This behavior was consistent with his age and immaturity and consistent with how he was raised and taught. But one thing for sure; Jeffery did know what had happened on that mountain, once again, would have a profound and lasting impact on the rest of his life.

Eighteen years old, running from the police, convicted felon, not yet an adult but by one senseless act, his fate was sealed for the rest of his life. And this is obvious from where we're at today because if you convict him of murder in the first degree, there are only two choices: One is death and one is life imprisonment with the possibility of parole. Either way, he will never walk amongst us again if convicted of murder in the first

degree.

Now on August 22, 1996, Jeffery was arrested in Water Valley, Mississippi, along with his brother, Jason Paul. He was transported immediately to Oxford, Mississippi, where he was advised of his rights to remain silent by Special Agent John LaVoie. And the interesting thing about this is that although Jeffery had been on the run for over a year, eluding responsibility for his actions, he did sign the rights form. He was informed he had a right to an attorney, that he did not have to make a statement.

And you will here from Special Agent John LaVoie that he voluntarily waived his right to an attorney and that without a promise being made, he gave a statement as to what transpired on the mountain.

Now you heard Mr. Snyder's rendition of what he told Special Agent LaVoie and I don't want to drag this out but he did say that he did plan to rob, but he also said that he did not plan to kill anyone; that while this robbery was occurring, something happened. Yes, he did take part in a robbery; yes, he did take part in his statement of taping this man's hands behind his back. But as they were beginning to leave, Trinity Ingle, the five time convicted felon, a habitual career offender, decided in a fraction of a minute impulsively and without planning that he was not going to go back to prison. And then he took the gun and shot Mr. Williams. Mr. Ingle took charge of that situation. Yes, Mr.

Paul helped pull the body off the trail but even after that, the keys were given to Mr. Ingle and he's the one that took the car and decided to drive it with Mr. Paul as a passenger.

Now Jeff has been charged with a two count indictment. You've heard it twice already but I'm going to say it again: That on or about June 22, 1995, Jeff and Trinity Ingle, while aiding and abetting each other, committed the offense of murder in the first degree.

To sustain this charge, the Government must prove beyond a reasonable doubt the elements of this offense, and I'm not going to go through that at this point.

Also in Count 2 it is charged that on or about June 22, that Jeffery Paul and Trinity Ingle, while aiding and abetting each other, committed the offense of knowingly carrying a firearm in relation to a crime of violence.

And once again, the burden on the Government is to prove each element of both of these offenses beyond a reasonable doubt. But as you already know and as you, obviously from reading this--what they're charged with, Jeff is not charged alone. It is not alleged that Jeff Paul committed this offense by himself. It is alleged that Jeff Paul and Trinity Ingle did commit these offenses together.

Now you already know that Trinity Ingle has been tried and convicted and sentenced to life in prison without possibility of release. And today you will have to decide, or in the days to

come you will have to decide whether Jeff did aid and abet Trinity Ingle in the commission of his offenses. That will be your burden, that will be your job, and you will be instructed a to that jury instruction. I'm going to read that just briefly.

"In order to have aided and abetted the commission of a crime, the person must before or at the time of the crime was committed; Number 1, had known the crime was being committed or going to be committed; and two, knowingly have acted in some way for the purpose of causing, encouraging or aiding in the commission of a crime."

Now the Government, once again, must prove these elements beyond a reasonable doubt. And as you read that instruction, as you consider arguments at the conclusion of the guilt phase, I want you to consider his statement where he did plan on robbing this man but did not intend and did not plan on killing anyone.

Now when you listen to the testimony and you've observed the exhibits and when you're instructed as to the law by Judge Hendren, I want you to remember the promises that you made during jury selection; Number 1, that each and every one of you will promise that you will listen attentively to evidence in this case and that you will follow the law as stated, whether you agree with it or not; that you will not allow prejudice or emotion to influence you; and that you will listen to the case with a fair and open mind. And at the conclusion of the trial, all I can

(Pg. 13) (Pg 12)

ask, all Mr. Williams can ask, and all Jeffery can ask is that you will render a fair and impartial verdict.

Thank you.

