8

Seymour L. Halleck, M.D.
549 Cedar Club Circle
Chapel Hill, N.C. 27517

Forensic Psychiatry
Phone: (919) 929-8574
Fax: (919) 929-0709

# DECLARATION

January 14, 2010

I am a psychiatrist currently practicing forensic psychiatry in Chapel Hill, North Carolina. Since November 20, 2002, I have periodically evaluated the mental status of Jeffrey William Paul and the relationship of his mental situation to his legal difficulties. On June 6, 2006, I submitted a report describing the results of my examination of this case in the preceding four years. This report was primarily based on four interviews I had with Mr. Paul while he was on death row at the Terre Haute Federal Penitentiary. The first interview on November 20, 2002 was a face-to-face contact interview at the prison which lasted for approximately 4½ hours. The second interview, by telephone on January 7, 2004, lasted for approximately 1 hour. The third interview on August 17, 2004 was by telephone and lasted for approximately 1½ hours. The fourth interview on February 28, 2006 was conducted at the prison and lasted for approximately 4 hours. This report also notes the hundreds of pages of collateral information I reviewed in developing my opinion.

In this current statement I will begin by summarizing the findings of the 19 page report. I noted in that report that Mr. Paul has experienced symptoms of severe mental illness including depression, agitation and irrational thinking at various times following his trial and incarceration. The frequency and intensity of these symptoms had been increasing. In 2006 there were still periods of time during which he was able to think more clearly and present his ideas more rationally. These periods of lucidity, however, had been diminishing.

At his trial for capital murder which began on June 21, 1997, Mr. Paul began to demonstrate inappropriate behavior and appeared to be extremely agitated. A mental

health professional, Dr. Anthony Semone, opined that, particularly at the sentencing phase of his capital murder trial, Mr. Paul may have been experiencing episodes of psychosis. Although neither Dr. Semone nor I were given an opportunity to testify about our findings, the district court rejected arguments based on Mr. Paul's lack of competence.

Some of the psychiatrists at the federal penitentiary in Terre Haute did note some signs of psychosis in Mr. Paul as early as 2000 and he was inconsistently treated with antipsychotic medication. As his condition deteriorated he became more depressed and he made an effort to hang himself on November 19, 2003. He almost succeeded but was rescued by correctional officers who observed that he was unconscious and cyanotic at the time of his rescue. After the hanging, he reported cognitive losses which were probably symptoms of chronic brain damage. He made another suicide attempt by trying to cut himself with glass shortly afterwards. Mr. Paul's symptoms did not significantly abate after the suicide attempts and at the time of my 2006 report he was still having periodic episodes of psychotic symptomatology.

At the conclusion of my 2006 report I offered some opinions regarding the relationship of Mr. Paul's disability to his legal status. I concluded that in the years following his trial and imprisonment his mental status had deteriorated so that he was experiencing longer periods of psychotic thinking with symptoms of delusions and hallucinations. His thinking was becoming increasingly irrational and disorganized and he appeared to be showing symptoms not only of schizophrenia but also of organic brain disease, the latter possibly being the result of the aborted hanging attempt. I opined that following his hanging attempt, Mr. Paul did not retain sufficient capacity to be able to assist his attorneys in dealing with their efforts to modify his sentence. Noting his diminishing capacities after incarceration and the reports of his disturbed behavior during his trial, I also concluded that Mr. Paul was probably incompetent to proceed at the sentencing phase of his trial.

I did not hear any more about Mr. Paul's situation until August 8, 2008 when I received a letter from Mr. O'Brien informing me that Mr. Paul's appeal to the circuit court of appeals was denied. In the letter Mr. O'Brien also noted that he had recently visited Jeff at Terre Haute and found that he was still being medicated, and was less agitated than he had been in the past. However, he continued to express bizarre ideas, including that his mother and father were not his real parents and that his thoughts and his destiny were being controlled by others.

