(Pg. 1)



**Termination of United States District Court for the District of the Canal Zone**

For termination of the United States District Court for the District of the Canal Zone at end of the "transition period", being the 30-month period beginning Oct. 1, 1979, and ending midnight Mar. 31, 1982, see Paragraph 5 of Article XI of the Panama Canal Treaty of 1977 and sections 3831 and 3841 to 3843 of Title 22, Foreign Relations and Intercourse.

## CHAPTER 153—HABEAS CORPUS

Sec.
2241. Power to grant writ.
2242. Application.
2243. Issuance of writ; return; hearing; decision.
2244. Finality of determination.
2245. Certificate of trial judge admissible in evidence.
2246. Evidence; depositions; affidavits.
2247. Documentary evidence.
2248. Return or answer; conclusiveness.
2249. Certified copies of indictment, plea and judgment; duty of respondent.
2250. Indigent petitioner entitled to documents without cost.
2251. Stay of State court proceedings.
2252. Notice.
2253. Appeal.
2254. State custody; remedies in Federal courts.
2255. Federal custody; remedies on motion attacking sentence.
[2256. Omitted.]

### HISTORICAL AND STATUTORY NOTES

**Codifications**

The table of sections for chapter 153 was amended by Pub.L. 95–598, Title II, § 250(b), Nov. 6, 1978, 92 Stat. 2672, effective June 28, 1984, pursuant to Pub.L. 95–598, Title IV, § 402(b), Nov. 6, 1978, 92 Stat. 2682, as amended by Pub.L. 98–249, § 1(a), Mar. 31, 1984, 98 Stat. 116; Pub.L. 98–271, § 1(a), Apr. 30, 1984, 98 Stat. 163; Pub.L. 98–299, § 1(a), May 25, 1984, 98 Stat. 214; Pub.L. 98–325, § 1(a), June 20, 1984, 98 Stat. 268, set out as an Effective and Applicability Provisions note preceding section 101 of Title 11, Bankruptcy, by adding:

"2256. Habeas corpus from bankruptcy courts.".

Section 402(b) of Pub.L. 95–598 was amended by section 113 of Pub.L. 98–353, Title I, July 10, 1984, 98 Stat. 343, by substituting "shall not be effective" for "shall take effect on June 28, 1984", thereby eliminating the amendment by section 250(b) of Pub.L. 95–598, effective June 27, 1984, pursuant to section 122(c) of Pub.L. 98–353, set out as an Effective and Applicability Provisions note under section 151 of this title.

Section 121(a) of Pub.L. 98–353 directed that section 402(b) of Pub.L. 95–598 be amended by substituting "the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 [i.e. July 10, 1984]" for "June 28, 1984". This amendment was not executed in view of the prior amendment to section 402(b) of Pub.L. 95–598 by section 113 of Pub.L. 98–353.

Rules Governing Section 2254 Cases in the United States District Courts and Rules Governing Proceedings in the United States District Courts under Section 2255 of Title 28, United States Code, are set out in this pamphlet, ante.

## § 2241. Power to grant writ

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

(b) The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

(c) The writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or

(5) It is necessary to bring him into court to testify or for trial.

(d) Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.

(Pg. 2)



(e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(June 25, 1948, c. 646, 62 Stat. 964; May 24, 1949, c. 139, § 112, 63 Stat. 105; Sept. 19, 1966, Pub.L. 89-590, 80 Stat. 811; Dec. 30, 2005, Pub.L. 109–148, Div. A, Title X, § 1005(e)(1), 119 Stat. 2742; Jan. 6, 2006, Pub.L. 109–163, Div. A, Title XIV, § 1405(e)(1), 119 Stat. 3477; Oct. 17, 2006, Pub.L. 109–366, § 7(a), 120 Stat. 2635.)

### HISTORICAL AND STATUTORY NOTES

**References in Text**

Section 1005(e) of the Detainee Treatment Act of 2005, referred to in subsec. (e)(2), probably means Pub.L. 109–148, Div. A, Title X, § 1005, Dec. 30, 2005, 119 Stat. 2740, which is set out in a note under 10 U.S.C.A. § 801 note. Pub.L. 109–163, Div. A, Title XIV, Jan. 6, 2006, 119 Stat. 3474, also enacted a "Detainee Treatment Act of 2005", see Short Title note under 42 U.S.C.A. § 2000dd and Tables, but that Act contains no section 1005(e).

**Effective and Applicability Provisions**

2006 Acts. Pub.L. 109–366, § 7(b), Oct. 17, 2006, 120 Stat. 2635, provided that: "The amendment made by subsection (a) [amending this section] shall take effect on the date of the enactment of this Act [Oct. 17, 2006], and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001."

**Treaty Obligations not Establishing Grounds for Certain Claims**

Pub.L. 109–366, § 5, Oct. 17, 2006, 120 Stat. 2631, provided that:

"(a) In general.—No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories.

"(b) Geneva conventions defined.—In this section, the term 'Geneva Conventions' means—

"(1) the Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, done at Geneva August 12, 1949 (6 UST 3114);

"(2) the Convention for the Amelioration of the Condition of the Wounded, Sick, and Shipwrecked Members of the Armed Forces at Sea, done at Geneva August 12, 1949 (6 UST 3217);

"(3) the Convention Relative to the Treatment of Prisoners of War, done at Geneva August 12, 1949 (6 UST 3316); and

"(4) the Convention Relative to the Protection of Civilian Persons in Time of War, done at Geneva August 12, 1949 (6 UST 3516)."

## § 2242. Application

Application for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf.

It shall allege the facts concerning the applicant's commitment or detention, the name of the person who has custody over him and by virtue of what claim or authority, if known.

It may be amended or supplemented as provided in the rules of procedure applicable to civil actions.

If addressed to the Supreme Court, a justice thereof or a circuit judge it shall state the reasons for not making application to the district court of the district in which the applicant is held.

(June 25, 1948, c. 646, 62 Stat. 965.)

## § 2243. Issuance of writ; return; hearing; decision

A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto.

The writ, or order to show cause shall be directed to the person having custody of the person detained. It shall be returned within three days unless for good cause additional time, not exceeding twenty days, is allowed.

The person to whom the writ or order is directed shall make a return certifying the true cause of the detention.

When the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed.

Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.

(A.3)



The applicant or the person detained may, under oath, deny any of the facts set forth in the return or allege any other material facts.

The return and all suggestions made against it may be amended, by leave of court, before or after being filed.

The court shall summarily hear and determine the facts, and dispose of the matter as law and justice require.

(June 25, 1948, c. 646, 62 Stat. 965.)

### § 2244. Finality of determination

(a) No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus, except as provided in section 2255.

(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.

(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

(D) The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.

(E) The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

(4) A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.

(c) In a habeas corpus proceeding brought in behalf of a person in custody pursuant to the judgment of a State court, a prior judgment of the Supreme Court of the United States on an appeal or review by a writ of certiorari at the instance of the prisoner of the decision of such State court, shall be conclusive as to all issues of fact or law with respect to an asserted denial of a Federal right which constitutes ground for discharge in a habeas corpus proceeding, actually adjudicated by the Supreme Court therein, unless the applicant for the writ of habeas corpus shall plead and the court shall find the existence of a material and controlling fact which did not appear in the record of the proceeding in the Supreme Court and the court shall further find that the applicant for the writ of habeas corpus could not have caused such fact to appear in such record by the exercise of reasonable diligence.

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

JOHN CUNNINGHAM, Petitioner

v

CALIFORNIA

549 U.S. —, 127 S. Ct. 856, 166 L. Ed. 2d 856, 2007 U.S. LEXIS 1324

[No. 05-6551]

Argued October 11, 2006.
Decided January 22, 2007.

**Decision:** California's determinate-sentencing system held to place sentence-elevating factfinding within trial judge's province, in violation of right to jury trial under Federal Constitution's Sixth and Fourteenth Amendments.

**Prior history:** 2005 Cal. LEXIS 7128

## SUMMARY

In Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435, 2000 U.S. LEXIS 4304, the United States Supreme Court held that, under the Federal Constitution's Sixth Amendment, any fact (other than a prior conviction) that exposes a defendant to a sentence in excess of the relevant statutory maximum must—unless admitted by the defendant—be (1) found by a jury, not a judge; and (2) established beyond a reasonable doubt, not merely by a preponderance of the evidence. Subsequently, the Supreme Court applied the Apprendi rule to facts permitting a sentence in excess of the "standard range" under a state's sentencing scheme (Blakely v. Washington (2004) 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403, 2004 U.S. LEXIS 4573). In United States v. Booker

(2005) 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621, 2005 U.S. LEXIS 628, (1) the Apprendi rule was applied to facts triggering a sentence-range elevation under the then-mandatory Federal Sentencing Guidelines, and (2) those Guidelines were made advisory only.

Under a determinate-sentencing system enacted by California in 1977, (1) most offenses were punishable by imprisonment for one of three fixed terms of years (lower term, middle term, or upper term); (2) the trial judge had no discretion to select a sentence within a range of years between those terms; (3) the judge was obligated to sentence a defendant to the middle term, unless the judge found facts that (a) were beyond the elements of the charged offense, (b) related to either the offense or the offender, and (c) would allow imposition of an upper-term or lower-term sentence; (4) the judge, and not the jury, had the authority to find aggravating facts that would permit a sentence to be elevated to an upper-term sentence; and (5) such aggravating facts needed to be established by only a preponderance of the evidence, not beyond a reasonable doubt.

A defendant was tried and convicted in a California trial court of continuous sexual abuse of a child under the age of 14, an offense that was punishable by imprisonment for a lower-term sentence of 6 years, a middle-term sentence of 12 years, or an upper-term sentence of 16 years. In a post-trial sentencing hearing in 2003, the judge (1) found six aggravating circumstances by a preponderance of the evidence, (2) concluded that the aggravating circumstances outweighed a sole mitigating circumstance, and (3) sentenced the defendant to the upper term. The Court of Appeal of California affirmed.

(Pg. 6)



The Supreme Court of California denied review (2005 Cal. LEXIS 7128), having decided in another case, 9 days earlier, that the judicial factfinding that occurred when a judge exercised discretion to impose an upper-term sentence under California's determinate-sentencing system did not implicate a defendant's Sixth Amendment right to a jury trial (People v. Black (2005) 35 Cal. 4th 1238, 113 P.3d 534, 29 Cal. Rptr. 3d 740, 2005 Cal. LEXIS 6566).

On certiorari, the United States Supreme Court reversed in part and remanded. In an opinion by GINSBURG, J., joined by ROBERTS, Ch. J., and STEVENS, SCALIA, SOUTER, and THOMAS, JJ., it was held that:

- California's determinate-sentencing system violated the jury-trial right under the Federal Constitution's Sixth and Fourteenth Amendments by (1) placing sentence-elevating factfinding within the judge's province, and (2) providing that circumstances in aggravation needed to be established only by a preponderance of the evidence, not beyond a reasonable doubt.
- California's system could not be justified as assertedly resembling the advisory federal sentencing-guidelines system installed by United States v. Booker.
- For Sixth Amendment purposes, it was beside the point that California's system required judge-determined sentences to be reasonable.

KENNEDY, J., joined by BREYER, J., dissenting, expressed the view that (1) the Apprendi line of cases was incorrect; (2) it might nonetheless be proper to distinguish between (a) sentencing enhancements based on the nature of the offense, where the Apprendi principle would apply, and (b) sentencing enhancements based on the nature of the offender, where the Apprendi principle would not apply; and (3) California's system had attempted to make this distinction.

(Pg. 7)



ALITO, J., joined by KENNEDY and BREYER, JJ., dissenting, expressed the view that California's sentencing system was indistinguishable in any constitutionally significant respect from the advisory guidelines scheme—with sentences subject to appellate review for reasonableness—that had been approved in United States v. Booker.

## COUNSEL

Peter Gold argued the cause for petitioner.

Jeffrey M. Laurence argued the cause for respondent.

---

# RULE 61

# HARMLESS ERROR

Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

## 2007 AMENDMENTS ROADMAP

**STYLE PROJECT CHANGES:** The densely complex first sentence of this Rule was reworded. The bulky "inconsistent with substantial justice" standard was thinned to "justice requires".

