this pg. 1

# Curb False Confessions: Provide Suspects With Lawyers

*by Derek Gilna*

According to the nonprofit National Registry of Exonerations, Cook County, Illinois has a false confession rate three times higher than the national average. In November 2017, Cook County Prosecutor Kim Foxx dropped criminal cases against 15 men because of police misconduct, a development the *Chicago Tribune* referred to as the largest mass exoneration in county history. Even for Chicago, which is no stranger to official corruption and abuse scandals, it was extraordinary.

It is no coincidence that Chicago and Cook County payouts to wrongfully convicted individuals skyrocketed in 2017. In December 2017, Chicago paid out almost $31 million to four wrongfully convicted men and millions more throughout the year, but the human costs is even greater for the hundreds, if not thousands, of innocent individuals and their families victimized by a dysfunctional justice system.

Additionally, the public pays twice for police misconduct—once to the innocent victims wrongfully charged and incarcerated, and again because the real offender remaining free to victimize others.

Numerous studies have shown that innocent people confess to crimes for a variety of reasons. A report by the Police Accountability Task Force, which examined arrests in Chicago in 2014 and 2015, identified one primary reason for false confessions: Less than one percent of adults and juveniles placed under arrest had an attorney present during any part of the interrogation, which means that nearly all suspects are interrogated without the assistance of a lawyer.

According to Elizabeth Clarke, a former appellate defender in northern Illinois, the simple way to address the scourge of police extracting false confessions is to provide everyone with a lawyer throughout police interrogation. She concedes that having a lawyer present during police questioning would definitely add expense to the criminal justice system, but as she points out, $31 million pays for a lot of public defenders.

Clarke wrote in *The Crime Report*, "Last Spring, the Cook County Chief Judge issued an order appointing the public defender to be available to represent children and adults during police interrogations, so that persons arrested in Cook County would have access to a lawyer without charge." Additionally, the Chicago Police Department agreed to comply with an Illinois statute that requires all police to post a sign with information on the right to legal assistance during interrogation. The Illinois General Assembly unanimously passed a law requiring attorneys to be present for all children under the age of 15 in felony cases and also videotaping of all interrogations in such cases.

Although many within the law enforcement community object to the notion of all suspects having the assistance of legal counsel during interrogation, police understand the importance of a lawyer's presence. The fact that police labor agreements contain numerous protections for officers when they are suspects under interrogation, including the assistance of legal counsel, bears this out. Police know that having a lawyer during questioning is essential to protect the rights of the suspect and integrity of the process, so that's why they demand it for themselves. They just don't want non-police suspects to have that same protection.

As noted by Clark, "The sad litany of exonerations based on false confessions illustrates that all arrestees need the protection of a lawyer. It is time for Illinois to follow the recommendations of the Police Accountability Task Force and ensure that all persons have a lawyer during interrogation, especially children." ■

Sources: *www.thecrimereport.com, www.law.umich.edu*

# DNA Evidence: New Jersey Court Vacates Two 1996 Murder Convictions

*by Mark Wilson*

After spending 24 years behind bars for murder, Eric Kelley and Ralph Lee walked out of a New Jersey prison in November 2017. Weeks earlier, New Jersey Superior Court Judge Michael Portelli had vacated their convictions for the 1993 murder of a store clerk after new DNA evidence cleared them. The newly discovered DNA belongs to Eric Dixon, a convicted felon who had been released from imprisonment for a similar crime three months before the murder. Dixon matched witnesses' description of the person seen inside the store about the time of the murder.

"With such compelling DNA evidence demonstrating Mr. Kelley and Mr. Lee's innocence and pointing to the true assailant, most prosecutors would have moved to overturn these convictions long ago," said Vanessa Potkin, Post-Conviction Litigation Director at the Innocence Project, which is affiliated with Cardozo School of Law. "We are grateful for the court's decision, which came after a year of hearing new evidence and argument and careful deliberation."

Tito Merino was stabbed to death during a 1993 robbery of a video store where he worked. A green and purple plaid baseball cap was recovered near Merino's body. It did not belong to anyone who worked at the store, and it was not present before the murder. Investigators concluded that it belonged to the killer. The hat was submitted for DNA testing in hopes of identifying the perpetrator, but the test results were inconclusive because DNA testing at the time was not as advanced as it is today.

Police initially searched for a single suspect but eventually turned their attention to Kelley and Lee. Kelley has difficulty processing information due to significant cognitive impairments from a traumatic brain injury he suffered in an automobile accident prior to the murder. Undoubtedly seeing him as the weakest link, police interrogated Kelley first, and he allegedly confessed to the crime after several hours of questioning.