BY THE COURT: Thank you Mr. Oliver. And ladies and gentlemen of the jury, thank you very much for your giving us this extra time. I will do my best to make it up to you.

AO 442 (Rev. 5/85) Warrant for Arrest

# United States District Court

## *Western District of Arkansas*

UNITED STATES OF AMERICA
v.
JEFFREY WILLIAM PAUL

WARRANT FOR ARREST

CASE NUMBER: 6:96CR60022-001

TO: The United States Marshal
and any other Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest JEFFREY WILLIAM PAUL
Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☒ Indictment ☐ Information ☐ Complaint ☐ Order of Court ☐ Violation Notice ☐ Probation Violation Petition

charging him with: Murder, Using a firearm during & in relation to a crime of violence, which caused the death of an individual and Aiding and Abetting.

in violation of Title 18 United States Code, Section(s) 1111(a), 924(c), 924(i)(1), and 2.

| | |
|---|---|
| Christopher R. Johnson | U. S. DISTRICT CLERK |
| Name of Issuing Officer | Title of Issuing Officer |
| | September 24 1996 Fort Smith, Arkansas |
| Signature of Issuing Officer | Date and Location |
| (By) Deputy Clerk | |

U. S. DISTRICT COURT
WESTERN DIST. ARKANSAS
FILED
OCT 28 1996
CHRIS R. JOHNSON, Clerk
By Deputy Clerk

Bail fixed at Detention By ______________
Name of Judicial Officer

## RETURN

This warrant was received and executed with the arrest of the above-named defendant at U.S. COURTHOUSE, 100 REserve STREET, HOT SPRINGS, AR

| Date Received | Name & Title of Arresting Officer | Signature of Arresting Officer |
|---|---|---|
| 09-24-96 | RICHARD NEAL | |
| Date of Arrest | DEPUTY U.S. MARSHAL | Richard Neal |
| 10-08-96 | | |

5 (PAUL)

II. REQUISITE MENTAL STATE

Instructions: For the following, answer "YES" or "NO."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant intentionally aided and abetted in the killing of Sherman Williams?

YES ✓ 1st. 4th. 6th, 14th viol.

NO ______

______________________
FOREPERSON

(Pg.38) (Doc. 112) (Pg 15)

## CHAPTER 51—HOMICIDE

Sec.
1111. Murder.
1112. Manslaughter.
1113. Attempt to commit murder or manslaughter.
1114. Protection of officers and employees of the United States.
1115. Misconduct or neglect of ship officers.
1116. Murder or manslaughter of foreign officials, official guests, or internationally protected persons.
1117. Conspiracy to murder.
1118. Murder by a Federal prisoner.
1119. Foreign murder of United States nationals.
1120. Murder by escaped prisoners.
1121. Killing persons aiding Federal investigations or State correctional officers.
1122. Protection against the human immunodeficiency virus.

### § 1111. Murder

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

(c) For purposes of this section—

(1) the term "assault" has the same meaning as given that term in section 113;

(2) the term "child" means a person who has not attained the age of 18 years and is—

(A) under the perpetrator's care or control; or

(B) at least six years younger than the perpetrator;

(3) the term "child abuse" means intentionally or knowingly causing death or serious bodily injury to a child;

(4) the term "pattern or practice of assault or torture" means assault or torture engaged in on at least two occasions;

(5) the term "serious bodily injury" has the meaning set forth in section 1365; and

(6) the term "torture" means conduct, whether or not committed under the color of law, that otherwise satisfies the definition set forth in section 2340(1).

(June 25, 1948, c. 645, 62 Stat. 756; Oct. 12, 1984, Pub.L. 98-473, Title II, § 1004, 98 Stat. 2138; Nov. 10, 1986, Pub.L. 99-646, § 87(c)(4), 100 Stat. 3623; Nov. 14, 1986, Pub.L. 99-654, § 3(a)(4), 100 Stat. 3663; Nov. 18, 1988, Pub.L. 100-690, Title VII, § 7025, 102 Stat. 4397; Sept. 13, 1994, Pub.L. 103-322, Title VI, § 60003(a)(4), 108 Stat. 1969; Apr. 30, 2003, Pub.L. 108-21, Title I, § 102, 117 Stat. 652.)