On September 30, 2009 I received another letter from Mr. O'Brien informing me about changes in Mr. Paul's condition. Mr. O'Brien noted, "He has gotten much worse since we last saw him and we believe that his condition is so severe that he is not

mentally fit for execution. We have not been able to conduct a rational conversation with him about his case in a couple of years." Mr. O'Brien asked me if I could again present an opinion on Mr. Paul's competence, particularly his competence to be executed. Mr. O'Brien explained the current statutory test for competence to be executed and sent me a copy of the Supreme Court's ruling on the Eighth Amendment Standard in the case of *Panetti vs Quaterman.*

Mr. O'Brien also sent me some collateral information including:

1. A copy of my Affidavit of February 2006.
2. A copy of the Declaration of Dr. Irving Kuo, dated August 7, 2008.
3. A Memorandum of attorney Jennifer Merrigan re: Client Visit June 24, 2009, and a second one from October 13, 2009.
4. A Memorandum of Sean O'Brien re: Client Visit May 14, 2009.
5. A pro-se Complaint hand written by Jeff against the Terre Haute institution dated May 25, 2009.
6. A copy of a law suit Mr. Paul filed to the United States District Court in Terre Haute, Indiana dated October 4, 2009.

Much of the rest of this report is based on the collateral information sent to me by Mr. O'Brien as well as a telephone interview I had with Mr. Paul on November 19, 2009.

**Mr. Paul's Mental Illness After His Arrest**

At the time of Mr. Paul's trial he was examined by three different professionals who provided opinions as to his mental status and his competency to stand trial. Dr. Bruce Berger at the Federal Correction Institution at Butner, North Carolina reported that Mr. Paul had an antisocial personality disorder and was competent to stand trial. Dr. Anthony Semone, a psychologist hired by the defense, believed that Mr. Paul was undergoing a psychotic process and predicted he was likely to decompensate during the trial. He raised serious doubts about Mr. Paul's competency to stand trial. Mr. Paul's attorneys also hired a mental health professional, Dr. Irving Kuo, and specifically asked him if Mr. Paul was psychotic, competent or needed medication. Dr. Kuo reported that Mr. Paul qualified for a diagnosis of antisocial personality, that he was not psychotic, did not need medication, and that he was competent to stand trial.

More recently, Dr. Kuo was presented with Mr. Paul's history and behavior since the trial as well as reports that were not available to him at the time of his examination of Mr. Paul. On August 7, 2008, Dr. Kuo wrote a report in which he recanted his previous observation. Referring to his review of new evidence and new psychological reports, Dr. Kuo states in his Declaration, "If I had had the benefit of the above evidence it is likely that the scope of my evaluation would have been different and that my conclusions might

have been affected. I do not believe that any of these symptoms or his behavior in the court room can be dismissed as the product of an antisocial personality and it would be inappropriate to use my report to justify dispensing with further examination. Dr. Semone's and Dr. Halleck's Declarations include references to events that occurred after my evaluation which are indicative of schizophrenia or other serious mental disease. These observations, which obviously could not have been known to me prior to Mr. Paul's trial, are nevertheless strongly indicative that Jeff was in the prodromal stage of schizophrenia prior to his trial. I have not reevaluated Jeff Paul based on the new information and it is not my intention to attempt to arrive at a definitive diagnosis. I am simply stating that I did not have evidence of the nature and quality described above when I conducted my examination in 1997 and such evidence would have affected the scope of my examination. Further, the evidence provides valid reasons to question the assessment of antisocial personality disorder and to consider instead a diagnosis of schizophrenia which cannot be ruled out at this time."

Before reviewing evidence of Mr. Paul's recent mental status, it is important to note that Jeff's mental status is quite variable. During the time I have known him, he has for short periods shown no signs of disorganized or irrational thinking but has also shown longer periods of time of totally disorganized and totally irrational thinking. Over the years (as I described in my 2006 report) he has developed techniques for hiding his pathology and for presenting himself to authority figures as being as lucid as possible. I noted in 2006 that since adolescence he tried to convince others he was "bad" rather than "mad." In one earlier legal proceeding he was quite coherent when talking in front of a judge but immediately afterwards, when alone with his attorneys, he became totally irrational and disorganized. Only hours after he had almost succeeded in hanging himself he denied emotional distress and told the prison psychologist that he was only "faking illness." He is inclined to reveal his illness only to those individuals whom he believes are trying to help him and seems determined to cover up his illness when dealing with members of the criminal justice system whom he assumes to be adversarial.

The most important reality of his current condition is that his ability to cover up his psychosis has diminished. He now appears overtly psychotic most of the time when he is talking to his attorneys or being interviewed by somebody like me. In my last telephone interview with Jeff in November of this year, he answered questions in a rational way for about two minutes. As soon as I began to ask him about his health, however, he began going off on tangents, could not produce logical sentences, lost track of the question, went into long diatribes as to how he was being persecuted by many individuals, and bragged about his "outstanding contributions" to society. His verbal productions were both paranoid and grandiose. His sentences did not follow one another logically. His single sentences were often presented in a way that their meaning was incomprehensible to the listener. This disorganized thinking is apparent not only in

interviews with his attorneys and myself, but also in his writings about legal issues which apparently take up a huge portion of his daily activities. While he is now psychotic most of the time he may still, however, have the ability, if only for a brief period of time (two minutes with me), to appear normal. The misleading appearance of normality is most likely to be evident if he perceives the interviewer as insensitive or unfriendly.