**NON-STYLE CHANGES:** None.

*NOTE: The Federal Rules "Style Project" is explained in Part III-A.*

## AUTHORS' COMMENTARY ON RULE 61

### PURPOSE AND SCOPE

Rule 61 codifies the principle that "harmless" errors by the district court—those errors that do not affect the parties' substantial rights—will not justify a new trial, setting aside a verdict, or vacating, modifying, or otherwise disturbing the court's order.

### APPLICATIONS

#### Standard for "Harmlessness"

Rule 61 defines a harmless error as one that does not affect the substantial rights of the parties or does not defeat substantial justice.[1] But an error will not be discounted as harmless if the court is left with a grave doubt as to whether the error had a substantial influence in the ultimate result.[2]

1. Rule 61. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752 (7th Cir.1994)(harmless error calls into question the fundamental fairness of the trial).

2. *See Krulewitch v. United States*, 336 U.S. 440, 444–45, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949)(defining harmlessness in criminal context); *Sims v. Great American*

(pg 9)




✓ U.S. V. Bello, 194 F3d 18 (1st Cir. 1999) –
"Plea of "NOT GUILTY", places All ISSUES in dispute, even the most PATENT TRUTHS."

✓ U.S. v. Hubbell, 167 F3d 552 (D.C. Cir. 1999) –
"5th Amdt. protects against (1.) COMPULSION (2.) OF TESTIMONY (3.) That INCRIMINATES."

✓ U.S. v. MAJORS, 329 F3d 791 (5th cir. 2003) –
"Denial of a DEFENDANTS RIGHT to Represent himself, if Established, requires reversal without need for a HARMLESS ERROR TEST."

TERRE HAUTE LAW LIBRARY
PROPERTY OF U.S.P.

# Federal Convictions Reversed

August/2010



The following are cases from United States Courts of Appeal and the United States Supreme Court. The opinions contain at least one point favorable to criminal defendants.

The purpose is to give Criminal Justice Act Panel Attorneys a shortcut to case law favoring their clients. All cases should be read in full and researched to be certain they are still viable. A precedent in one jurisdiction is not necessarily the law elsewhere. A one-line summary is insufficient to cite these cases without reading each first.

Editions that precede the date of this issue may be discarded. The collection is cumulative. New cases are added. Cases are removed when they have been overruled or superseded.

PROPERTY OF U.S.P.
TERRE HAUTE LAW LIBRARY

Editor
Alexander Bunin
Federal Public Defender
Northern District of New York

39 North Pearl Street, 5th Floor
Albany, New York 12207

Updates can be found at www.nynd-fpd.org. Editions are distributed by e-mail in Acrobat. An Acrobat reader can be downloaded free at www.adobe.com.

PROPERTY OF U.S.P.
TERRE HAUTE LAW LIBRARY

(P) 112)

13 Fe ... rsed

United ... 666 (5th Cir ... not have be ... defend...

## Conflicts

United States v. Shorter, 54 F.3d 1248 (7th Cir.), cert. denied. 516 U.S. 896 (1995) (Actual conflict when the defendant accused counsel of improper behavior).

United States v. Malpiedi, 62 F.3d 465 (2d Cir. 1995) (Conflict for counsel representing witness who gave damaging evidence against his defendant).

United States v. Blang, 140 F.3d ...

United States v. Kayser, 488 F.3d 1070 (9th Cir. 2007) (Defendant is due a charge on his theory of defense despite the strength or weakness of the evidence).

United States v. Moran, 493 F.3d 1002 (9th Cir. 2007) (District court erroneously excluded one defendant's testimony as hearsay that would have comprised a critical element of defendants good faith defense).

United States v. Canty, 499 F.3d 729 (7th Cir. 2007) (Failure to give notice of public authority defense did not justify barring defendant's testimony of his state of mind).

United States v. Ricks, 573 F.3d 198 (4th Cir. 2009) (Defendant properly raised self-defense justification in firearm possession case).

## Jury Instructions

... commented on the credibility of another witness).

United States v. Paguio, 114 F.3d 928 (9th Cir. 1997) (Missing witness's self-incriminating statement should have been admitted).

United States v. Montilla-Rivera, 115 F.3d 1060 (1st Cir. 1997) (Exculpatory affidavits of co-defendants were newly discovered evidence regarding a motion for new trial).

United States v. Lis, 120 F.3d 28 (4th Cir. 1997) (Ledger connecting another to the crime was not hearsay).

United States v. ..., 120 F.3d 985 (9th Cir. 1997) (Unavailable witness's ...

Timeliness 2005 60

Haynes v. Cain, 298 F.3d 375 (5th Cir. 2002) (Counsel conceded defendant's guilt on several counts over objection).

Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.), cert. denied, 539 U.S. 916 (2003) (Counsel failed to request diminished capacity jury instruction).

United States v. Smith, 217 F.3d 746 (9th Cir. 2000) (Court failed to instruct upon defendant's theory of the case).

United States v. Chanthadara, 230 F.3d 1237 (10th Cir.), cert. denied, 534 U.S. 992 (2001) (Judge said that defense was a "smoke screen").

United States v. Mason, 233 F.3d 619 (D.C. Cir. 2000) (Felon could get instruction that firearm was briefly possessed for legal purpose).

United States v. Crowley, 236 F.3d 104 (2d Cir. 2000) (Jury should have been charged on voluntary intoxication).

United States v. Miguel, 338 F.3d 995 (9th Cir. 2003) (Defendant was prevented from arguing theory of the case).

...enied, 549 U.S. 1186 (2007) ... medication was not ...

..., 418 F.3d 444 (5th Cir. ... dant made prima facie ... etardation without expert).

...s v. Rivera-Guerrero, 426 ... Cir. 2005) (Abuse of ... deny continuance of ... cibly administer anti- ... s).

... v. Allen, 449 F.3d 1121 ... (Insanity defense was ... hibited in firearm ... se).

United States v. Long, 562 F.3d 325 (5th Cir. 2009) (Defendant's personality ... raise defense of insanity).

...ates v. Ruston, 565 F.3d 892 ... 2009) (Defendant's erratic ... required judge to hold ... y hearing).

...ege

...ited States, 52 F.3d 223 (9th ... Fee information was ... intertwined with privileged ... tions).

...es v. Sindel, 53 F.3d 874 ... 5) (Fee information could ... ed without disclosing other ... d information).

...ertner, 65 F.3d 963 ... S summons of ... a pretext to ... ient).

...e Inc., 68 F.3d 38 (2d ... misapplied the crime- ...

... Rowe, 96 F.3d 1294 ... n-house investigation ... ociated with the ... r was covered by the ... rivilege).

... Bauer, 132 F.3d 504 ... Questioning of ... kruptcy attorney ... y-client privilege).

... Glass, 133 F.3d 1356 ... (Defendant's ... patient privilege was

27 Federal Convictions R...

Cir. 2007) ...

8/

MJD

[- Exhibit for 4860 FCR - AFFIDAVIT -] (pg 12)

- Inform: Jefferson Par.) -

SPECIAL REPORT

# Decades of life stolen from men facing death



The execution chamber in Huntsville, Texas

PAUL BUCK, AFP/GETTY IMAGES

## Journey from execution sentence to exoneration

Several condemned men recently exonerated from death row bring to life the issues raised in Justice Stephen Breyer's dissent from the Supreme Court ruling that upheld lethal injection:

▶ **Henry Lee McCollum** was a black teenager with an intellectual disability when he was convicted of raping and murdering an 11-year-old girl in North Carolina. He spent 30 years in prison before DNA found on a cigarette butt led to his exoneration. This month, he won $750,000 in compensation from a state commission. "I represented him for 20 years and could not get anyone's attention," says Ken Rose, senior staff attorney at the Center for Death Penalty Litigation in Durham. "It is the most frustrating experience to know that you might have an innocent client and that there's nothing you can do about it."

▶ **Ricky Jackson** served 39 years in prison for murder in Ohio based on the false testimony of a 12-year-old boy. He holds the record for time in prison before being exonerated, though his death sentence eventually was commuted to life without parole. "If Ricky's sentence had not been commuted, he already would have been executed by the time we proved his innocence," says Brian Howe, one of his lawyers at the Ohio Innocence Project.

▶ **Glenn Ford** languished on death row for nearly 30 years in Caddo Parish, La. — home to half the death sentences rendered in the state — after inexperienced lawyers couldn't convince an all-white jury in 1984 that he did not murder a Shreveport jeweler. His exoneration produced a mea culpa from one of the prosecutors, A.M. "Marty" Stroud. "At the time this case was tried, there was evidence that would have cleared Glenn Ford," Stroud wrote in *The Times* of Shreveport. After 15 months of freedom, Ford died of lung cancer June 29, the same day the Supreme Court upheld lethal injection.

Richard Wolf

### THE FIRST AMENDMENT

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

(Pg 13)

Bel v. USA 8th Cir. 14-1872 USDC+

FCC Terre Haute

# Inmate Bulletin

## Institutional Operations for All Inmates

Due to an aggressive inmate on staff assault and recent intelligence concerning possible inmate on inmate and inmate on staff assaults all inmates will remain in Secured Cell status and scheduled visits in the General Population visiting Room will be suspended.

We will continue the Secured Cell status throughout the weekend in order to further evaluate security issues and concerns.

The reason for continued in cell activity throughout the weekend is to conduct interviews and evaluate the security issues and concerns prior to allowing the unit to return to normal operations.

On Monday, July 1, 2013, Executive Staff will re-evaluate and develop a progressive release plan base on the security needs of the institution.

6/30/2013
Date

J. F. Caraway, Warden

LEE V. CITY OF LOS ANGELES, 250 F3d 668 (9th Cir. 2001)
A detainee has a right under the Due Process Clause to be free from continued detention after it was or should have been known that the detainee was entitled to release.

ESTELLE V. GAMBLE, 429 US 97, 50 LEd2d 251, 97 SCt 285 (1976)
Detention beyond the termination of the sentence constitutes cruel and unusual punishment when it results from "deliberate indifference" to the prisoners interest in liberty.

YONG V. I.N.S., 208 F3d 1116 (9th Cir. 2000)
Special solicitude is required from courts with respect to habeas proceedings because the writ is intended to be a swift and imperative remedy in all cases of illegal restraint or confinement.

(Pg 14)

# LeaderBoard

## CONVERSATION




**OUR ANNUAL ALMANAC** of the planet's wealthiest slimmed down this year: By our tally, just 1,810 people worldwide possess ten-figure fortunes, down a net 16 from a year earlier. There were 221 drop-offs—the biggest drop since 2009, when 355 got the boot. The media wept. (Crocodile tears? Never.) "Life was tough for the world's 1,810 billionaires," the *New York Post* observed. (*Post* owner Rupert Murdoch and family: $10.6 billion, down 24% from a year prior.) The *Guardian* could barely conceal its grief: "Spare a thought for the billionaires," it pleaded. Most others, though, eschewed sarcasm for high dudgeon. "A small group of people continue to make vast amounts of money from an economic system that has been rigged in their favor," said Oxfam policy head Claire Godfrey.

## BILLIONAIRE BANTER

FORBES readers run the emotional gamut—scorn, envy, admiration—when they think about the world's richest.

**ADA UBANI** *on 19-year-old Norwegian Alexandra Andresen, the world's youngest billionaire:* "We have a young lady who has everything the world can offer, but she tries to create her own world and stay out of the limelight. Over to you, Kylie Jenner."

**LYDIE LIVOLSI** "This is why I came [to the] USA! The future of immigration in the U.S. is up in the air, but foreign billionaires have already lived out their American dreams."

10/2015

G Ford Debt (SD)
at AB&T
(@) 1989-94
* mach. liens / Appreciation
* prop shares!

(P. 15)



# THE TOP 20

1/9 Ford Motor Co

DEBT! Priority claims!

BS. office lien ✓

(Remittance - %?

**BILL GATES IS STILL THE RICHEST, BUT BIG GAINS BY AMAZON'S JEFF BEZOS AND FACEBOOK'S MARK ZUCKERBERG VAULT THE TWO TECH PIONEERS INTO THE RANKS OF THE TEN WEALTHIEST AMERICANS FOR THE FIRST TIME, WHILE NIKE'S PHIL KNIGHT RETURNS TO THE TOP 20 AFTER 18 YEARS .**

POLITICAL CAPITAL

## 1. Bill Gates

**$76** BILLION ▼ SELF-MADE SCORE: 8 ✓

SOURCE: MICROSOFT

AGE: 59 RESIDENCE: MEDINA, WASH.