Police then interrogated Lee, and then admittedly fed him information supplied by Kelley. He supposedly confessed, as well. Investigators did not record the interrogations or take notes of what occurred. The only evidence of the confessions were two typewritten statements prepared by detectives and signed by Kelley and Lee.

Kelley supposedly told detectives where the knife used in the murder was hidden and where stolen property was fenced. Not surprisingly, police could not corroborate either.

claim. Evidence at the crime scene also contradicted both confessions. Nevertheless, Kelley and Lee were convicted of felony murder and robbery in 1996.

Several years later, the Innocence Project and Centurion Ministries sought to prove Kelley and Lee's innocence. Despite the prosecution's objection, they persuaded the trial court to order new DNA testing on the baseball cap in October 2010. The results of the new testing revealed male DNA that excluded both Kelley and Lee. The profile was then entered into the FBI DNA database of convicted felons.

The DNA matched Eric Dixon, who fit the age and physical description of a person witnesses said was in the store around the time of the murder. He had been released from prison just three months earlier after serving three years for a similar knifepoint robbery of a nearby store.

At a hearing, an expert witness testified that false confessions are a leading cause of wrongful convictions, contributing to more than 25 percent of the 351 DNA exonerations nationwide. Lawyers for Kelley and Lee also offered testimony from a forensic psychologist who concluded that Kelley is vulnerable to making a false confession during a custodial interrogation because he is "more suggestible than approximately 98 percent of the normal population." Finally, a former detective who now specializes in police interrogations criticized the way Kelley and Lee were interrogated and testified about discrepancies, contradictions, and the lack of corroborating evidence supporting their statements.

"This is probably one of the best examples of tunnel vision one could imagine," declared New Jersey Superior Court Judge Portelli in vacating their convictions on September 15, 2017. "During the trials and this motion, the State has relied heavily on the statements given by the defendants when they were initially arrested," observed Portelli. "However, history has shown many instances where false confessions are given and DNA has proven the defendant or defendants not guilty notwithstanding a confession." In vacating the conviction, Judge Portelli noted that the new DNA evidence "would probably change a jury's verdict" if they were to be tried again.

Potkin applauded the decision. "We now know that the primary evidence used to convict Mr. Kelley and Mr. Lee is unreliable and objective scientific evidence points to their innocence," she said. "We hope that the prosecutor's office will move quickly to dismiss the charges and finally initiate an investigation into the person whose DNA was found at the crime scene."

That hope turned out to be too optimistic. The prosecution has not announced that it is dismissing the charges against Kelley and Lee. In fact, the prosecution has signaled that it may indeed try them again. In a further sign that the prosecution refuses to concede even the possibility it made a mistake and wrongfully convicted Kelley and Lee, Dixon reportedly is not being investigated as the possible perpetrator.

In response to the prosecution's baffling disregard for facts and clinging to its discredited theory of the case, the *Star-Ledger* editorial board penned an editorial titled "Let justice be done in Passaic County: Probe the prosecutor." The editorial board had this to say about prosecutor Camelia Valdes: "given her pigheaded reluctance to acknowledge the innocence of Lee and Kelley, this prosecutor … should be permanently removed from the case and placed in the state's crosshairs."

The editorial board urged the state office of attorney ethics to investigate the motives of Valdes and her staff, "because their refusal to reopen the case is an outrageous example of malpractice and a violation of their ethical obligation to seek justice."

Too many prosecutors all across the country lose sight of the fact that their primary duty is not to win convictions, but rather to ensure the fair administration of justice. ■

Sources: *www.innocenceproject.org, www.nj.com*

## Use of Sentencing Mitigation Videos Grows

*by Derek Gilna*

Defendants who plead guilty on both the state and federal level generally are interviewed by the sentencing jurisdiction's probation department, which seeks background information regarding the criminal history, family history, and health history of the defendant in order to assist the judge in determining an appropriate sentence.

An increasing number of defense counsel are utilizing sentencing mitigation videos to present their clients in a more sympathetic light in the hopes of receiving a lower sentence or a more favorable outcome in a civil action. Personal injury attorneys have long used such videos in an attempt to win plaintiffs big damage awards.

*The New York Times* describes sentencing mitigation videos as "empathetic biographical mini-documentaries." They are made for an audience of one—the sentencing judge. Like with most things having to do with the criminal justice system, they don't come cheap. On average, they cost $5,000 to $25,000 to make.

There are no firm rules either permitting or denying the right to use such videos, and that leaves it up to the judge to decide if one will be permitted. One of the pioneers in this developing area is Doug Passon, president and creative director of D Major Films, as well as a defense attorney.