#### HISTORICAL AND STATUTORY NOTES

*Effective and Applicability Provisions*

1986 Acts. Amendment by section 87 of Pub.L. 99-646 effective 30 days after Nov. 10, 1986, see section 87(e) of Pub.L. 99-646, set out as a note under section 2241 of this title.

### § 1112. Manslaughter

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than 15 years, or both;

Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

(June 25, 1948, c. 645, 62 Stat. 756; Sept. 13, 1994, Pub.L. 103-322, Title XXXII, § 320102, Title XXXIII, § 330016(1)(H), 108 Stat. 2109, 2147; Oct. 11, 1996, Pub.L. 104-294, Title VI, § 604(b)(13), 110 Stat. 3507; Jan. 7, 2008, Pub.L. 110-177, Title II, § 207, 121 Stat. 2538.)

#### HISTORICAL AND STATUTORY NOTES

*Effective and Applicability Provisions*

1996 Acts. Amendment by section 604 of Pub.L. 104-294 effective Sept. 13, 1994, see section 604(d) of Pub.L. 104-294, set out as a note under section 13 of this title.



Exibit P(C) 7th Circ. (Pg. 16) (Pg 16)

Department of Justice

Federal Bureau of Prisons

# INMATE SKILLS DEVELOPMENT PLAN

## Current Program Review: 05-23-2014

[redacted]

Name: PAUL, JEFFERY WILLIAM
Register Number: 10517-042
Security/Custody: HIGH/MAX
Projected Release: / DEATH SENT

Institution: TERRE HAUTE USP
4700 BUREAU ROAD
SOUTH
TERRE HAUTE, IN 47802
Telephone: (812) 244-4400
Fax: 812-244-4791

Next Review Date: 11-18-2014
Next Custody Review Date: 05-20-2015
Age/DOB/Sex: 37 / 09-02-1976 / M
CIM Status: Y
If yes, reconciled: Y

Driver's License/State: /
FBI Number: 220926WA9
DCDC Number:
INS Number:
PDID Number:
Other IDs:

Release Residence: No residence, Homeless, No residence.
730 UNITED ST
KEY WEST, FL 33040
Telephone: [Phone]

Release Employer: *[Name]*
*[Address]*
Contact: *[POC]*
Telephone:

Primary Emergency Contact: Paula Paul, Mother
Rt. 1 Box 93D
Paris, MS 38949
Telephone: (662) 234-3152

Secondary Emergency Contact: *[POC]*
*[Address]*
Telephone:

Mentor Information:

Controlling Sentence Information:

| Offense(s)/Violator Offenses | Sentence | Sentencing Procedure | Supervision Term |
|---|---|---|---|
| | DEATH | 3559 VCCLEA VIOLENT SENTENCE | NOT APPLICABLE |

| Controlling Sentence Began | Time Served/Jail Credit/Inoperative Time | Days GCT/EGT/SGT | Days FSGT/WSGT/DGCT | Parole Status |
|---|---|---|---|---|
| 06-25-1997 | 17 YEARS 9 MONTHS 2 DAYS / 307 / 0 | 0 / 0 / 0 | 0 / 0 / 0 | Hearing Date: NOT APPLICABLE<br>Hearing Type: NOT ELIGIBLE<br>Last USPC Action: |

Detainers: N
Special Parole Term: NOT ENTERED
Pending Charges: None known
Cim Status: Y
Cim Reconciled: Y

| Financial Responsibility | Imposed | Balance | Case No./Court of Jurisdiction | Assgn/Schedule Payment |
|---|---|---|---|---|
| ASSESSMENT USDC | $200.00 | $25.00 | 96-60022-001 (expired) | FINANC RESP-COMPLETED |

Financial Plan Active: N
Financial Plan Date: *[Date]*

Comm Dep-6 mos: $430.00
Commissary Balance: $63.20

Payments
Commensurate: *[Y,N]*
Missed: *[Y,N]*

Judicial Recommendations: None / None / None

Special Conditions of Supervision: See J&C.