**Current Evidence of Mental Illness**

In a Memorandum submitted on May 14, 2009, Sean O'Brien describes his and Robert McGlasson's interview with Jeff Paul which took place on that date. He states, "When Jeff sat down he immediately started talking in a rapid-fire pace about suing the State of Arkansas citing the preamble of the Constitution, the Bill of Rights, the Declaration of Independence and the Gettysburg Address for violating the rights of children to life, liberty and pursuit of happiness. This was his answer to dealing with the "grand secret conspiracy" by government actors to single out children like himself being condemned to prison. His speech was tangential and circumstantial. Throughout our visit he seemed distracted by something in the room."

Later O'Brien states, "Jeff continued to be obsessed with unseen people or forces controlling his life. He thinks he was given AIDS through a blood transfusion when he was a child. He has several small sores under his arm that worry him and he picked at them occasionally throughout the interview. He continues to be distressed by the prison environment and said that he was 'treading water in an alligator farm.' He thinks the reason he is condemned to die is that he stole bubblegum from a wealthy and influential retailer as a child who has held it against Jeff ever since."

O'Brien further states, "We did not succeed in getting him to talk about his trial or the facts of his case. He rarely answered our direct questions even though we tried to bring him back from his circumstantial meanderings. Not once did he respond in a manner reflecting a rational understanding that he was sentenced to death for his role in the homicide of Sherman Williams."

In a five-page report of an interview she conducted with Jeff Paul on June 24, 2009, attorney Jennifer Merrigan states the following. "Jeff was extremely anxious throughout the interview. His speech was rapid and tangential. He switched back and forth between his own personal memories and his ideological beliefs. Jeff has always been very paranoid. For the last few years I have been on the case, he has firmly believed that he is the target of a conspiracy; that is, he believes that the television he watches is planted, that his parents are body doubles, that his fiancée was a transsexual. Recently though, he has begun searching for the reasons why he is the target. In this visit he was tying his political ideology to his personal memories of childhood as well as to his

incarceration. Jeff does not believe he is on death row for homicide. He believes he has been targeted from the beginning of his life for his political ideology. He believes he angered someone at some point in his life who is now enacting revenge upon him."

Ms. Merrigan's report of June 24, 2009 is a rendition of his verbatim productions during the interview. The first paragraph is similar to all of the others and I will repeat it here. "They let me out of jail but then they brought me back. They hurt me bad and then they slid in with the fiancée so I never saw it coming. This is a case of excessive bail and back taxes. There are corporate organized racial groups that are dominating Congress and oppressing Americans. I need to make sure that this is still the Constitution and law of the land because we are not in America any more. They shipped me overseas. There's case law that says this is back taxes and excessive bail. We need to throw out my sentence and declare victory as a regional sovereignty for the judge in Arkansas. In Arkansas I was tazered in the head and I had a nose bleed then I went retarded for a long time. I should have been paid for my work. In fourth grade I cut through a field and I got probation and we had to move. This is a Greek tragedy. My criminal record is a violation of the Bill of Rights. They are either going to let me out or they are going to take me out of here and shoot me in the head in the field. If I'm ever allowed to leave they need to at least cancel my warrants from Arkansas." The rest of Mr. Paul's verbal productions in this interview are equally disorganized and irrational.

Ms. Merrigan saw Mr. Paul again on October 13, 2009 and submitted a five-page report of her interview findings. She concluded, "There were several themes that Jeff focused on but he was frequently hard to follow when he discussed the details of his delusions. His entire focus shifted from depression and wanting to die to demanding that he be recognized as a civil servant, be paid for his services, and permitted to go home."

I will quote only one paragraph from Ms. Merrigan's four page report of Jeff's consistently psychotic statements. "I do not accept my life without parole sentencing. When I was 13 and 14 they told me at the prison that 14 years was the maximum they could hold me without executing me. Then I spent 72 days in solitary and that was way too much. People that could be mitigated ought to be released. They are charging people money for notaries for the alibi statements. There is no other system where they can rape your wife, take your land, take the flag down from the Revolutionary War. The employees are draftees and should not get $44,000 and land. They should get nothing. I spent my life bitching in my cell while they fucked my wife. But I couldn't be possessive because of slavery. Any Congressional acts would have prison, that's obvious. But it's also obvious that I've been here for a really long time. I am a Storm Trooper. I am a naturalist and I'm not. Insolence eliminates opinions for achieving goals."