3% MSFT




The world's richest man is deploying his billions primarily to improve humanity's lot. In July European regulators gave the green light to the world's first malaria vaccine, developed by GlaxoSmithKline in conjunction with PATH, a nonprofit group supported by the Bill & Melinda Gates Foundation. He's also focused on social policy in the U.S., donating heavily to improve education, giving $1 million with his wife, Melinda, to support a gun-control initiative in his home state of Washington and penning an editorial in the *New York Times* with fellow billionaires Sheldon Adelson and Warren Buffett encouraging Congress to pass immigration reform. Gates hasn't contributed to any current presidential candidates, but he donated to Barack Obama's 2012 campaign. His foundation has given more than $25 million to the Clinton Foundation. Forty years after launching Microsoft with Paul Allen (No. 28), Gates now owns just under 3% of the company—constituting about 13% of his total fortune—and stepped down as chairman in February 2014.

ILLUSTRATIONS BY STEPHEN WEBSTER FOR FORBES




POLITICAL CAPITAL

## 17. Phil Knight

**$24.4 BILLION** ▲ SELF-MADE SCORE: ⑧

SOURCE: NIKE

AGE: 77 RESIDENCE: HILLSBORO, ORE.

Change is afoot at Nike. In a banner year for the sportswear giant's stock—shares climbed 35% in the past 12 months—Knight announced in June that he will step down as chairman. At the same time Knight's son, Travis, joined Nike's board, and Knight moved the vast majority of his Nike stock into an entity appropriately titled Swoosh LLC. Going forward, Nike CEO Mark Parker is set to take on the chairman role; he has been at Nike almost since the beginning, starting as a shoe designer in 1979. Knight founded Nike in 1964, shortly after he graduated from Stanford B-school, traveled the world and talked his way into meetings with Japanese shoe suppliers. Back home he and his old track coach Bill Bowerman each put up $500 to start a company called Blue Ribbon Sports. Knight changed the name to Nike in 1978, after the Greek goddess of victory. The tread on Bowerman's early shoe designs was inspired by his wife's waffle iron. Knight made rare public political contributions earlier this year to the Republican National Committee and to Utah Senator Orrin Hatch.

## 18. Forrest Mars Jr.

**$23.4 BILLION** ▲ SELF-MADE SCORE: ②

SOURCE: CANDY

AGE: 84 RESIDENCE: BIG HORN, WYO.

## 18. Jacqueline Mars

**$23.4 BILLION** ▲ SELF-MADE SCORE: ②

SOURCE: CANDY

AGE: 76 RESIDENCE: THE PLAINS, VA.

## 18. John Mars

**$23.4 BILLION** ▲ SELF-MADE SCORE: ②

SOURCE: CANDY

AGE: 79 RESIDENCE: JACKSON, WYO.

Their Mars Inc. is America's largest candymaker and makes virtually all the goodies it sells in the U.S. at manufacturing plants here in the States. To that end Mars Inc. said in July it would put another $100 million into a Topeka, Kans. chocolate factory. The privately held company has already put $330 million into the facility, which opened last year—its first new chocolate plant in 35 years. Its treats are as distinctly American as apple pie: M&M's, Snickers and Milky Way, plus grocery store staples like Uncle Ben's rice and Whiskas pet food. The siblings themselves epitomize the image of the reclusive heir: They are almost never spotted in public. They have come out of hiding to support political candidates in the past but not yet this election cycle. Their grandfather started the business in his Tacoma, Wash. kitchen. After bankruptcy he finally hit it big in 1923, the year the Milky Way debuted.

SPECIAL THANKS TO ORBIS BY BUREAU VAN DIJK, PRIVCO, LW HOSPITALITY ADVISORS REAL CAPITAL ANALYTICS, CENTER FOR RESPONSIVE POLITICS, FACTSET AND ALL THOSE LISTED BELOW WHO HELPED US WITH OUR REPORTING AND VALUATIONS: ERIC ANTON, HFF; JIM BARRETT, C.L. KING & ASSOCIATES; BROWN HARRIS STEVENS; RON BUSS, BUSS-SHELGER ASSOCIATES; JIM BUTLER, CHAIRMAN GLOBAL HOSPITALITY GROUP OF JMBM; CBRE; CENTER FOR RESPONSIVE POLITICS; S. CRAIG COGNETTI, GRAIL PARTNERS; COSTAR; JEFF DAVIS, FAIRWAY ADVISORS; PAULA DEL NUNZIO, CHRIS DENICOLO, STANDARD & POOR'S RATINGS SERVICES; CUSHMAN & WAKEFIELD; FACTSET; TRUMAN FLEMING, PLATINUM REAL ESTATE PROFESSIONALS; RONALD M. GOLD, RONALD M. GOLD, INC.; GREEN STREET ADVISORS; BJORN HANSON, PROFESSOR, NEW YORK UNIVERSITY PRESTON ROBERT TISCH CENTER FOR HOSPITALITY AND TOURISM; JONES LANG LASALLE; KEVIN KAMEN, KAMEN & COMPANY GROUP SERVICES; DAVID KUSIN, KUSIN & CO.; ADAM LASOFF, CUSHMAN & WAKEFIELD; CLIFF LEIMBACH, IHS; DANIEL LESSER, LW HOSPITALITY ADVISORS; DAVID LOEB, RW BAIRD; PHIL MAHONEY, NEWMARK CORNISH & CAREY; MARCUS & MILILCHAP; MATTHEW GALVIN, MORNINGSTAR GOLF & HOSPITALITY, LLC; JACK MCCABE OF MCCABE RESEARCH AND ASSOCIATES; JONATHAN MILLER, MILLER SAMUEL REAL ESTATE APPRAISERS & CONSULTANTS; TOM MCGOVERN, CUSHMAN & WAKEFIELD; ORBIS BY BUREAU VAN DIJK; IAN PECK, ART CAPITAL GROUP; CLAYTON PRESS, LINN PRESS ART ADVISORY SERVICES; PRIVCO; PROPERTYSHARK; REAL CAPITAL ANALYTICS; NAVEEN SARMA, STANDARD & POOR'S RATINGS SERVICES; JULIA SEGAL, BOLD NEW YORK; DYLAN SINGH, STANDARD & POOR'S RATINGS SERVICES; S&P CAP IQ; STAFFING INDUSTRY ANALYSTS; STEPHEN ALGERMISSEN, COLLIERS; STEVEN KHALILZADEGAN, SAVI REALTY; STEVEN FRANKEL, DOUGHERTY & COMPANY; STIFEL; MATTHEW TARPLEY, CUSHMAN & WAKEFIELD; NORMA TOERING AND JOSH TOERING, CHARLEMAGNE INTERNATIONAL PROPERTIES; TREPP; BRIAN TUNICK, RBC CAPITAL; BETSY VAN HEES, WEDBUSH SECURITIES; GREG WASIK, LOS ANGELES VALUATION GROUP; BRIDGET WEISHAAR, MORNINGSTAR; JEFF WOOLSON, CBRE; PETER ZALEWSKI, CRANESPOTTERS.

# MATH-STERS OF THE UNIVERSE

**GALILEO BELIEVED THAT MATHEMATICS WAS THE LANGUAGE GOD USED TO WRITE THE UNIVERSE. FOUR HUNDRED YEARS LATER A BRILLIANT PRACTITIONER AND A COMPUTER SCIENTIST ARE QUIETLY TRANSLATING THESE SECRETS—INTO THE NEWEST GREAT HEDGE FUND FORTUNE. (PITY THE EMPLOYEES WHO GET IN THEIR WAY.)**

BY NATHAN VARDI

LAST YEAR SOME OF THE nation's greatest math minds gathered at Manhattan's elegant Tribeca Rooftop for stunning views, fancy food and wine—and a series of complex equations to determine who among them would be king of the geeks. The annual event was hosted by the Museum of Mathematics, which was underwritten in 2012 by Google and the world's richest quantitative Wall Street traders, including Renaissance Technologies' billionaire founder, James Simons.

In the end there was little surprise that the finals featured Terence Tao, 40, considered one of the greatest mathematicians of this generation. A professor at UCLA, Tao has won the Fields Medal, often described as the Nobel Prize of math, and the $3 million Breakthrough Prize. But Tao didn't win that night. He was beaten in the final round by a secretive Wall Street hedge fund manager named John Overdeck, who solved a problem involving infinite sequences and prime factorization. In fact, it was the second time in its short history Overdeck, also a backer of the museum, had won the competition.

Like Tao, Overdeck is a math genius, but unlike his contest rival, he never wanted to be a professor. After winning a silver medal at the International Mathematical Olympiad in Poland at age 16, young Overdeck told the *Washington Post* that writing papers didn't seem fulfilling and instead he wanted to make the math "do something."

Do something? How about build the fastest-growing big hedge fund on the planet and make multibillionaires out of its two founders? Overdeck, 45, and partner David Siegel, 54, run Two Sigma Investments, a little-known quantitative hedge fund firm that gathers seemingly random

ROBERTO PARADA FOR FORBES



(X³) Survey ① by: Tiffany W. (pg. 17)

10/2015

Macro-liability adj.!

(?) Priority-Claims

(Pg. 18)

GEEKS

I'm with The King of Geeks!



The math men of Two Sigma: John Overdeck (left) and David Siegel.

bits of information and tries to detect patterns that can be used to forecast the price direction of stocks and other securities. They are card-carrying members of the growing tribe of quants who use big data and machine learning in an attempt to beat the market consistently. And they join the ranks of the most successful of such traders, including James Simons (worth $14 billion), Ken Griffin (worth $7 billion) and David Shaw (worth $4.7 billion).

Within the last five years Overdeck and Siegel's for-profit Wall Street think tank has quietly swelled from $5 billion to $28 billion in assets—one of the biggest hedge funds in America, even besting Simons' Renaissance. What is yet more impressive is that Overdeck and Siegel's rocket-science-fueled operation is able to command fees in its biggest fund of 3% of assets and 30% of profits, versus the industry standard of 2-and-20. The firm's biggest fund, Spectrum, has earned an annual average return of 9.4% net of fees since 2004. Growth + returns + whopping fees = a great wealth-building formula. This year Overdeck and Siegel debut on The Forbes 400, each with a net worth estimated at $2.8 billion.

"The challenge I think facing the investment world is that the human mind has not become any better than it was 100 years ago, and it's very hard for someone using traditional methods to juggle all the information of the global economy in their head," Siegel said at an investor conference earlier this year. In fact, Two Sigma's data scientists and systems analyze more than 10,000 data sources, using 75,000 CPUs with 750 terabytes of memory. Their hedge funds have executed more than 1.2 billion trades over the last 14 years.

Said Siegel: "Eventually the time will come that no human investment manager will be able to beat the computer."

So in a world where investors should effectively be shorting the likes of Warren Buffett in favor of faceless machines like IBM's Watson, where math formulas can create immense wealth, it is no surprise that Overdeck and Siegel are obsessive about avoiding publicity and keeping the firm's secrets under wraps. (Overdeck and Siegel declined to comment to FORBES.)

But Two Sigma's breakneck pace has created a big challenge for its founders. Putting all that money to work means stretching beyond its core competencies. The firm has expanded into reinsurance, venture capital and marketmaking. And it requires a never-ending supply of young

> "EVENTUALLY THE TIME WILL COME WHEN NO HUMAN INVESTMENT MANAGER WILL BE ABLE TO BEAT A COMPUTER."

math whizzes. Its core hedge fund operation, run out of offices in Manhattan's SoHo district, now employs more than 800 researchers, computer programmers and statisticians, including 130 Ph.D.s and 6 International Math Olympiad winners. Most staffers are plucked straight out of the computer science, mathematics and engineering programs of MIT, Carnegie Mellon and Caltech. Instead of competing with Goldman Sachs and George Soros, Two Sigma opens its checkbook to compete for top talent with Silicon Valley firms like Google and Facebook.

But those big packages—a twentysomething researcher can take home $550,000—come at a price. Even in the sharp-elbowed trading culture, Two Sigma has proved exceptionally aggressive when it comes to protecting its methods and methodology, to the point where some employees who have tried to leave the nest have been sued, prosecuted—and jailed. These math nerds shoot to kill.