According to Passon, lawyers must "rise to the challenge of making judges 'suffer'" much like their clients are suffering, and it appears that the videos are working. Passon claims that "sentences are almost always better than they would otherwise be," when these videos are used.

Having seen the success of the videos with his own clients, Passon has a passion for teaching other lawyers how to create effective videos for their clients. He has been holding The Sentencing and Post-Conviction Film Festival at the annual training conference for federal public defenders for nearly a decade.

His passion for sentencing mitigation videos is clear. In *The New York Times* op-doc titled "No Jail Time: The Movie," he states: "These folks are like me, this could be my own son, this could be my own daughter, this could be myself. And so our job is not to go for sympathy—oh, they've had such a hard life, poor me—that never gets us anywhere. Our job is to go for empathy."

He goes on to observe, "There have been hundreds and hundreds of people who've been convicted in court beyond a reasonable doubt, and it's come out that it's not true—they're innocent. These are human beings, so they deserve a little bit more consideration than a sentencing chart pulled out of someone's ass." ■

Sources: *https://abovethelaw.com, www.nytimes.com*

[M3]

T-28 -FRCP- omission -

R-61 Standard - "Could not Consider evidence."

HARMLESS-ERROR - "is structural-ERROR!

"Not guilty plea nullification by adm. of Guilt - "Involuntary-plea

# Massachusetts Supreme Court: Sleeping Juror Is "Structural Error," Requires Intervention

by Dale Chappell

THE MASSACHUSETTS SUPREME COURT reversed convictions for involuntary manslaughter and assault and battery and ordered a new trial because the trial judge failed to conduct voir dire after the prosecutor advised that some jurors fell asleep during trial.

Anthony Villalobos took his murder and assault charges to trial, hoping for a fair trial. Instead, he watched as the lawyers lulled at least two jurors to sleep. When the jury returned a guilty verdict, Villalobos appealed, raising the issue that jurors were asleep. The Appeals Court rejected his claim, and Villalobos took his case to the Massachusetts Supreme Court.

The Supreme Court determined that the prosecutor's report to the trial judge that the jurors were sleeping should have prompted the judge to intervene. The judge, though, "simply observed" the jurors the rest of the trial to make sure nobody else fell asleep.

If a judge receives information that a juror is sleeping or is otherwise inattentive, and the judge determines that information is "reliable," the high court explained that he "must take further steps to determine the appropriate intervention." Typically, the next step is to conduct a voir dire, or interview, of the inattentive or sleeping juror to investigate whether that juror "remains capable of fulfilling his or her obligation to render a verdict based on all the evidence," the Court explained. A voir dire is not always necessary, the Court said; a judge may instead decide to intervene without conducting a full voir dire.

But the judge must do something. In the present case, the prosecutor told the judge that one juror had fallen asleep "several times" during the testimony, and that another "was sound asleep" during cross-examinations. The judge took the prosecutor's word as reliable, but still did not question the sleeping jurors to determine what evidence they may have missed.

When the prosecutor complained to the judge, "I think that both sides deserve to have jurors that are able to stay awake," the judge responded, "but I have to notice it." But the Supreme Court instructed that the judge's impression that he had to witness the jurors sleeping was "mistaken."

"On the contrary," the Court clarified, "the receipt of reliable information from any source, not just the judge's own observation, that a juror is sleeping requires prompt judicial intervention." The judge's belief that he lacked the ability to do anything other than observe the jurors "was itself an error of law," the Court ruled.

The State argued that the jurors being asleep during trial was harmless. It argued that the sleeping jurors missed only "minimal and relatively inconsequential" parts of the trial.

The Court gave no weight to the State's arguments. First, the record did not show one way or the other what the sleeping jurors did or did not miss, the Court said. The purpose of a voir dire is to look into what the sleeping juror might have missed. "Because the judge did not conduct a voir dire, we do not have these essential findings," the Court pointed out.

Further, the judge's response to the prosecutor's reports about sleeping jurors "leaves us serious doubt that the defendant received the fair trial to which he is entitled," the Court said. The possibility that a sleeping juror missed a significant portion of the trial is a "structural error and can never be considered harmless," the Court stated.

The Court likened Villalobos' case to its recent decision in *Commonwealth v. McGhee*, 470 Mass. 638 (2015), in which the Court held that a judge's failure to intervene after a report of a sleeping juror created "serious doubt" McGhee received a fair trial. The Court concluded Villalobos' case was no different.

Thus, the Massachusetts Supreme Court reversed Villalobos' convictions and remanded for a new trial. See: *Commonwealth v. Villalobos*, 84 N.E.3d 841 (Mass. 2017).