During my own interview with Jeff Paul on November 19, 2009, as noted, he became disorganized and irrational after about two minutes into the interview. He showed extreme paranoia reporting many plots against him and grandiosity regarding the impossible contributions he purports to have made to society. He had many physical complaints including loss of visual acuity, bad teeth, deterioration of his skin and deterioration of his musculature. He again showed much evidence of anxiety and depression. He also seemed to have a little bit of insight into the fact that he has trouble thinking and cannot remember things. He told me that he has to take notes to remember what happened to him through the day. He believes he has been "lobotomized" following his aborted attempt at hanging himself. He presents many bizarre beliefs as to why he is incarcerated and on death row. At no time did he verbalize any real connection between his presence on death row, his possible execution, and his role in the crime of capital murder.

It is extremely hard to follow Jeff's thinking when he expresses his thoughts. Since almost everything he says is irrational, it is extremely hard to determine how one of his sentences is connected to others. In recording his statements the listener is under pressure to try to make sense out of what Mr. Paul is saying rather than recording it directly. The listener is likely to interpret more reality into a description of what he is thinking than actually exists in Jeff's mind. Mr. O'Brien, however, who listened to my entire interview, had some success in reporting Mr. Paul's verbatim responses to my questions.

Mr. O'Brien reports, "Dr. Halleck asks: What do you spend your time doing? Jeff's response: I'm 31 years old. I'm filing a lot of legal work. I'm trying to get to reconduct to sacrosanct moral comparisons used to connect deviant activity in the first place that result from unconstitutional activities in the first place by government actors who have done more than just collect taxes. I would refuse to show up everyday if my job was to feed somebody in a cell. What's the point except to vanquish and ravish women? Including my property in Mississippi and my two babies. I went to death row because I had something somebody wanted. Someone is wearing an American flag to seize my woman and my property and I want compensation for it.

"In response to Dr. Halleck's question: How many hours do you spend each week working on your law suit? Jeff replied, I try to run through Arch d'Triumph at least three times a year. To Dr. Halleck's question: What are you reading?" Jeff replied, "I read *Newsweek*, the *2008 Almanac*, the Constitution, *National Geographic*, *The Boy Scout Handbook*. I'm not crazy. All this shit is really happening. Perestroika after 30 years, fathers are not their children and the children are not their fathers. And it's the same shit over and over. How am I supposed to put $50,000 on down payment on a house when I'm only 11 years old and Dad's at work?

"Dr. Halleck asked him: When we talked before you said that when you watched TV you had a feeling that these things happened before. Is that still going on?" Jeff's response: Metaphors are unrelatable. I'd like to know how metaphoried anybody could learn language."

"Dr. Halleck asked: Are there messages on the TV that are just for you?" He answered, "Yes I have as a member of a focus group. I'm following the ball. I'm trying to get the complete record of filings for my great-grandfather's estate in Mississippi, 25 acres of chicken feed. In answer to the question: Do you read books? Jeff replied, I'm distracted. I haven't been able to read a book in quite a while. I'm too busy with the constitutional foundation. I cannot stand at attention for 10 or 20 years straight. To the question: Are you sometimes distracted? Jeff answered: Yes, there is a chemical frequency modulation. It's like a complete inability to think. The medication they give me interacts with VHF and UHF frequency that demands attention, like when you touch something metal to a filling. I volunteered for a trial where I'm going to die like a guinea pig with pink eyes. I've done everything like turn around three times before bed. But every time I prefer to earn money, buy real estate, I am prohibited. Question: Are you hallucinating? Jeff replied: I have depth perception problems, like a little gremlin following me around."

Mr. O'Brien recorded about four pages of Jeff's responses. The quotes presented here are representative of the irrationality of the total conversation.

From my telephone conversation with Jeff it is clear that he has paranoid delusions, he has trouble concentrating, organizing his thoughts and thinking logically. He appears to be experiencing considerable physical distress. Anxiety and feelings of extreme sadness are readily apparent in his tone of voice and in the content of his talk. In addition, he is showing much more forgetfulness than I've seen in the past. This current interview by telephone, while not being as valid as a face-to-face visit might be, strongly suggests that Jeff Paul is now experiencing a fully developed paranoid schizophrenic disorder. In addition, there is more evidence of organic brain disorder than has been present on other occasions.