JOHN OVERDECK GREW UP IN THE well-to-do Maryland suburbs between Baltimore and Washington, D.C. His father was a mathematician at the National Security Agency, and his mother, who had a master's in math, managed a computer company. At 16, Overdeck was studying at Stanford University, where he ultimately earned a degree in math and a master's in statistics, but he dropped out before getting his doctorate. In 1992 he was recruited by D.E. Shaw, the quant hedge fund of billionaire computer scientist David Shaw. There he rose to managing director in charge of risk management but after nearly seven years left to work for another D.E. Shaw alum, Jeff Bezos, at his upstart Seattle-

# THE D.E. SHAW MAFIA

THE PAYPAL MAFIA BUILT PAYPAL AND WENT ON TO OTHER SUCCESSES THAT SHAPED SILICON VALLEY AND PRODUCED THREE FORBES 400 MEMBERS: ELON MUSK, PETER THIEL AND REID HOFFMAN. BUT PIONEERING QUANT HEDGE FUND FIRM D.E. SHAW HAS NURTURED THE CAREERS OF FOUR FORBES 400 MEMBERS.



**David Shaw**
Founder, D.E. Shaw
NET WORTH
$4.7 billion



**Jeff Bezos**
Founder, Amazon
NET WORTH
$47 billion



**John Overdeck**
Cofounder, Two Sigma Investments
NET WORTH
$2.8 billion



**David Siegel**
Cofounder, Two Sigma Investments
NET WORTH
$2.8 billion

FROM LEFT: NO CREDIT; DAVID RYDER / GETTY IMAGES; AMANDA GORDON / BLOOMBERG; THOS ROBINSON / GETTY IMAGES

(14.20)



based online bookseller.

At Amazon, Overdeck was Bezos' first shadow, following him everywhere he went. Then Overdeck was assigned to work on customer-relationship issues, building a services architecture for recommendations and customer reviews and supervising some 90 employees.

Rather than remain a well-paid cog in Bezos' retailing juggernaut, Overdeck quit Amazon in 2001 to return to Wall Street to form his own data-driven hedge fund with Siegel, another D.E. Shaw refugee.

Siegel is the stereotypical computer nerd. A native of suburban Westchester County, N.Y., he is an ardent believer that technology makes everything better. He has a Ph.D. from MIT in computer science with a specialty in artificial intelligence. Prior to forming Two Sigma with Overdeck, Siegel worked at billionaire Paul Tudor Jones' New York hedge fund, Tudor Investments. In fact, when Two Sigma launched in 2001—the early days of computer-driven "electronic trading"—Tudor Investments was the key investor, providing the startup with space in its offices at One Liberty Plaza.

What's the significance of the name Two Sigma? According to those familiar with the firm, sigma with a lowercase "s" is the ratio of an investment's volatility to its excess return—that is, the return above benchmark. This is a key factor in deciding how much capital an optimal portfolio should allocate to a given investment. The second meaning of sigma—with a capital S—denotes sum.

> TRADING TACTICS USE MACHINE LEARNING. COMPUTERS ANALYZE DATA, ADAPT TO CHANGES AND REACT ON THEIR OWN.

From inception Two Sigma's early funds, like Eclipse and Spectrum, focused on trading stocks globally. Eclipse was faster, changing positions within weeks, while Spectrum had a longer-term horizon closer to one month.

The duo eventually used their algorithms to create programs that operate outside the global stock markets, like the trend-following Compass funds that bet on futures markets. In 2014 another important fund, Horizon, was folded into Spectrum, which had diversified its offering beyond stocks. One of Two Sigma's least visible funds is its Partners Fund, an internal fund of funds, fueled mostly by capital from the founders.

MF TE4

Inside the firm Overdeck presides over the construction of models while Siegel handles the engineering and infrastructure that support the technology used to make predictions. Think of Two Sigma as the kitchen at a top restaurant. Overdeck is the master chef, approving the recipes and preparing the meals. Siegel is the manager, ensuring that the kitchen is humming with ingredients, pots, ovens and electricity.

Two Sigma researchers spend time testing existing models, and each researcher is expected to come up with two or three new models per year. These are presented to Overdeck in a white paper that is typically less than ten pages long. Since Two Sigma's trading models can change its forecast in seconds, lots of back-testing goes into each model. It's not unlike the way Amazon exhaustively tests various Web-page changes in real time to ensure optimal clicks and purchases. At Two Sigma headquarters the model builders, who need to write code, sit with the engineers and collaborate with them all the time.

Two Sigma builds trading algorithms around four kinds of information: technical information like trading volumes of stocks; event-based information such as credit agency actions, mergers or other news; fundamental data like corporate financial statements; and so-called alpha capture, which is often company- or industry-specific intelligence, not publicly available per se and gathered via proprietary surveys. Alpha capture is controversial. In fact, Two Sigma suspended a survey of stock research analysts last year after BlackRock entered into a settlement agreement with New York's attorney general, who claimed a similar BlackRock survey unfairly gave it access to information about companies ahead of other investment banking clients.

For many trades different kinds of models and data are used in combination. For example, the hedge fund may be signaled to buy a stock if a new analyst report is greeted with low volume. Cutting-edge trading tactics are also deployed, including the application of machine learning or artificial-intelligence techniques, where Two Sigma's computers extract information, adapt to changing market environments and react on their own. When the humans overseeing the models intervene, it's usually only to increase or dial back risk.

One of the biggest risks for Two Sigma is that its models work in theory but that the idiosyncrasies of limited data render them useless when applied to the real world. "It's really hard to ascertain whether this kind of strategy has real merit or whether it's a mirage of statistical computer might," says David Bailey, a mathematician and noted computer scientist affiliated with the University of California, Davis, who co-wrote a paper suggesting that these strategies are often "spuriously validated." Siegel emphasized this issue at an investment conference this year: "You have to formulate your big-data analysis in a way that you can understand whether or not you are over-fitting the data or actually extracting legitimate information out of the data—that is what the business is all about."

While some big hedge fund investors, like $13 billion SkyBridge Capital, shun what they view as black-box

quants like Two Sigma, there is no shortage of investors clamoring for consistent returns made possible by science. Since the financial crisis and the Madoff debacle, institutional investors have rushed to larger hedge funds with established systems and controls. By 2008 Two Sigma already had $4.6 billion in assets and 200 employees, while other similar-size value funds had far fewer employees.

Moreover, Two Sigma's returns have been respectable and consistent. While many other big funds suffered losses this summer—the core definition of a "hedge" fund has pathetically morphed from downside protection to the heads-I-win, tails-you-lose 2-and-20 payment model—Two Sigma deftly navigated the volatility. Spectrum was up by about 6% net of fees in the first eight months of 2015.

RETURNS HAVE BEEN STEADY. WHILE MANY LOST MONEY IN AUGUST, TWO SIGMA DEFTLY NAVIGATED THE VOLATILITY.

The $6 billion Compass fund had a big 2014, up 25.6%. Since inception in 2005 it has logged an annualized return of 14.9%. In August it gained 2.8% versus a 6% decline for the S&P 500. A leveraged version of Compass doubled that, up 5.7% during the turbulent month. Another big fund, Absolute Return, rose 6.1% in the first eight months of 2015.

Returns like these mean the money will continue to pour into Two Sigma. Last year, in fact, the firm raised $3.3 billion for a new macro fund, one of the biggest initial fundraisings in years.

TWO SIGMA'S OFFICES ARE THE KIND of place where you might trip over someone's homemade remote-control car or look on as custom chess sets are created by 3-D printers in its hacker lab. On certain walls you can view colorful digital algorithmic art developed by an employee. There are hack nights, when staffers collaborate intensely on software-related projects like getting machines to play the videogame Dr. Mario. Robots have been built to challenge staffers to games of shuffleboard.

There are no suits or ties, just sweaters, collared shirts, khakis and jeans. People don't work exceptionally hard by Wall Street standards, and they get paid well. Junior researchers in their 20s, for example, can make half a million dollars a year in salary and bonuses. The firm has a retention rate of 97%.

It sounds like an idyllic environment for would-be math professors or computer scientists—until they try to go off on their own. When Overdeck and Siegel feel threatened by the departure of a key employee, the lawsuits start flying, and on more than one occasion departing employees have faced criminal prosecution and jail time.

In 2006 Two Sigma sued Jianjun Qiu, a Two Sigma researcher who the firm claimed stole intellectual property and fled to his homeland of China. Two Sigma had hired Qiu in 2004, but within two years he was escorted out of its offices and placed on leave pending an investigation.

Two Sigma later claimed in court filings that Qiu had downloaded massive amounts of Two Sigma data to a home computer and refused to let the hedge fund inspect it. After being interrogated by the firm's lawyers, Qiu sent an e-mail to his manager saying he had left for China. Two Sigma sent someone to meet with Qiu in China, where the hedge fund claimed he admitted taking "ten computer hard drives" of data, which he refused to return. The hostilities ended abruptly after Two Sigma settled its lawsuit with Qiu, who returned to the U.S. and ultimately went to work at other financial firms, including billionaire Ken Griffin's Citadel.

In 2010 an employee in Two Sigma's Houston office came under suspicion and was summoned for a meeting at the Manhattan headquarters. Upon arrival he was greeted by New York City police officers and promptly arrested—Two Sigma suspected the employee had taken sensitive computer algorithms. The company alerted the Manhattan district attorney. The employee ended up pleading guilty to a misdemeanor count of unauthorized use of a computer and left the firm.

Two Sigma's most prominent criminal case against

## FORMULA FOR SUCCESS

EXPLOSIVE GROWTH HAS PUT TWO SIGMA IN THE HEDGE FUND ELITE.



(Pg. 22)



an employee involves Chinese national Kang Gao, a then 28-year-old researcher who gave notice to the hedge fund in 2014. Gao had worked at Two Sigma since 2010, after graduating from MIT with degrees in physics and engineering.

In early 2014, when Gao was preparing to leave, Two Sigma claims, he e-mailed himself some of the firm's trading models. After exploring his options, he ultimately accepted a position at Citadel but agreed not to start right away, in accordance with his one-year noncompete; he planned to spend his free time studying. Two Sigma notified Cyrus Vance Jr., the Manhattan district attorney, that it believed Gao had stolen its intellectual property. So after Gao's recorded exit interview in February 2014, he was arrested on charges of unauthorized use of secret scientific material and unlawful duplication of computer-related material.

Gao pleaded not guilty but declined to meet the $500,000 bail set by the judge. Gao's lawyer, Marc Agnifilo, reasoned that because Gao was a resident alien he was headed to jail one way or the other. Two Sigma informed the government of Gao's situation, and his work visa was revoked, depriving him of immigration status. He would thus have been transferred to federal immigration jail if he put up bail, leaving his lawyers with limited access to him as they mounted his defense.

Instead the boyish-looking, bespectacled Gao chose to apply for a tourist visa and wait for approval in the local jail, New York City's notorious Rikers Island. During Gao's eight-month detention he suffered through extended lockdown periods and was beaten up. While Gao's IP-theft case never gained the notoriety of that of Sergey Aleynikov, the former Goldman Sachs programmer sent to the slammer and immortalized in Michael Lewis' book *Flash Boys*, Gao has endured nearly as much jail time as Aleynikov, whose conviction has been overturned.

> DURING GAO'S EIGHT-MONTH DETENTION HE WAS BEATEN. THIS HASN'T ENDED TWO SIGMA'S QUEST TO PUNISH HIM.

The criminal case against Gao accuses him of taking two trading models he developed in 2011 and 2012. He was also accused of taking a research paper and a research presentation that he wrote. Says Gao's lawyer, "How can taking math be secret scientific material? It's math."

In February 2015, just four months after leaving Rikers, Gao pleaded guilty to one count of unlawful duplication of computer-related material and was sentenced to time already served. He then returned to China. This hasn't stopped Overdeck and Siegel in their quest to punish him. In addition to accusing Gao of taking its property, Two Sigma filed a civil suit against Gao around the same time he was arrested.

The judge in the case, Jeffrey Oing, has been openly hostile to Overdeck and Siegel's hedge fund. "Aren't you guys going over the top in terms of this, to put someone in jail for a breach of duty?" he said in a 2014 hearing. "What caused him to have you guys, other than being totally annoyed and angry at him, to do this?" Now Two Sigma is initiating an arbitration case against Gao, seeking over $300,000 in damages. Gao's lawyer has tried to stop it by arguing that his client has already spent $100,000 on the civil action alone.

In early 2015 a senior analyst at Aberdeen Asset Management, an investor in Two Sigma, told Two Sigma's London office that Aberdeen had been approached by a former Two Sigma employee about a new hedge fund. Other firms like Deutsche Bank and UBS were similarly approached.