One useful way to get a meaningful understanding of the depths of Mr. Paul's irrationality and disorganized thinking is to examine his own writings. There are two documents created by Mr. Paul which were provided to me. One entitled "Complaints and Questions," apparently was produced in May 2009. The other, an effort to initiate a law suit in the U.S. District Court in Terre Haute, was apparently produced in October 2009. Together these documents contain about 70 pages of Jeff's written statements which tell us a great deal about his thinking. The material is presented to us without the

problem of a second person having to try to interpret exactly what Jeff is saying and without the observer having to try to quickly make sense of it. Another way of putting this is that all of the material I have presented up until now has been passed through the "filter" of a presumably rational person. Reviewing Jeff's own writings, however, provides an un-interpreted version of his thought processes. I could select material from any part of these documents and it would show the depth of Mr. Paul's pathology. For the sake of brevity, however, I am using only three quotations to illustrate a sense of Jeff's thinking.

The first quotation is on Page 7 of the first document, Complaints and Questions:

> I mean a banking revenue overhaul. That existing company structures be evaluated by staff numbers and salary maintenance with regard to material stability as in buildings, work spaces and equipment. That production and profit or profit loss as compared to expectation not be essential to company worth and that expectation of profit as equity be considered in a debt and litigation scheme that should begin soon and forgive irregular loans to ensure a stable economy and that in conjunction with the Internal Revenue Service debt management should be offered through one-stop banking services as I previously described. That basic food ingredients are foundations of federal reserve banking the product stability such as beverage and meal recipes are subject to be retained with regard to franchise or trade mark integrity or that pre-required payments and revenues percentages are now future scheme but are expected and exist as accounts to the rank of registration or measures are all components of the United States Treasury, and include as follows, timber, food and specific product's growth and management by acre per harvest on all stable/fertile land at first sale price.

On Page 11 of the same document he states:

> I would also like to note that any damages resulting from a finding of government fault or violation would originate from budgets or budgets with Treasury discretion and that I would like to receive damages sufficient to cover cost of living allowances, legal representation and damages resulting from confinement, Health Department

> classification as ineffective applications of law on both state and federal levels at this point. I would request and pursue an investigation into the Department of Health and Human Services operations conducting experimentation including but not exclusively to intelligence control, time distortion, captives and notification, informational sequencing and mind control predictability tolerance and pattern recognition and distortion as well as sexual and physical abuse."

On Page 4 of the third part of the document, Jeff writes as follows:

> As of approximately 1997 I have been excluded, attacked to injury and loss of both financial common law associations and credibility, orientation and the on-set of physical infirmity and psychological stress with catatonic and paranoid type of delusions and loss of reason and reference from exposure to substance known or unknown without or without content, lack of to one extent and effect or another, an ordinary inexplicable losses of authority with no respect to my own rights or compensation for my efforts or reaction to incidents with injury to myself with forfeiture of my rights above and beyond allowances and proportion that would be to the actuality of liberation, quality of life adjustments and all of the forms, procedures incidents noted and cited and comparably used to enable access or clearance to proceed both independently and actual liberty.

**The Issue of Malingering**

In my previous report of June, 2006, I considered the possibility that Mr. Paul was malingering insanity in an effort to find some legal means of gaining freedom. This possibility must be looked at carefully since the federal prison psychologists seem to believe that Jeff was feigning psychosis even when he almost succeeded in hanging himself. Jeff has also told one of the psychologists that he was malingering insanity.

The arguments that Jeff is not malingering are actually overpowering. Malingering in the criminal context involves creating behaviors which signal to others that one is experiencing psychotic symptomatology for the purpose of diminishing or avoiding punishment. It is a dishonest attempt to present a picture of a non-existent illness. The aspect of dishonesty that is of most importance in Mr. Paul's behavior,

however, is his effort to signal to others that he is not experiencing psychotic thinking. He does not fake psychotic symptomatology, but he does at times feign a kind of normality that does not exist.