The inquiry came from Sergey Fein, 34, a computer scientist recruited from Russia's St. Petersburg National Research University. Fein had worked at Two Sigma in Manhattan for seven years, ultimately rising to the level of vice president. Unlike most researchers at Two Sigma, Fein had worked on all four of Two Sigma's proprietary investment disciplines. When he resigned in May 2014, Two Sigma elected to apply its one-year noncompete and pay him $210,000, 40% of his $525,000 annual compensation.

But in March 2015 Overdeck and Siegel got wind of Fein's discussions about a new quant fund. Two Sigma then delivered a threatening letter to Fein's would-be partners. Within days Fein's plans fell apart as partners abandoned the effort. But that wasn't enough. The next month Two Sigma sued Fein in a New York State court. Fein has denied violating his contractual obligations to Two Sigma, saying he and his partners held only exploratory talks with potential investors and didn't raise any money or open a brokerage account. Fein said he hoped to raise the money after the noncompete expired.

"I have to ask Two Sigma a question," Judge Oing began during the lawsuit's initial hearing. "Did you seek to put Mr. Fein in jail?" Oing continued: "It sounds to me like it's like the same thing that happened with the other action."

Two Sigma did not contact law enforcement but wanted the judge to extend Fein's noncompete for seven months, the length of time by which Two Sigma claimed he had breached the initial deal. Judge Oing refused, saying he didn't have the authority, and closed the case, ordering Fein not to violate the initial deal for its remaining five weeks.

Fein should consider himself lucky. Overdeck and Siegel have concocted arguably the greatest hedge fund success story of post-meltdown America. And they've clearly done the brass-knuckled math: When that success is derived around formulas and equations, you do whatever is necessary to keep your numbers to yourself. F

Unreal!


GAWKER VS. THE BILLIONAIRE: THE UNTOLD STORY
SPECIAL ISSUE
Forbes
ELECTION-PROOF YOUR PORTFOLIO
2016 INVESTMENT GUIDE
SUNDAR PICHAI
THE FRESHMAN CEO BETS THE COMPANY ON A.I.
GOOGLE'S NEW SUPERPOWER
THE SEARCH GIANT'S BOLD MOVE TO REINVENT EVERY DEVICE ON THE PLANET—INCLUDING YOU.

MAP Resolution 411 / C83 ① AxS1 A15 ① (Pg. 24)

# GOOGLE IS ABOUT TO CH




ETHAN PINES FOR FORBES

(Pt 25)

# NGE EVERYTHING—AGAIN

New CEO **Sundar Pichai** is a brainy product guy who aims to reinvent the world's second-most-valuable company—and pretty much every digital experience—with a heavy dose of artificial intelligence.

BY MIGUEL HELFT



For music fans the 22,000-seat Shoreline amphitheater in Silicon Valley is iconic. Legendary concert promoter Bill Graham designed it with inspiration from the Grateful Dead logo, and that band played here 39 times. Neil Young, the Bee Gees, Bruce Springsteen—they've all graced the Shoreline stage. A few weeks ago, accompanied by bouncy electronica music and arcade-inspired videos flashing across giant screens, so did Google CEO Sundar Pichai.

It would be an exaggeration to say he looked comfortable as he walked onstage. The cerebral 43-year-old is built like a straw, his eyes darting behind rectangular glasses, more Carl Sagan than Carlos Santana. No matter. At the annual Google I/O conference he was a rock star, the headline act. As he took in the hoots and cheers from the crowd of software developers, his face eventually settled into a smile. "We live in very, very exciting times. Computing has had an amazing evolution," Pichai said in his south Indian accent, stretching *amaaaaazing* as a way to get the crowd going.

Okay, not exactly Steve Jobs. Or even Mark Zuckerberg or Jeff Bezos or Tim Cook. Pichai is the classic insider CEO, a low-profile, methodical brainiac who would rather geek out over the future of computer science than whip up a crowd of software developers with choreographed product demos. And that's exactly what Google cofounder Larry Page was after when he handpicked Pichai last year to take over one of the greatest tech franchises of all time.

The task at hand is monumental. With a market cap of roughly half a trillion dollars, Google, or rather its parent, Alphabet, is the world's second-most-valuable company, dominating vast swaths of the tech industry, including search, digital advertising, mobile and video. But Page and Pichai know all too well that tech behemoths often lose their way when they are strongest. And while earlier tech giants, from IBM to BlackBerry, were felled by a single foe, Google faces a bruising multifront war with the other four superpowers in tech. It's fighting Apple in mobile and Facebook in advertising, video and communications. It's pitted against Amazon in commerce, a resurgent Microsoft in business software, and Amazon and Microsoft in cloud services.

Pichai wages all these battles amid a fundamental technological shift. As Google continues to navigate the transition from desktop to mobile, computing is already moving to multiple screens and in some instances—such as with Amazon's surprise hit Echo smart speaker—no screens. Interactions with devices and apps are quickly becoming two-way conversations, sometimes employing smart "bots" promoted by Microsoft, Facebook and others. Unlike apps, these bots run atop communications services like Facebook's Messenger (900 million users) or Microsoft's Skype (300 million users). Google has the wildly popular Gmail (more than 1 billion users), but it lacks the kind of modern messaging system that the younger set favors.

Pichai, however, believes this new tech world is tailor-made for Google because of one thing: artificial intelligence. Pretty much everyone can program simple, rudimentary conversations—Apple's Siri was among the first—but to go beyond flashy "demo-ware" you need more sophisticated algorithms. And artificial intelligence has been in Google's wheelhouse for years. The company invested in fundamental building blocks such as voice recognition, language understanding and machine translation long before most of its rivals. And after years of preparation, Pichai says, the company is ready to bring all that work together in compelling products that will keep the company ahead of the competition. "We have this vision of a shift from mobile-first to an AI-first world over many years," Pichai tells FORBES.

Onstage at the Shoreline, Pichai unveiled the early fruits of those efforts: a smart speaker called Google Home that is aimed squarely at Amazon's Echo (and perhaps at an upcoming one Apple is rumored to be developing) and a messaging app called Allo. Powering both is a new service that Pichai calls the "Google assistant," the company's own take on conversational computing.

Think of it as Search 3.0—a new, interactive way to communicate with Google itself. With it you'll be able to order a ticket, book a flight, play music, schedule a task, reply to a message; the Google assistant might even write it for you. It might prompt you to order flowers ahead of Mother's Day or to pack for your upcoming trip, and it might be able to pick up an earlier conversation from where you left off. In other words, it will be there, ready to help, in your phone, your speakers, your television, your car, your watch and eventually everywhere. "You are trying to go about your day, and in an ambient way, things are there to help you," Pichai says. Making sure this assistant lives up to its full potential will take years, and building it will be harder than it was for Page and cofounder Sergey Brin to create search itself. Adds Pichai: "In every dimension it is more ambitious."

The cheers of the Shoreline crowd weren't enough to distract anyone from the obvious. The release of Allo

Your AI's AXS/AI? Call me. Who you ARE?

(19.27)

glaringly reinforces the reality that Google is nowhere in messaging and that it badly needs to get somewhere fast. Google Home suggests that no one at Google saw the smart-speaker wave coming—Amazon had to show the way. And these deficiencies underscore one of Pichai's most significant challenges: While no one disputes that Google excels at complex technologies like AI and machine learning, it is not always a leader when it comes to turning those technologies into killer products.

"The risk for Google is that their ability to do really hard AI leads them to overlook simple opportunities to create good-enough user experiences," says Tim O'Reilly, the founder of O'Reilly Media. Google Home will be a test, though the results remain a few months away. What's more, if conversations and messaging, rather than the desktop or even your smartphone's home screen, are to become the new conduits for bots and other digital services, Google needs to lure those services quickly and effectively, just as Facebook, Microsoft, Amazon and perhaps Apple try to do the same. "In the end every third-party developer will not connect to every platform," says Harvard Business School's David Yoffie, a respected student of the tech industry. "The question is who is going to be most successful."

Get what you need!

**"THERE IS A RENEWED SENSE OF FOCUS ON OUR MISSION AND ON TRANSFORMING THE COMPANY USING MACHINE LEARNING AND ARTIFICIAL INTELLIGENCE."**

Pichai's job is to ensure that the answer is Google, while keeping a company of some 60,000 employees and $75 billion in annual revenue humming. This enormous task underscores why Page went for substance over style. Pichai's to-do list starts with monetizing a sprawling digital empire that spans search, Android, maps, YouTube, Play and many lesser properties. It includes maintaining the cohesion of the disparate coalition of competing companies that make up the Android world; unifying Google's two operating systems, Android and Chrome; and grappling with antitrust and tax investigations in Europe and elsewhere.

Pichai says he's ready to lead Google's metamorphosis. "Personally, there is a renewed sense of focus on our mission and on transforming the company using machine learning and artificial intelligence," he says.

If you ran the clock back three or so decades, you might find Pichai standing on the front of a motor scooter, his father holding the handlebars, his mother perched on the passenger seat with his younger brother on her lap as the family navigates the chaotic traffic of Chennai. That's where Pichai grew up, in a simple two-room house. By Western standards his father, an electrical engineer, and his mother, a stenographer, were of modest means. For years they didn't own a television, a telephone or a car.

But his parents put a strong emphasis on education, and Pichai earned a spot at the prestigious Indian Institute of Technology in Kharagpur. After graduating with an engineering degree, he won a scholarship to Stanford, where in 1993 he began graduate studies in materials science and engineering with the goal of a Ph.D. and an academic career—his parents' dream. As with so many at Stanford, though, Silicon Valley beckoned, and after his master's he latched on to chip-industry pioneer Applied Materials. An M.B.A. from the Wharton School and a consulting gig at McKinsey & Co. followed.

Pichai landed at Google in 2004, when the fast-growing search company still considered Microsoft its most formidable foe. Pichai was thrown into the trenches of the company's battle with the software giant. From the very beginning he exhibited a methodical and strategic approach to decision making that propelled him through Google's managerial ranks. He was put in charge of an unglamorous but critical piece of software, the Google Toolbar, which allowed people to search directly on their browsers without having to go to Google's home page.

Pichai's strategic work on the toolbar led to his next big bet: the Chrome browser. The project was controversial inside Google, where some feared it would unnecessarily irk Microsoft, whose Internet Explorer dominated the browser market. Pichai argued that Google could build a better browser and that it risked losing a substantial chunk of its search revenue if Microsoft, as many feared, tweaked Explorer to make it more difficult for users to access Google. With a small team, Pichai, who at the time worked for Marissa Mayer, now the CEO of Yahoo, developed the product quietly. While its carefully orchestrated launch in 2008 was a p.r. fiasco, courtesy of a German blogger who obtained marketing materials and broke the news early, Pichai's browser was slicker and faster than anything else in the market, and his team managed to

keep it ahead even as rivals raced to catch up. By 2012 Chrome had become the No. 1 PC browser, and thanks to the growth of Android, it's also the most popular on mobile devices.

Chrome's improbable victory cemented Pichai's reputation as a product whiz and, even though he never started a company, something of an entrepreneur, and it set him on a vertiginous ascent up Google's corporate ladder. "There is a part of Google that has a professorial style, and Sundar fits that perfectly," says a former senior executive. "But people underestimate how deeply technical and how entrepreneurial he is. He's very, very good at that stuff."

His responsibilities grew as some of his would-be rivals fell out of favor. Mayer, his onetime boss, was sidelined and left for Yahoo. In 2013 Pichai, who had gone on to develop an operating system and a set of laptops based on Chrome, was handed control of Android, one of Google's crown jewels, after Andy Rubin, its creator, was pushed aside. A year later Vic Gundotra, the senior exec who led Google +, the company's expensive and ill-fated push into social networking, was forced out as well.

Throughout it all, Pichai remained unflappable, burnishing his reputation as a collegial executive and, more important, earning the trust of Page. "He will make tough and difficult decisions, but there is not much swirl around them," the former senior executive says. "People love the lack of drama and the thoughtfulness. It's led to more cohesion." At a retreat for Google's top brass last spring, Pichai was asked to sketch a vision for how apps would evolve in a multiscreen world. When he was done, a beaming Page stepped up to say he couldn't have painted a clearer picture of the future, according to a person who was there. "They really see eye to eye on what the future will look like," this executive says. A few months later, when Page reorganized Google into a holding company called Alphabet, he named Pichai CEO of Google. It accounts for 99% of Alphabet's revenue and all of its profits.