I would note the following:

1. I do not have access to all of the psychological tests that Mr. Paul may have been given over the years. I do know that Dr. Semone's evaluation at the time of Mr. Paul's trial included tests which indicated to Dr. Semone that Mr. Paul was not malingering.
2. It is very unusual for somebody who is trying to malinger illness to acknowledge to officials that he is pretending to have an illness. In my years of correctional work, the only time I ever heard of prisoners stating they had malingered insanity was when they had actually been psychiatrically treated and recovered their sanity. They did not want to be placed on a psychiatric unit and were trying to get back into population. There are many reasons why a prisoner would want to deny that he experienced psychotic symptomatology, and pretend to be malingering. He may fear the stigma of a mental illness diagnosis. He may want to preserve his own self-esteem. He may wish to protect his status with other prisoners.
3. Dr. Semone's tests also indicated that Mr. Paul had unusual ability to hide his emotional difficulties from others. Dr. Kuo has acknowledged that Jeff's psychiatric presentation to him apparently led him to his making an erroneous diagnosis. Even with me, Jeff has often tried to hide or minimize his symptoms.
4. In my previous report of 2006 I described Jeff's tendency to present himself as "bad" rather than "mad." Other criminals, of course, will do this but Jeff seems to have done this to extremes even as an adolescent. When sent to a psychiatric hospital in his teens he stated, "I am not a mental patient. I am a criminal." This tendency to present himself as "bad" makes an evaluation of his possible malingering difficult. Any examiner has to be extremely careful in believing the negative things he may say about himself.
5. Jeff has been demonstrating psychotic symptoms consistent with a diagnosis of schizophrenia intermittently since his trial. His symptoms have gradually increased in frequency and intensity. Malingering is generally not sustained for many years. It is not easy to "act crazy" in a consistent manner. Most people who try to gain something by feigning illness will simply give up the pretense when they find it to be unsuccessful.
6. I've never seen anybody who was not psychotic have so many different irrational ideas which appear consistently to others and in his own writing as Mr. Paul does. Anyone who tried to fabricate his writing would need great

energy and mental acumen to produce the same kind of disorganization and same paranoid themes over time. Jeff's tendency to mix his irrational ideas with occasional reality-based issues is typical of a degree of mental illness that is not easily feigned.

7. Mr. Paul's writings and verbal productions, although disorganized, convey the pathos and extreme pain and suffering of a mentally ill person. His thinking is consistent with his symptomatology of anxiety and depression. He genuinely feels the pain of a person who has been "persecuted" and victimized.
8. There is a tendency for rational people dealing with Jeff's thinking to try to make sense of it and to view him as more rational than he really is. Most of us cannot tolerate the discomfort of making sense of what is "nonsense." Instead, we search for rationality in his thinking. This may be one reason why his actual writings are more accurate evidence of his disturbance than his verbal statements.
9. Mr. Paul, like most patients who have serious mental illness, have periods of greater awareness and lucidity. At these times he acknowledges his ability to think clearly, to concentrate and to pay attention have been drastically diminished, particularly following his attempt at self destruction. His efforts to deal with his disabilities by taking notes, and using them to orient himself is typical of a patient with organic brain disease. Malingerers are not likely to acknowledge their efforts to deal with cognitive defects.
10. Individuals who feign psychosis are likely to be inconsistent, uncooperative and prone to present bizarre hallucinating symptoms. Mr. Paul does not show these indicators of malingering.
11. Mr. Paul does not have the intelligence and knowledge to consistently fabricate symptoms which are characteristic of a complex psychotic illness.

**Discussion of Legal Issues**

I have tried to document the severity of Mr. Paul's mental illness. To the extent he is willing to talk about his crime and the expected penalty, he cannot present a rational reason why he is in prison, why he is on death row and why he may be executed. He explains everything about his current plight in terms of injustices perpetrated against him by arbitrary and malevolent forces. At no time does he present a rational understanding that he is facing the death penalty because of his participation in a murder.

Because of the mental disorder I have described here, Mr. Paul is incompetent to be executed under the Panetti standard. It is also my opinion that Mr. Paul cannot communicate rationally with counsel about his case.

In order to validate or modify my opinion, I need to accomplish the following:

1. Have a face-to-face interview with Mr. Paul for several hours.
2. Have an opportunity to review more recent medical records including what medications he may be taking and how his doctors currently view his illness.
3. Ascertain that he receives neuropsychological testing and neuro-imaging studies to assess the extent to which he is now experiencing permanent brain damage.
4. Spend at least another 10 to 20 hours reviewing and assessing the above listed data.

I anticipate billing for my services at the rate of $250.00 per hour. I will be pleased to elaborate on this report, if necessary.

I declare under the penalty of perjury under the laws of the United States that the foregoing statements are true.

Sincerely,

Seymour L. Halleck, M.D.