GROUND ZERO OF PICHAI'S push into an AI-first world is a nondescript two-story building across the street from the center of the company's sprawling Googleplex headquarters in Mountain View, Calif., where a skunkworks, appropriately called Google Brain, develops much of the intelligence that will bring Google and its products into the future.

The group was formed about four years ago as something of a research experiment involving a set of artificial-intelligence programming techniques called deep learning and neural networks. Computer scientists had developed the techniques years earlier, but they hadn't been properly tested because they required massive amounts of computing power. Google had that power, so it brought one of its leaders in large-scale computing systems, engineer Jeff Dean, together with AI experts. They trained the systems on the task of recognizing images, and the results were immediately encouraging, delivering huge improvements over Google's existing methods.

Google Photos, released a year ago, brought those improvements to the masses and wowed the tech world with its ability to recognize and search images and to automatically organize them. You can search for a person, a type of animal or images of people hugging. Despite intense competition from rival products, Google Photos now has 200 million users. To Pichai it's a classic example of how better AI can help Google win. "Were people using other photo products?" Pichai asks. "Yes. Have we seen tremendous adoption and traction with Google Photos? The answer is yes."

**"THE RISK FOR GOOGLE IS THAT THEIR ABILITY TO DO REALLY HARD AI LEADS THEM TO OVERLOOK SIMPLE OPPORTUNITIES TO CREATE GOOD-ENOUGH USER EXPERIENCES."**

What worked for image recognition turned out to work when applied to voice recognition, translation and other similar tasks. When Dean's systems were trained to recognize speech, accuracy jumped dramatically. That means there are far fewer times when an "OK Google" query on an Android phone is misunderstood. It also means that Google is more likely to understand someone like Pichai, with his lilting accent, or to detect what is being said in a noisy bar and do it in more than 55 languages.

Similarly, the techniques used to recognize images in Google Photos are able to power StreetView's ability to "read" signs and Project Sunroof's ability to identify rooftops that are suitable for solar panels based on aerial images. It's also enabling a small experimental team at Google to effectively detect diabetic retinopathy, an eye disease that can lead to blindness, by looking at iris scans. "It's a pretty significant shift," Dean says. "Word is spreading throughout the company that there is this

new capability to solve problems in this way," he says, in reference to the new AI techniques.

What started as a research project with a handful of people has grown to perhaps hundreds—Dean refuses to say how many—who have developed algorithms, computer systems and, more recently, Google's own chips, all customized for these AI approaches. (Google Brain's software tools are known as TensorFlow and the chips as Tensor Processing Units.) As a result there are now more than 2,000 projects inside the company applying Google Brain's capabilities to scores of products. Dean's group has held machine-learning office hours, and thousands of Google engineers have gone through internal courses that can last weeks. "It went from being a research project to a mainstream engineering activity," says John Giannandrea, an AI expert appointed by Pichai to lead the company's search efforts.

To see the immediate potential of machine learning to create a new generation of digital products—ones that could change how humans themselves live—Allo, which won't be publicly available until later this summer, is a good place to start. Despite a mature and saturated market for communications apps, Pichai bets that, as with Photos (and with his Chrome browser), a few smart features will help it gain a following.

One of them, Smart Reply, automatically suggests three different prewritten answers to a message based on its content. Google developed Smart Reply in less than a year and first tested it in Inbox, a mobile e-mail app. It allows users on the go to select one of the answers and reply with a single tap. With Allo, Google went one step further, blending Smart Reply with image recognition, so it can suggest responses to photos sent via message. Send your friend a picture of yourself skydiving and Allo may suggest replies like "awesome," "brave" or "scary;" send a picture of a kid or pet, and it may suggest "cute." In Allo the Google assistant might also pop up in the middle of a conversation to help you book a restaurant or plan a trip.

Google's rivals are also rushing into an AI-powered world. Microsoft has an initiative similar to Google Brain that involves pushing machine-learning techniques into scores of products; its CEO, Satya Nadella, recently showcased conversational bots built atop its Cortana digital assistant. Facebook's Zuckerberg has quickly built a team of hundreds of AI researchers who have made breakthroughs in image recognition and language understanding, and he's demonstrated bots built atop Messenger. Amazon's Bezos has more than 1,000 people working on the family of products tied to Alexa, the conversational interface that powers the Echo smart speaker. Apple is busy expanding Siri's capabilities and is expected to open it up to third-party developers soon.

## AI BATTLE ROYAL



**AMAZON.** After four-year AI push, more than 1,000 people are working on its Alexa intelligent assistant, which powers the Echo family of products and can be embedded by third parties into their devices. Outside developers can teach it new "skills."



**APPLE.** The company pioneered the digital assistant category with Siri, which already lets users do things like search through photos, set reminders and get directions. Apple is busily expanding Siri's capabilities as it seeks to catch up with rivals that leapfrogged it. It is widely expected to open Siri to third-party developers soon.



**FACEBOOK.** Fast-growing AI research team developing "M" virtual assistant and smart chat bots built atop Messenger and pushing into language understanding, translation and computer vision. More than one in four engineers tapping company's AI "backbone."



**MICROSOFT.** Large AI and machine-learning research group. Created "cognitive services" and "bot framework" to allow third parties to use its AI-powered tools and is integrating AI into its Azure cloud computing services.

Pichai is convinced Google is further along than its competitors. He cites AlphaGo, which recently defeated the world's best Go player—and may someday be applied to more practical problems—as the kind of investment that will keep it at the head of the pack. "When you look at machine learning and AI, there are things you can do now, some in two to three years and some that are deeper and will take more time to do," Pichai says. Observers like Yoffie, the Harvard professor, agree that Google is well-positioned to lead the transition to an AI-powered world. "Sundar is jumping on the right categories and making a lot of good decisions," Yoffie says. Then he adds: "But he hasn't really been tested yet." Ⓕ

SIRI PHONE: KAREN BLEIER/AFP/GETTY IMAGES

# MOVING SAGA




ROBERT GALLAGHER FOR FORBES

**JOE SHOEN GRABBED CONTROL OF U-HAUL FROM HIS FATHER, ESCALATING A FAMILY FEUD INTO ALL-OUT CIVIL WAR. TWENTY-FIVE YEARS' WORTH OF LAWSUITS, CHARACTER ASSASSINATIONS, MURDER ACCUSATIONS AND A SUICIDE LATER, THE FAMILY IS SHATTERED, BUT U-HAUL IS THRIVING AND JOE IS NOW A BILLIONAIRE AND FIRMLY IN THE DRIVER'S SEAT.**

BY LUISA KROLL AND ALEX MORRELL

Dressed in black pants and a black U-Haul shirt, Joe Shoen, 66, is sitting in a conference room in the middle of a meeting. His cellphone buzzes. Brenda, a customer moving from Michigan to Florida, is furious about a U-Haul phone operator who hung up on her. Shoen scribbles some notes and apologizes. He directs her to the location finder on uhaul.com, where she can look up climate-controlled self-storage locations. Later he calls Mike Kinealy, vice president of sales and customer service, and tells him to follow up. Using Brenda's phone number, Kinealy and the local manager identify and reach out to the employee to discuss her actions.

The longtime CEO of U-Haul's parent company, Amerco, Shoen has personally responded to such calls—on average three a day, but sometimes dozens in hours—since he gave out his cellphone number on the TV show *Inside Edition* in February 2008. He did so in response to allegations about the poor safety conditions of U-Haul trailers: There were dozens of sway-related accidents in a decade. Shoen believed they could have been avoided if U-Haul employees had properly informed customers. "People can't get this organization to behave. I can," Shoen said at the time.

Most CEOs would have had their assistant set up another line minutes after the show aired. Not Shoen. Not only did he not change his number, but eight years later he still claims to respond to every call—although sometimes via e-mail or text—and now insists that all U-Haul general managers post their cellphone numbers in their stores and on the perimeter gates and print them on their business cards. (Don't believe us? Call him at 602-390-6525.) He credits the direct line with such innovations as a box designed for flat-screen televisions, 24/7 access to

(RE) Guarantee Clause – U-Haul ISI (Pg. 31)




Undeterred by his battle wounds, Joe Shoen (center) still believes in family business and is entrusting U-Haul's future to his sons Sam (red shirt) and Stuart (white shirt), both top executives at the company.

U-Haul's storage units and printed instructions for customers on how to safely connect and disconnect trailers.

Frankly, a few calls from enraged customers in the middle of the night are nothing compared with what Shoen has already endured for this company. His family and U-Haul—which his father, Leonard Samuel (a.k.a. "L.S."), and mother, Anna Mary, founded in 1945—have been at the center of one of the messiest family feuds in American history. Having lost faith in his father's ability to run the business, Joe wrested away control of Amerco in 1986, unleashing a torrent of litigation and reputational warfare; L.S. later accused Joe and his younger brother Mark of being involved in the murder of their sister-in-law. L.S. told FORBES in 1994 that Joe was mentally ill. Others insisted that L.S. was manic-depressive; he killed himself in 1999. There were allegations of financial shenanigans, which were followed by a bankruptcy filing. U-Haul only recently escaped from the quagmire of family infighting, settling the last of the litigation in 2012.

All of the distractions should have driven U-Haul into the ground. And they nearly did, hindering the company's ability to borrow money, attract talent and forge partnerships. But Joe held firmly on to control and kept U-Haul alive by concentrating on the mundane, day-to-day details of its core self-moving business.

"[Joe] manages in an interesting way. I would characterize that as 'Keep your head down and focus on the customer.' We're in the world of celebrity CEOs and celebrity executives, and Joe's not out there pounding his chest," says Amy Hillman, a dean and professor of strategy at Arizona State University's business school, who has written a case study on the company.

Quite the opposite. Still scarred by the dozens of TV shows, books and newspaper articles chronicling his family's murder saga, Shoen wants almost no attention. He rarely speaks to the press. He is also not receptive to Wall Street, usually refusing to speak to investors or analysts. The company participates in just one investment conference a year, and only two analysts cover the over $6 billion (market cap) firm.

**IN 1957 ANNA MARY DIED AT AGE 34, LEAVING BEHIND SIX CHILDREN UNDER AGE 13, EACH OF WHOM INHERITED A PIECE OF THE COMPANY.**

But it's an extraordinary story. Thanks to Joe's unwavering focus, U-Haul has steadily expanded its dominance in the self-moving business. As of fiscal year 2015 (calculated from March to March) it had 135,000 trucks and 107,000 trailers on the road, 17,000 more than the year prior. Rival Avis Budget last reported 22,000 truck rentals in 2014, down 5,000 from the previous two years. Penske rents out approximately 15,000 trucks on a local or one-way basis, plus another 25,000 commercial trucks on a local basis.

Since the family finally settled the last of its lawsuits in August 2012, Amerco, which also has a growing self-storage business and a small insurance outfit, has achieved record sales of $3.1 billion (the majority of it, some $2.2 billion, from its core move-it-yourself business) and earnings of $357 million, up 23% and 74%, respectively, since FY 2012. For the first nine months of FY 2016 revenues increased by 6.6%, a bit lower than its five-year average of 9%, while net earnings have risen 26%. Amerco is in the top 5% of Nasdaq's best-performing stocks, with its shares up 255% in value since the settlement, to a recent $333—despite the fact that they have stumbled 24% from their late-November peak.

"A weight had been lifted off everyone in the organization. It was an unbelievable relief," recalls Shoen, who, thanks to his 17.6% stake and the stock's performance, now has a fortune of nearly $1.2 billion. Still Shoen is never at ease. "To me it seems [business] is more difficult every morning," he says. "As we grow we have to con-


L.S. Shoen

## THE LONG AND WINDING ROAD

**FEB. 29, 1916**
**L.S. Shoen is born in Minnesota;** his father, Sam, was a former boxer and semiprofessional baseball player.

**1937**
L.S. enrolls at Oregon State. He gives haircuts in his dorm room to earn money. **With a friend, L.S. opens a barbershop near campus, which leads to a chain of shops.** He pays for college and eventually matriculates to the University of Oregon's School of Medicine. The attack on Pearl Harbor shuts down the business as most of his barbers enlist. Not L.S., who was in the Navy's V-12 program, which permitted men to finish schooling before becoming Naval officers.

tinue to be sharp. We have to continue to be careful."

**U-HAUL WAS CONCEIVED** by L.S. Shoen and his wife, Anna Mary. The two met in Portland, Ore. in 1943. L.S. was studying to become a medical doctor at the University of Oregon while Anna Mary Carty was a student at nearby Marylhurst University. Then, at age 27, L.S., who had earned the nickname "Slick" in med school for hatching moneymaking plans, got kicked out a year shy of graduation for covering for an absent friend during roll call.

No longer in school, he was quickly eligible for action in World War II. Before heading off to boot camp, he married Anna Mary. But he never made it onto the battlefields because of his own fight against disease. He caught scarlet fever while training in Idaho, then rheumatic fever while in Seattle. The Navy eventually sent him to Corona, Calif. (just east of Anaheim) to recover until he was discharged in 1945.

By then the couple had a 4-month-old son, Sam, and, according to company lore, they tried to rent a trailer to move their stuff back to Portland but had no luck. On the long drive home the pair dreamed up the name U-Haul and formulated a rough plan.

The couple moved onto Anna Mary's family ranch an hour from Portland and began pouring their life savings of about $5,000 (around $65,000 in today's dollars) into launching the company. L.S. originally purchased used trailers, but they broke down often and repairs were expensive. So he taught himself how to weld and began building his own. Then he traveled around, persuading gas station owners to let them rent the trailers from their property in return for commissions: 25% for one-way rentals and 40% for local ones.

The postwar baby boom was an ideal time for the business. Economic prosperity—and the birth of the Eisenhower Interstate Highway System—sparked the growth of the suburbs and unparalleled migration by American families. U-Haul's nationwide, one-way trailer rentals became an indispensable tool, and "U-Haul" entered the lexicon in the same way Xerox would (later) for photocopies and Google would (much later) for search.

It was generally smooth driving until 1957, when Anna Mary, who had a congenital heart defect, died at age 34. At the time the couple had six children under the age of 13, and each child inherited a piece of their mother's 50% stake in the company, which by then had $6 million in sales (roughly $50 million in 2015 dollars) from 22,000 trailers. Ultimately her death not only shifted ownership to the kids but also shattered the family.

A year later L.S., who was often on the road, married Suzanne Gilbaugh, the much younger daughter of his neighbors, and sent his two eldest sons, Sam and Mike, then 12 and 10, to boarding school in California right after the wedding. The next eldest, Joe, 8, and Mark, 6, stayed at home in Oregon, where they formed a lasting bond. Over the course of that marriage L.S. had five more children and moved the family to Palm Springs, Calif. and then to Phoenix, where U-Haul remains headquartered. The couple divorced after 20 years, and L.S. married four more times, twice to the same woman. Shoen gifted shares to all his children over the years and owned none at the time of his suicide.

The wheels started to fall off the business in the 1970s during the oil crisis. Most of U-Haul's dealers were set up in partnership with local gas stations, which started going under




**1944**
Soon after being kicked out of medical school and just before joining the Navy, **L.S. marries Anna Mary Carty, his sister's college roommate, whom he started dating a year earlier.** Anna Mary grew up on a prosperous ranch in Ridgefield, Wash. Her mother had served as Oregon's first female postmistress. Her father, Bill, was a farmer and state representative.

**1945**
L.S.' military stint is cut short after he contracts scarlet and then rheumatic fevers. **While recuperating in California, L.S. has the idea for one-way trailers.** The couple soon moves to his wife's family ranch almost an hour outside Portland, Ore., where they found U-Haul.

**1956**
**U-Haul is on the move, overhauling the look of its trucks and trailers and painting them orange and white.** The company sets up five regions with their own directors and introduces a roadside-assistance service. The next year Anna Mary dies at age 34, leaving behind six children under age 13, all of whom inherit a piece of the company. **1969** Amerco is incorporated in Nevada as a holding company for U-Haul businesses. L.S. acquires Oxford Life Insurance to provide cost-effective health and life insurance to employees. Four years later **U-Haul starts selling liability insurance to its customers.**


Anna Mary and L.S. Shoen

at an alarming clip when they ran out of gas to sell. Many of those that survived shifted to self-service and no longer had the staff to rent U-Haul's trucks and trailers. In response L.S. bought up nearly 1,000 buildings in 1975, many of them cast-off Chrysler dealerships, and began opening company-owned locations. It upended U-Haul's business model and added lots of costs, both in property purchases and in hiring full-time employees.

It was also the decade that several of Shoen's children joined U-Haul as executives; many had worked for the company part-time over the years and were pressured by their father to join the ranks. Joe came on board in 1973, immediately after graduating from Harvard Business School, where he'd written a paper on the economics of the self-storage business. Around the same time Joe's older brother Sam quit his medical career to come help, and Michael, a lawyer, gave up his practice to join U-Haul.

Tensions mounted as the brothers jockeyed for position and disagreed about the best direction for the business. Doc Sam, as he was nicknamed (even after picking up a Harvard M.B.A.), largely supported L.S.' efforts and was seen as Dad's top choice for successor.

Joe, on the other hand, was fairly obstinate that the company was not moving in the right way. He wanted U-Haul to get back to the basics of renting trucks and trailers. He also didn't like working in the shadow of his big brother. So he quit in 1978, went to law school at Arizona State and one year later opened Space Age Auto Paint, selling paint for cars, boats and airplanes. (He still owns the business today; U-Haul is a customer.) With his brother Mark (part of the faction who stayed at home in Oregon) he also opened a printing outfit next door called Form Builders Inc. (F.B.I.), whose main customer was U-Haul.

While Mark and Joe tended to their ventures, L.S. began casting about for new revenue streams, setting up U-Haul centers where people could rent all sorts of items—from motor homes and floor sanders to Jet Skis and party supplies like dance floors, awnings and punch bowls. As U-Haul lost focus, its finances unraveled; net profits sank to $9.2 million in 1986 and $2.2 million a year later, down from $42 million two years earlier, and debt ballooned to nearly $600 million. Thousands of employees lost their jobs.

Worried that his father was wrecking the company, Joe led a coup in 1986, forcing L.S., then 70, into retirement. His father conceded the chairman's post to Joe as long as Doc Sam, L.S.' longtime ally, stayed on as CEO. L.S. even threw himself a retirement party.

But things turned sour quickly, and Sam quit in less than a year, unable to get along with Joe. Then Sam and L.S. reached out to Bear Stearns to explore options that would give the shareholders some liquidity. At that point they had just enough votes to carry out their plan. Joe was furious, viewing their move as a hostile takeover. He countered, persuading the board to issue 8,099 shares on favorable terms to five key executives, tilting voting power to his faction. In response Sam and L.S. took U-Haul

FAR LEFT: EVERETT COLLECTION/NEWSCOM




**1973**
The oil crisis strikes, forcing thousands of gas stations to close and costing U-Haul a lot of business. **L.S.' son Joe, a recently minted Harvard M.B.A., joins full-time.** Around this time father asks Joe's older brothers, Sam and Michael, to quit their jobs (one is a doctor, the other a lawyer) and come help. In 1974 it opens its first U-Haul Moving Center and enters the storage business.

**1981**
**Joe opens Space Age Auto Paint.** He still owns the business today, which sold $300,000 worth of paint to U-Haul last fiscal year.

**1985**
L.S., apparently feeling his children were not taking enough interest in the company, kicks seven of them off Amerco's board, despite the fact that the kids hold most of the voting power. In November 1986, as U-Haul's financials worsen, a **number of siblings band together and use their shares to force L.S. into retirement.** "He had to retire and be run off simultaneously," Joe told FORBES in 1987.

**AUG. 6, 1990**
Sam Shoen's wife, Eva, is murdered. **Her young daughter, Bente, finds her mother's body at the top of the stairs at their home in the tony ski town of Telluride, Colo.** She, her brother and a friend were all in the house at the time of the murder. So, too, were the family's dogs. Sam was in Phoenix on a business trip. L.S. and Sam offer a $250,000 reward and, convinced that his sons Joe and Mark had a role in the killing, gets the tabloid TV show *Unsolved Mysteries* to feature it. The coverage leads to the arrest and conviction of Frank Marquis, an ex-con and serial rapist. Joe and Mark sue for defamation, but the case is eventually dismissed.



Eva Shoen

(Pg. 35)

to court in 1988 to challenge the maneuver and seek damages. Joe retaliated by canceling his father's lifetime employment agreement.

Then it got much worse. Sam's wife, Eva, was found murdered in their Telluride, Colo. home on Aug. 6, 1990, with a gunshot wound to her back. L.S. and Sam were convinced that Sam was the intended target—and that it was a hit job orchestrated by Joe and Mark.

Certain of his sons' involvement, L.S., with Sam, offered a $250,000 reward to find the killers and pushed to have the saga aired on *Unsolved Mysteries*, which it was in December 1992. While L.S. was trying to prove his sons were killers, the show actually helped authorities find the real culprit, a serial-rapist ex-con named Frank Marquis, who had confessed to his own brother-in-law. In exchange for providing evidence that he had not been hired to kill Eva, Marquis was given a plea deal in 1994 to serve 24 years for reckless manslaughter and second-degree burglary. He was paroled from the Penitentiary of New Mexico in Santa Fe in 2011.

**CERTAIN OF HIS SONS' INVOLVEMENT IN THE MURDER, L.S. OFFERED A $250,000 REWARD.**

Despite the conviction, Sam still doesn't believe Marquis was the culprit, or at least the only one: "I don't believe Marquis did it. And if he did, he certainly wasn't alone." Joe and Mark insist they were not involved in any way. The sheriff on the case, Bill Masters, also dismisses Sam's theory. "There's no doubt in my mind that Frank Marquis murdered her and was acting alone," Masters says.

Joe may have had nothing to do with the murder, but he was found guilty of breaking another law. In 1994 a jury found that, by issuing new shares, the board of directors breached their fiduciary duty by preventing the plaintiffs from gaining control. It ordered them to pay nearly $1.5 billion. On top of that, Joe had to pay an additional $70 million in punitive damages.

"We were a tad surprised at that [verdict]," recalls Joe. The next year a judge reduced the damages to $462 million overall (and $7 million for Joe personally) but determined that it had to be paid in cash.

Coming up with that much cash seemed an impossible task. Five board members who were held personally liable filed for bankruptcy (a sixth, Joe's youngest full brother, Paul, who was no longer on the board, worked out a separate agreement). Amerco, which had indemnified the directors, was now responsible. Since its assets were already being used as collateral for a general line of credit to run the business, it was forced to sell millions of dollars' worth of assets.

Enter Joe's closest sibling, Mark, who joined Amerco's board in 1990, after the coup, and therefore couldn't be held liable. Mark bought a bunch of the assets U-Haul was forced to sell. He then borrowed against them and immediately remitted the cash to the company. Between 1994 and 2002 Amerco sold 230 self-storage properties for $600 million in cash and debt to a special-purpose entity called SAC Holdings, of which Mark is the main owner. The move gave it cash and also let it collect fees for managing the properties. Today he owns more than 400 self-storage properties that U-Haul still manages. These assets are worth an estimated $3.3 billion, more than double the value of his 19.5% stake in U-Haul, which itself is worth $1.2 billion.

The financial maneuverings were clever, but were they legal? In the wake of Enron, PricewaterhouseCoopers recommended that it consolidate SAC on its financial statements going back to 1995. That pushed up its debt levels to $900 million, made it difficult to renew credit lines and put it in danger of losing its Nasdaq listing. In the middle of it all brother Paul, the youngest of L.S. and first wife Anna Mary's six children, sued, alleging inappropriate dealings with SAC, including the transfer of $200 million. U-Haul filed Chapter 11 bankruptcy in June 2003 and emerged the next year. Meanwhile, the legal case dragged




**1994**

**Amerco, U-Haul's parent company, whose sales topped $1 billion for the first time the previous year, goes public on Nasdaq** at $15.83 a share on a split-adjusted basis. The IPO comes one month after a jury rules that U-Haul and its board owe Sam and other plaintiffs $1.47 billion. A judge later cuts it down to $462 million.

**2002**

Amerco's longtime auditor PwC tells the company to restate its financials, pushing $900 million of debt onto the balance sheet. It defaults on $100 million. **Brother Paul sues its off-the-books entity SAC Holdings, alleging that his brothers Joe, James and Mark binged on Amerco's assets, using the same financial instrument infamously used by Enron.** In June 2003 U-Haul files for bankruptcy. It emerges nine months later.

**FEB. 27, 2008**

**Joe Shoen goes on *Inside Edition* to defend the company's role in dozens of sway-related accidents over a decade involving its single-trailer model.** The company eventually pays millions in settlements.

**2010**

Seeing an opportunity to reach younger customers, **U-Haul buys Collegeboxes,** which had its origins as a Duke University class project. Collegeboxes says it's now the largest student summer storage and shipping provider in the country, delivering boxes to dozens of schools and storing belongings over summer breaks.

*Source:* A Noble Function: How U-Haul Moved America.

(PX. 36)



on. It was dismissed with prejudice in 2012, with Paul and the others forced to sell their Amerco shares and forbidden by the Nevada court from holding shares for 20 years.

**IT'S HARD TO IMAGINE** running a business amid all this turmoil, but that's just what Joe had to do. So he retreated into the work. From 1987 to 1996 he jettisoned noncore businesses and spent $2.8 billion in capital expenditures, buying 80,000 new trucks and lowering the fleet's average age from 11 years to 5.

5/13 fleet Rollover

Even at the rockiest times Joe kept his ear to the road. As a young teen he would climb aboard his dad's single-prop Cessna 182 to accompany him to different locations. He later took his own kids, Sam and Stuart, now both executives at U-Haul, on similar trips. "If not, we'd have had an absentee dad," says Stuart, executive vice president of U-Haul International. "Traveling with my dad taught me everything I learned. It really is his passion."

These days Shoen spends roughly every other week visiting some of U-Haul's dealers. He typically starts early on a Monday morning and works until 9 most nights, visiting as many as 17 states in a week. He flies in the company plane to get to more locations more quickly, but the frills stop there. He has a policy of two people per motel room and insists they stay at inexpensive chains like Red Roof Inn and La Quinta. Room service is verboten. He eats most of his meals at McDonald's. Joe's cheapness is the stuff of company lore. On one trip he and four of his employees showed up at a motel. Despite the fact they'd booked three rooms with two double beds, there were only five rooms, with one king-size bed apiece. Even though it was after midnight, Joe insisted on finding a different motel.

"He's boots on the ground. That's how he knows what's going on. He's always in our field operations, learning, listening, watching, doing," says Bob Wesson, a longtime U-Haul exec. At each location Shoen prints out a P&L statement and asks the manager what Shoen can do to make the business better. He jots down ideas on a pad, then snaps a photo of his notes with his phone to text to his assistant, who then often turns it into a memo to the employees. He also spends a lot of time scouting for self-storage locations, a growing part of the business, generating $211 million in sales in 2015. U-Haul not only manages 481 of them for SAC Holdings and others (owned mostly by Mark) but also owns 799 in all 50 states. Most of the facilities are conversions or adaptations of landmark buildings like the Wonder Bread bakery in Jamaica, Queens.

**"IT'S AN EXAMPLE OF A COMPANY THAT FOCUSES ON ONE THING AND OVER THE DECADES HAS GOTTEN VERY GOOD AT IT."**

U-Haul is a sprawling operation to keep tabs on. It now operates and manages 1,600 locations, but another 18,200 are independent dealers, run out of self-storage centers, gas stations, convenience stores, auto repair shops and even lumber stores. Thanks to a comprehensive plan that Shoen put into place to attract more small businesses, 2,700 new partners have signed on since 2012. Not to be confused with franchisees, these dealers simply let U-Haul park its trailers and trucks in their parking lots and rent the vehicles out for, on average, a 21% commission. It's a throwback to L.S.' old arrangement with gas station owners in the 1950s. To service these dealers and their customers U-Haul now has close to 15,000 vendors, including towing companies and mechanics, throughout North America that can be called if a customer's rental breaks down. That is a huge jump from 2,500 in 2012. The number of staffers, both full- and part-time, increased by 7,700 in that time.

At this point it's not just about beating rivals. "The competitive moat enjoyed by this company is significant and has myriad competitive advantages it enjoys," says Jim Barrett, an analyst for CL King & Associates who has followed the company for nine years. "It's an example of a company that focuses on one thing and over the decades has gotten very good at it. Its real competitor is the consumer who borrows the van next door and moves themselves."

Shoen has a few plans to woo these customers, too. In 2010 the company bought Collegeboxes, which was founded at Duke University (it's now headquartered in Phoenix) and specializes in shipping students' belongings to their dorms. It also set up movinghelp.com, an online marketplace that connects customers to laborers who can help them move, and created a U-Box program, in which the company drops off and picks up storage containers for customers who don't want to rent and drive their own trailers. (It initially called them pods but stopped doing so after PODS Enterprises sued for trademark infringement and a jury awarded PODS $64 million.)

Pods

U-Haul is well positioned to grow for decades to come, but it's come at a huge human cost. Joe, for instance, speaks to only two of his siblings. But he has no interest in mending fences and expresses no regrets at how things unfolded. "I don't think that the break in the family caused [U-Haul's] success. I think it could have caused the failure of U-Haul," says Joe, who is remarried and has three younger children. "So of course I would rather that we would not have discord in the family, but the result we have achieved is much more in keeping with the ethics and values that my father attempted to pass on."

Specifics for Articles of Incorporation-Real Property-
Applied financial conversion system-weight(&)measures-

(P37)

Inre:Intellectual Property-REVISION-

Title-"The Pennystock Survey" ® - REAL PROPERTY CONVERSION -

...this is for an applied financial conversion which converts units of Standard Weight(&)Measure-commonly used for real estate surveys into a Denominational Minimum value based upon the Legal tender unit of(1¢),(&)the sum of the subjects incremental parts which function as equally important parts of a whole number.

For Real Estate-the author uses MATH RULES,to determine what unit of measure is the convergence to comply with the terms of the account entry on the survey,which is to be treated as a Bond, invoiced(&)from which the ensured value is drawn upon,outright or negotiated from.

-----------

(1/ONE Acre(=)43.560ft(EXACTLY)Surface Area/SA-(or)43.559.5ft(MATH RULES/ROUND NUMBERS(for)a convergence of 72in to Feet-(=)Inches per foot(for)-(144in per ft(=)$1.44(USD) X 43.560ft(=)$62.726.40(ths)-(or)by Volume-(X 6)(=)261.360ft(V) X $1.44(USD)for(=)$376.358.40(ths)-Per Acre-

Surface Area(=)$62.726.40(ths)PER ACRE-(Possessive Bond)
Volume(=)$376.358.40(ths)PER ACRE-(Performance Bond)

------------

(1/FOOT(=)144in EXACTLY-Surface Area/SA
( X 6) for Volume rate(=)864in(V)-(1¢)(Per Unit)-
Surface Area(=)$1.44(USD)PER FOOT-(Possessive Bond)
Volume(=)$8.64(USD)PER FOOT-(Performance Bond)

The author retains right to resolve other ratios for this type of survey,respecting increments of:MM/CM(&)16ths of an inch for(performance bond)sums.

Signed Jeffery W. Paul

Jeffery W.Paul(8/20/2016)-

(Pg. 38)

CALHOUN COUNTY, TEXAS

2,200 acres Port O'Connor, TX.

Seize this rare opportunity to purchase property on the Texas Intracoastal Waterway. Nestled in nature, these exceptional, 2,200 acres shelter a lush array of plants and animals on land and in water. This is your chance to purchase one of the last remaining large, unencumbered pieces of land in the area. With a diverse population of wildlife ranging from deer, turkey, dove, quail, hogs and 400+ species of birds, this property is ideal for the hunter or conservationist. Known for fishing, hunting, birding and kayaking, this peaceful area is a sportsman's delight, with some of the best duck hunting on the Texas coast. Port O'Connor offers a relaxing, laid-back atmosphere and numerous boating venues. With the largest and deepest bay on the Texas Gulf Coast, Port O'Connor offers many opportunities for the avid fisherman. Close proximity to the Gulf provides excellent fishing for red snapper, king, ling and jack fish, and the opportunity for deep-water fishing for sailfish, mahi-mahi and Wahoo. A short ride across Madagorda Bay lays





## THE PRESERVE AT LASALLE RANCH

CALHOUN COUNTY, TEXAS

Great!





(pg.39)



CALHOUN COUNTY, TEXAS

Great water view





Madagorda Island, which is now a national preserve for a large variety of endangered migratory birds. This entire are is rich in both wildlife and recreation–perfect for the outdoor enthusiast.

Just a few hours from the major metropolitan areas of Houston, Austin, San Antonio and Corpus Christi, The Preserve at Lasalle Ranch is often touted as the "Best Kept Secret on the Gulf Coast." The ranch is conveniently located within hours of big-city amenities like fine dining and shopping, major medical centers and airports, as well as numerous art, sports and cultural events. The property includes plentiful native pasture grass, a fresh water well, electricity recently installed, great access from the highway on an all-weather road and a newly installed private gated entrance for better access. The nearby development offers many amenities to the owners. Call today to reserve your time for a full property tour.
Call for Price.



**SUPERIOR FARM & RANCH**
Rick Doak
361.243.1040
jrdoak@me.com

SUPERIOR Farm & Ranch Realty LLC

AMERICAN FARM & RANCH MEMBER BROKER

duPont REGISTRY FEATURED PROPERTY

BY M[illegible] KREITZ



Ron Willard, President of The Willard Companies, has spent the last 40 years of his career transforming Smith Mountain Lake, Virginia into a resort area that has attracted people from across the globe to enjoy golf, recreation, and resort living. As Willard approaches retirement, his company will be selling The Water's Edge, a 712 acre development, including 18-hole PGA Championship course hailed as one of the top in the mid-Atlantic, a private 36,000 square foot country club nestled along 13.5 miles of beautiful Smith Mountain Lake shoreline, and a 12,000 square foot gated estate.

"I'm 70 and I'm ready to downsize, travel and enjoy my golden years," says Willard. He will continue to reside in the community as well as part-time in his Naples, Florida home. Willard developed the surrounding country club in the late 1980s and built the home in 2004. The property includes an equestrian center, a restored historic 48-seat 19th-century chapel, a clubhouse with tennis courts, a pool, pro shop and fitness center. The 18-hole PGA Championship course was originally designed by R.F. Loving, Jr., and received a comprehensive $5.2 million renovation in 2007.

"The home, country club, church, equestrian center and the peninsula of land sitting on Smith Mountain Lake facing the Blue Ridge Mountains are truly one of a kind,"

# BLUE RIDGE MOUNTAIN PARADISE

## Smith Mountain Lake, Virginia



says Willard. "It will inspire anybody that appreciates quality. They will find there are no corners cut, no blades of grass out of shape and the sand bunkers are hand raked. This is a must see."

Willard's son, Ron Willard II, has listed the property through Berkshire Hathaway HomeServices Smith Mountain Lake Real Estate. According to Willard II, their business model continues to produce a positive cash flow and this is a prime opportunity for an investor to capitalize on and take into the future. The new owners will also have the option of contracting The Willard Companies to continue managing the operation.

"When I decided to build this estate, I wanted to build a monument to the lake and this particular community, and the land where I grew up," says Willard, who grew up on a farm in the area.

**RON WILLARD II, ASSOCIATE BROKER**

1825 Water's Edge Drive
Smith Mountain Lake · Penhook, VA 24137
540.721.5288
**WatersEdgeGolfEstate.com**

(4.41)

# *Pristine Waterfront Estate and Club*

$25,000,000

WatersEdgeGolfEstate.com




## *The Estate*

12,000 sq. ft. on 6.3 acres with over 1,235' of water frontage in beautiful Smith Mountain Lake, VA

7 Bedrooms, 8 bathrooms, 3 car garage, swimming pool and a 3000 sq. ft. dock with gazebo






## *The Property*

- 712-acre community
- 18-hole PGA Championship Course
- Private 36,000 sq. ft. country club
- 36-acre fully equipped equestrian center



BERKSHIRE HATHAWAY
HomeServices
Smith Mountain Lake Real Estate

Ron Willard II, Associate Broker
540-721-5288

The Water's Edge

Private tour available by appointment. Proof of ability to purchase and confidential disclosure required.

©2016 BHH Affiliates, LLC. An independently owned and operated franchisee of BHH Affiliates, LLC. Berkshire Hathaway HomeServices and the Berkshire Hathaway HomeServices symbol are registered service marks of HomeServices of America, Inc®. Equal Houseing Opportunity.