USDC/SOUTHERN DISTRICT of IN.

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
2018 OCT 12 PM 2:17
SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

Inrem:PAUL V.SUPERINTENDANT(WTL/MJD)
Case No#2:13 cv 304(CAPITAL HABEAS)-(PRO-SE)
COUNSEL APPOINTED-

------------------

-MOTION FOR RELIEF OF JUDGEMENT BYWAY OF DEMAND-PURSUANT TO FRCP-TITLE 7-RULE 55(a)(b)(2)Entering a DEFAULT Judgement by the Court,(A,B,C(&)D)-(c)Setting aside...(via)RULE 60(b),(d)a Judgement against The United States of America...due to Affirmitive Defense,voiding the Judgement on appeal-

Attached EXHIBITS Pgs.1.-24-

THIS IS A UNCOUNSELED PRO-SE PETITION SHOWING THE CONVICTION(&) SENTENCE RETURNED WAS RETURNED IN VIOLATION OF THIS APPELLANTS RIGHT TO COUNSELED DEFENSE(&)CURRENT CAPTIVITY IS A VIOLATION OF MY RIGHT TO PROMPT(&)EQUITIBLE RELIEF ON APPEAL -

--------------------

Signed ______________________
Jeffery W.Paul-10517042 Rg#

Done this Day-10/9/2018-

SUMMARY of Complaint(&)Request for entry of default to relieve a FUNDAMENTAL MISCARRIAGE OF JUSTICE,violating this Prisoners LIBERY INTERESTS(&)CIVIL RIGHTS-

The Petitioner Pro-Se does hereby uncounseled plea submit the following request for relief byway of demand for default in light of counseled petition which affirms the appellant shows compelling proof of ACTUAL-INNOCENCE.

The petitioner asserts that the initial pro-se petition was a viable plea,(&)precedent law supports my right to have that processed forthrightly...see:Pg.1.cite page copy w/controlling authority,including SCT.cite,HAINES V.KERNER,(1972)-"court should allow plea to prevail..."

The petitioner includes cite for new collateral claims,see:Pg.2.-9.,REEVES V.FAYETTE SCI(2018),McCoy V.Lousiana,US(2018),(&)Hernandez V.Chappell(2017)...please note,"REEVES",was a simple case whereby the Court decided his counsel was inneffective for failing to present evidence that someone else couldve committed the crime,he also confessed to the crime but the confession was materially inconsistant so they considered it false(&)result of torture..."McCoy",was a case in contention because the guy was overwhelmingly guilty but refused the Plea Bargain,(&)objected during his trial because he demanded to assert that he was framed,the only dissent was from JUSTICE ALITO,who was concerned because the trial attorney merely admitted guilt to a lesser offense but did deny "McCoy"was guilty of 1st degree murder..."Hernandez"is a failure to present sentence mitigation for a defendant who was overwhelmingly guilty...

Please review quickly,the record on appeal for my original Pro-Se claim that my TRIAL ATTORNEY foreclosed my right to a GUILT/INNOCENCE phase by attempting to comply w/terms of a PLEA-BARGAIN I rejected

Continued...

because it required admissions of guilt(&)perjured testimony about a crime,(&)compound crimes I denied involvement in,or knowledge of(&) claimed to only be a witness too,in parts which I tried to explain during an F.B.I.interview which had to be terminated because The Agent was off topic(&)out of context...I denied I committed any crime relevant to the Sherman Williams homicide including possession of any firearms on June 22 1995...

Please recall that you have a PETITION for WRIT filed 10/18/16 before you which contains the eyewitness testimony about the crime, (via)The DECLARATION OF TRINITY INGLE-see Pg.10-15.,which is a wholly exonerating(&)credible statement,consistent with the forensics(&)by legal standards,see:Pg.16."HARMLESS ERROR" -,I am in custody without a DULY RENDERD CONVICTION...(&)am being tortured...the admission of GUILT,in violation of my right to defend my innocence,in defiance of my decision to reject the proffer of plea bargain lenity...is a PRIMA FACIE violation of my 6th amendment right(&)my captivity is a violation of The 13th amendment...

Please recall,I needed a Lawyer appointed a decade ago when counsel failed to file a compelling brief on my innocence claims(&)if the court has reason to believe my relief should not be available now,despite Counsels appeal,then it should appoint a Lawyer PRO-BONO to quickly locate the problem(&)resolve any doubt about the legality of my claims (&)obligate a substantative restitution,starting w/release(&)partial damages,(&)an order for PROTECTION of INTELLECTUAL PROPERTY,including claim for my PRIORITY CLAIMS Incorporation,the Industrial Manufacturing Ensurance shouldve been the first TRILLION$,company in The USA...see:Pg. 17,18,(&)that my rights to first entry are in jeopardy from exposure, Pg.19.(&)that my ideas are good,see:Pg.20-24...specifics for applied, improved energy technology,for a "COLD FUSION GENERATOR"using existing ROTARY MOTION INVERSION SYSTEMS....

Continued...

The petitioner does hereby move the Court to enter a Default in the matter of relief from my PRO-SE Petition,(&)award a partial up-front damages under The ACTUAL INNOCENCE PROTECTION ACT of $275.000(ths) a YEAR,TREBLE Assessment-for $825.000(ths)(=)$18.150.000(mn),(&)a 1(Million)Yearly assessment for SPOUSAL ESTRANGEMENT,also treble for a total of $66.000.000(mn),which would be a lump sum of $84.150.000(mn) cash,before tax(&)further special damages for loss of business(&)felony assessments for torturing my appellate process...

If my inventions were registered,The USA owns rights to ensure(&)re-cover from every product assembled by automation or dependent upon it for solvency(&)that includes viable options to develop alternative energy sources,(&)applied information processing such as map resolution.

I need a protective order for all my inventions,revisions(&)claims from infringements to revise those for upfront money,futures(&)the dam-ages from ANTI_TRUST violations stemming from the 1980's...

Please give this PETITION,the PRIORITY OF CIVIL-ACTION that I deserve as a person being egregiously tortured(&)Appellant showing compelling (&)material evidence of my ACTUAL-INNOCENCE...

I DID NOT,get the benefit of evidentiary proffers in this case(&)I DID NOT,get the process one could legitimately demand in the matters before you,the specifics of which I still cannot review due to orders to refrain from sending doc's into the prison...

Please order me forthrightly released,as SOON AS YOU READ THIS,in light of COUNSELED Petitions,(&)Counsels Affidavits attached proving my right to relief is affirmitive,(&)consider inclement weather,holidays(&)estr-angements already endured being exacerbated for no good-cause!

Respecfully Submitted,

Signed ______________________

Jeffery W.Paul 10517042
USP Terre Haute,IN.
PO BOX 33,Terre Haute,IN.47808

(Pg. 1)

# PRO SE COMPLAINTS

(1) PAPANTONY V. HEDRICK, 215 F3d 863 (8th Cir. 2000)

Pro se habeas petitioner should not unreasonably be subjected to stringent procedural niceties.

(2) McCORMICK V. CITY OF CHICAGO, 230 F3d 319 (7th Cir. 2000)
BOAG V. MacDOUGALL, 454 US 364, 70 LEd2d 551, 102 SCt 700 (1982)
HAINES V. KERNER, 404 US 519, 30 LEd2d 652, 92 SCt 594 (1972)

Pro se litigants pleadings are to be construed liberally and held to less stringent standard than formal pleadings drafted by lawyers; if court can reasonably read pleadings to state valid claim on which litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements.

(3) US V. SEESING, 234 F3d 456 (9th Cir. 2000)

Pro se complaints and motions from prisoners are to be liberally construed.

(4) McBRIDE V. DEER, 240 F3d 1287 (10th Cir. 2001)

Court was to liberally construe pleadings of pro se petitioner.

(5) DILS V. SMALL, 260 F3d 984 (9th Cir. 2001)
CALDWELL V. AMEND, 30 F3d 1199 (9th Cir. 1994)
HOUSTON V. LACK, 487 US 266, 101 LEd2d 245, 108 SCt 2379 (1988)

Prisoner's pro se motion for judgement N.O.V. was deemed filed on date motion was placed in prison's "legal Mailbox," as opposed to date of its receipt by court clerk.

CB Zinger

You have the constitutional right to represent yourself in court and that if you have an attorney he is merely your agent and is bestowed only with the authority you voluntarily grant him. See the Sixth Amendment. Also see Title 28 U.S.C. 1654 and Faretta v. California, 422 US 806.

(6) HOHN V. US, 262 F3d 811 (8th Cir. 2001)

Courts interpret pro se petitions for post-conviction relief liberally.

(7) RICKS V. NICKELS, 295 F3d 1124 (10th Cir. 2002)
FLOREZ V. WILLIAMS, 281 F3d 1136 (10th Cir. 2002)

Where habeas petition was prepared pro se, Court of Appeals construed its legal arguments liberally.

(8) ARON V. US, 291 F3d 708 (11th Cir. 2002)
URBINA V. THOMAS, 270 F3d 292 (6th Cir. 2001)

Federal court should constru a habeas petition filed by a pro se litigant more liberally than one filed by an attorney.

(9) US V. MAJORS, 329 F3D 791 (5th Cir. 2003)

Denial of defendant's right to represent himself, if established, requires reversal without need for harmless error analysis.

(EXIBIT FOR The 7th Circ.)



(Pg 25)

To contact the reporter on this story: Alisa Johnson in Washington at ajohnson@bloomberglaw.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bloomberglaw.com

*Civil Rights Actions*

## Non-Lethal Shooting of Psychotic Man Not Excessive Force

The decision to shoot pepperballs in an attempt to subdue a man who was in the throes of a psychotic episode wasn't unconstitutional excessive force, the U.S. Court of Appeals for the Tenth Circuit held July 17.

"No reasonable juror could find the use of pepperballs objectively unreasonable in violation of the Fourth Amendment," the court said, affirming summary judgment in favor of the defendant law enforcement officers in this civil rights action.

The attempt to subdue Gary Clark through nonlethal means escalated the situation, and ultimately resulted in the police shooting him multiple times, causing permanent injuries.

Even so, starting with pepperballs "likely seemed more humane in the moment than waiting the situation out or spending valuable time tracking down someone who could better communicate with Clark," the court said in an opinion by Chief Judge Timothy M. Tymkovich.

Clark suffers from schizophrenia. During the flare-up he lunged at his brother with a large kitchen knife. The brother called police.

"Clark's failure to drop the knife and submit to arrest—whether a manifestation of his illness or not—left the officers little choice but to use *some* physical force against him," the court said.

Bryan & Terrill Law PLLC represented Clark. Zorn & Wagner P.C., and Pierce Couch Hendrickson Baysinger & Green LLP represented the defendants.

The case is *Clark v. Colbert*, 2018 BL 252554, 10th Cir., 17-7046, 7/17/18.

By Alisa Johnson

To contact the reporter on this story: Alisa Johnson in Washington at ajohnson@bloomberglaw.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bloomberglaw.com

*Habeas Corpus* ✓

## Confessed Murderer Gets Chance to Challenge Conviction

Evidence pointing to an alternate perpetrator may allow a convicted murderer to seek habeas corpus relief beyond the normal time limit, the U.S. Court of Appeals for the Third Circuit said July 23.

Evidence qualifies as "new" for purposes of filing a late habeas corpus petition when a petitioner claims his trial counsel was ineffective for failing to develop or present it at trial, the court held in an opinion by Judge Patty Shwartz.

Jerry Reeves can file a late petition if he can convince the district court of the reliability of his new evidence, which would make it more likely than not that no reasonable juror would have voted to convict him had it been presented at his trial, the court said.

If reliable, the evidence meets the standard of "actual innocence" that in extraordinary cases can excuse the failure to timely file for habeas relief, the court said.

The court sent the case back to the district court for it to determine whether the evidence is sufficiently reliable. If the answer is yes, the district court must assess the merits of Reeves's ineffective assistance claim.

✓ Judge Theodore A. McKee, concurring, pointed out that Reeves has served eight years in prison after being pressured to confess by police who refused to follow up on evidence pointing to someone else.

The Law Office of Matthew Stiegler, Philadelphia, and K&L Gates LLP represented Reeves. The Dauphin County Office of the District Attorney represented the state.

The case is *Reeves v. Fayette SCI*, 2018 BL 259913, 3d Cir., 17-1043, 7/23/18

By Alisa Johnson

To contact the reporter on this story: Alisa Johnson in Washington at ajohnson@bloomberglaw.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bloomberglaw.com

*Insurance*

## Insurer Skirts Suit in Fatal Attack By Pub Patron

Nautilus Insurance Co. won't have to defend wrongful death claims that a pub served alcohol to an underage and violence-prone customer who stabbed another customer to death, a federal court in Pennsylvania ruled July 17.

The ruling means Owens Cafe in Philadelphia won't have the backing of a $1 million policy in defending claims by the parents of Thomas Ewing that bar staff negligently served alcohol to Angelo Maldonado and enlisted him to confront their son and other patrons.

A clause in the policy written by Nautilus excluded bodily injury claims stemming from physical altercations, even when staff fail to prevent or suppress an altercation, the U.S. District Court for the Eastern District of Pennsylvania said.

The chain of events began when cafe employees allegedly directed Maldonado to confront Ewing after a bottle was taken from behind the bar, according to the decision.

It was foreseeable the "visibly intoxicated" Maldonado, known by bar employees to be violent, would assault Ewing, his estate claims in the underlying civil suit.

Arguments that the cafe was negligent in failing to secure the bottle and in enlisting Maldonado didn't change the policy's "broad" exclusion of bodily injury claims, the court said.

The clause also specifically extended to allegations that the cafe negligently hired and trained its employees when such injuries occur.

Judge Gerald Austin McHugh wrote the opinion.

Bricklin & Saltzburg LLC represented Nautilus. The Law Offices of Thomas P. Pfender represented Owens


COPYRIGHT © 2018 BY THE BUREAU OF NATIONAL AFFAIRS, INC. CRL ISSN 0011-1341

Back to Roane! (pg. 3)



897 F.3d 154
United States Court of Appeals, Third Circuit.

**Jerry REEVES**, Appellant
v.
FAYETTE SCI; the Attorney General of the State of Pennsylvania; the District Attorney of Dauphin County

No. 17-1043
|
Argued May 16, 2018
|
(Filed: July 23, 2018)
|
Amended: July 25, 2018

on tape confession!

**Synopsis**

**Background:** After affirmance of state prisoner's convictions for second-degree murder, robbery, and carrying firearm without license, relating to convenience store robbery that resulted in store clerk's death, and after affirmance of denial of state postconviction relief, 2013 WL 11250902, prisoner filed four-months-late petition for federal habeas relief, alleging that counsel was ineffective in failing to present exculpatory evidence, including evidence concerning two other potential suspects. The United States District Court for the Middle District of Pennsylvania, No. 3-14-cv-01500, Malachy E. Mannion, J., 2016 WL 7411130, adopted the report and recommendation of Susan E. Schwab, United States Magistrate Judge, 2016 WL 7424265, and dismissed the petition. Prisoner appealed.

**[Holding:]** The Court of Appeals, Shwartz, Circuit Judge, held that as a matter of first impression, when a state prisoner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the actual innocence miscarriage of justice gateway to excusing procedural default of a state prisoner's federal habeas claim.

Vacated and remanded.

McKee, Circuit Judge, filed a concurring opinion.

West Headnotes (18)

[1] **Habeas Corpus**
⚷=Availability of Remedy Despite Procedural Default or Want of Exhaustion

For a state prisoner to qualify for the actual innocence miscarriage of justice exception to procedural default of a federal habeas claim, the prisoner must present new, reliable evidence showing it is more likely than not that no reasonable juror would have voted to convict him. 28 U.S.C.A. §§ 2244(d)(1)(A), 2254.

Cases that cite this headnote

[2] **Habeas Corpus**
⚷=Scope and Standards of Review

Appellate review of the District Court's dismissal of a state prisoner's federal habeas petition is plenary, where the District Court did not conduct an evidentiary hearing. 28 U.S.C.A. § 2254.

Cases that cite this headnote

[3] **Habeas Corpus**
⚷=Scope and Standards of Review

The Court of Appeals exercises plenary review over the District Court's determination of a state prisoner's claim of actual innocence, for purposes of the actual innocence miscarriage of justice exception to procedural default of a federal habeas claim. 28 U.S.C.A. §§ 2244(d)(1)(A), 2254.

1 Cases that cite this headnote

(pg. 4)

# Lead Reports

*Due Process*

## Lawyer Couldn't Concede Guilt in Death Penalty Case

A lawyer was wrong to admit his client's involvement in a triple-murder, even if it was part of a strategy to try to keep him off death row, the U.S. Supreme Court held May 14.

"With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense," Justice Ruth Bader Ginsburg wrote for herself and five other justices.

The decision delved into defendants' autonomy and, for some, highlighted what's wrong with criminal justice in Louisiana.

Larry English hoped that by telling a Louisiana jury upfront that Robert McCoy killed three people, he might get mercy in the face of strong evidence and a likely penalty phase. The strategy didn't work. McCoy was convicted of three counts of first-degree murder and sentenced to death.

McCoy objected to the concession strategy, maintaining his innocence and demanding that English put on an alibi defense that his attorney believed was a conspiracy theory contradicted by the evidence.

On appeal, McCoy said it should've been his choice, regardless of whether the lawyer thought the concession was a good idea or even the only way to save McCoy's life.

McCoy is correct, Ginsburg wrote for the majority. To hold otherwise would violate the Sixth Amendment right to counsel, she wrote.

The majority's opinion "restores in Louisiana the constitutional right of every individual to present their defense to a jury," McCoy's Supreme Court lawyer Richard Bourke said in an emailed statement to Bloomberg Law.

The high court threw out McCoy's conviction and sentence, setting the stage for a retrial.

"Mr. McCoy's case will now, for the first time, be investigated and litigated by a legal team intent on honoring his vehement protestations of innocence, rather than conceding his guilt," Bourke, director of the Louisiana Capital Assistance Center, said.

The state of Louisiana sees it differently.

"We are disappointed in today's ruling that grants a new trial in a case where overwhelming evidence of guilt is present and where the entire Supreme Court acknowledges the result is not likely to be different," Louisiana Attorney General Jeff Landry said in an emailed statement to Bloomberg Law.

The majority made "a policy decision, not a constitutional one," Landry said.

**'Straightforward,' But Potential 'Danger'** A leading death penalty proponent told Bloomberg Law he agreed with McCoy's position generally.

"Admitting guilt, even of a lesser degree of offense, should be the client's decision as long as he is mentally competent," Kent S. Scheidegger, legal director of the Criminal Justice Legal Foundation, said.

Yet he didn't fully praise the opinion.

"The danger that I see is that this decision may be exploited to attack convictions when the defendant did not express his disagreement in court, and the facts are all shielded by the attorney-client privilege," Scheidegger said.

"The objection could be fabricated after the trial. We do need some safeguards to ensure that does not occur," he said.

Robert Dunham, executive director of the Death Penalty Information Center in Washington, called the majority's decision "straightforward."

"The court has long said that defendants have the right to make particular choices and one of the most important of those choices is how to plead," Dunham told Bloomberg Law.

Another lawyer described the case through the lens of what some see as Louisiana's idiosyncratic justice system.

"The case is another clarifying example of Louisiana's broken death penalty system," G. Ben Cohen told Bloomberg Law. He's of counsel at The Promise Of Justice Initiative in New Orleans, where he filed an amicus brief supporting McCoy.

"It may not happen very often in the rest of the country, but it's a real problem in Louisiana, with undertrained and overworked lawyers making decisions that undermine their clients autonomy, while judges simultaneously ignore or override complex questions about competency and mental illness," Cohen said.

Competency wasn't directly at issue in McCoy's appeal.

**Not All-or-Nothing** To get the assistance of counsel required by the Sixth Amendment, "a defendant need not surrender control entirely to counsel," Ginsburg wrote for the majority.

"The choice is not all or nothing," she said.

It's true that some decisions are up to the lawyer, like what objections to raise about evidence, Ginsburg noted.

But some decisions belong to the client, and maintaining innocence is one of them, Ginsburg said.

A client "may hold life in prison not worth living and prefer tc risk death for any hope, however small, of exoneration," she said.

**Nixon is Different** The justices decided McCoy's case against the backdrop of a somewhat similar one: *Florida v. Nixon*.

In that 2004 decision, also authored by Ginsburg, the court said a lawyer could concede a client's guilt in a



PAUL, JEFFERY 10517042

death penalty case when the defendant doesn't say whether he wants to pursue that strategy.

But the defendant there didn't object, so "Nixon's attorney did not negate Nixon's autonomy," Ginsburg said.

That's not what happened here.

McCoy "opposed English's assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court," Ginsburg said.

McCoy's supporters are pleased that the majority recognized the distinction.

"Today's decision vindicates the principle of defendant autonomy and the long-standing maxim that the Sixth Amendment guarantees the right to a personal defense," Jay Schweikert of the Cato Institute told Bloomberg Law. He was the principle author of an amicus brief supporting McCoy.

Lawrence Fox told Bloomberg Law that he's happy with the result but that he thinks the majority didn't go far enough in terms of client autonomy. Fox, the George W. and Sadella D. Crawford Visiting Lecturer in Law at Yale, likewise filed an amicus brief supporting McCoy, on behalf of law professors and the Ethics Bureau at Yale.

**Prejudice Presumed** Another question was what legal test to apply to McCoy's claim.

Typically in an ineffective assistance case, a defendant has to show he was prejudiced by the lawyer's ineffectiveness under *Strickland v. Washington*.

But because McCoy's autonomy, not his lawyer's competence, is at issue here, the majority didn't apply the *Strickland* test.

The error here was "structural," Ginsburg wrote. That means McCoy gets a new trial without having to show prejudice.

**Dissent Tries to Keep it Real** Justice Samuel A. Alito Jr. dissented, joined by Justices Clarence Thomas and Neil M. Gorsuch. The trio has on multiple occasions voted together to dissent from execution stay grants this term.

The dissent accused the majority of skewing the facts to "achieve a desired result."

That echoed the Louisiana attorney general's sentiments.

"We were always concerned that the actual facts of this case would be eclipsed by fiction. Unfortunately, that's exactly what happened," Landry said.

Alito pointed out that McCoy was charged with first-degree murder and that English didn't concede that McCoy committed that particular crime.

Rather the lawyer admitted that McCoy killed the victims but "strenuously argued" that McCoy was guilty of a lesser degree of murder.

"So the court's newly discovered fundamental right simply does not apply to the real facts of this case," Alito charged.

The case is *McCoy v. Louisiana*, U.S., 16-8255, reversed and remanded, 5/14/18.

To contact the reporter on this story: Jordan S. Rubin in Washington at jrubin@bloomberglaw.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bloomberglaw.com

(pg. 5)

*Search and Seizure*

## Justices Hand Driver Win On Rental Car Searches

A driver not listed on the rental agreement may still have a reasonable expectation of privacy in the vehicle, the U.S. Supreme Court ruled May 14.

The justices unanimously rejected the argument that Terrence Byrd couldn't challenge the search of a rental car he was driving simply because he wasn't an authorized driver.

The court takes "an expansive reading of the Fourth Amendment, with the conclusion being that the Constitution trumps contractual terms," Colin Miller, of the University of South Carolina College of Law, Columbia, S.C., told Bloomberg Law in an email. Miller filed an amicus brief in support of Byrd.

Orin Kerr, of the University of Southern California Gould School of Law, Los Angeles, who has written about the case on The Volokh Conspiracy, nevertheless described the court's decision as "narrow."

The court didn't lay out the "precise test for when a person has sufficient rights in a rental car to have Fourth Amendment rights," Kerr told Bloomberg Law in an email. It simply said that being an unauthorized driver, by itself, wasn't enough to defeat a driver's Fourth Amendment interest.

The court sent the case back to the U.S. Court of Appeals for the Third Circuit to examine the contours of the appropriate test.

That court previously rejected Byrd's motion to suppress the 49 bricks of heroin and body armor found in the trunk, noting a split existed in the federal courts on whether drivers like Byrd have expectations of privacy in rental vehicles.

**Your Stuff?** The court took what it called a "property-based" look at the Fourth Amendment.

In "the main, 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude,'" Justice Anthony M. Kennedy wrote for the court.

There's "no reason why the expectation of privacy that comes from lawful possession and control" would "differ depending on whether the car in question is rented" by "someone other than the person in current possession of it," Kennedy said.

The court's core reasoning seems to be that the ability to challenge a search of "property comes from it being treated as your stuff, and whether your name is on the rental car contract doesn't seem that important to whether it's treated as your stuff," Kerr said on Twitter.

**No Lines** The decision leaves open "the hard line-drawing question as applied to this case," Kerr said.

The government argued that Byrd procured the rental car by a fraud. He used "a straw renter to allow him to take sole control of a rental car that he would not have been able to rent himself" because of his criminal background, the government said in its brief.

The government likened Byrd to a car thief, whom all parties seemed to agree would not have a reasonable expectation of privacy in the car.

But the court was unclear if "law should distinguish between one who obtains a vehicle through subterfuge


COPYRIGHT © 2018 BY THE BUREAU OF NATIONAL AFFAIRS, INC. CRL ISSN 0011-1341
PAUL JEFFERY 10517042

(Pg. 6)



Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McCOY *v.* LOUISIANA

CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 16–8255. Argued January 17, 2018—Decided May 14, 2018

Petitioner Robert McCoy was charged with murdering his estranged wife's mother, stepfather, and son. McCoy pleaded not guilty to first-degree murder, insisting that he was out of State at the time of the killings and that corrupt police killed the victims when a drug deal went wrong. Although he vociferously insisted on his innocence and adamantly objected to any admission of guilt, the trial court permitted his counsel, Larry English, to tell the jury, during the trial's guilt phase, McCoy "committed [the] three murders." English's strategy was to concede that McCoy committed the murders, but argue that McCoy's mental state prevented him from forming the specific intent necessary for a first-degree murder conviction. Over McCoy's repeated objection, English told the jury McCoy was the killer and that English "took [the] burden off of [the prosecutor]" on that issue. McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom. The jury found him guilty of all three first-degree murder counts. At the penalty phase, English again conceded McCoy's guilt, but urged mercy in view of McCoy's mental and emotional issues. The jury returned three death verdicts. Represented by new counsel, McCoy unsuccessfully sought a new trial. The Louisiana Supreme Court affirmed the trial court's ruling that English had authority to concede guilt, despite McCoy's opposition.

*Held*: The Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Pp. 5–13.

(a) The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." The defendant does not

(pg. 7)



surrender control entirely to counsel, for the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta* v. *California*, 422 U. S. 806, 819–820. The lawyer's province is trial management, but some decisions are reserved for the client—including whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. Autonomy to decide that the objective of the defense is to assert innocence belongs in this reserved-for-the-client category. Refusing to plead guilty in the face of overwhelming evidence against her, rejecting the assistance of counsel, and insisting on maintaining her innocence at the guilt phase of a capital trial are not strategic choices; they are decisions about what the defendant's objectives in fact *are*. See *Weaver* v. *Massachusetts*, 582 U. S. ___, ___. Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as English did here. But the client may not share that objective. He may wish to avoid, above all else, the opprobrium attending admission that he killed family members, or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. See Tr. of Oral Arg. 21–22. Thus, when a client makes it plain that the objective of "his defence" is to maintain innocence of the charged criminal acts and pursue an acquittal, his lawyer must abide by that objective and may not override it by conceding guilt. Pp. 5–8.

Plea Barg. Rejected! No Mens Rea! Witness only "Saw"

(b) *Florida* v. *Nixon*, 543 U. S. 175, is not to the contrary. Nixon's attorney did not negate Nixon's autonomy by overriding Nixon's desired defense objective, for Nixon "was generally unresponsive" during discussions of trial strategy and "never verbally approved or protested" counsel's proposed approach. *Id.*, at 181. He complained about counsel's admission of his guilt only after trial. *Id.*, at 185. McCoy, in contrast, opposed English's assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court. Citing *Nix* v. *Whiteside*, 475 U. S. 157, the Louisiana Supreme Court concluded that English's refusal to maintain McCoy's innocence was necessitated by a Louisiana Rule of Professional Conduct that prohibits counsel from suborning perjury. But in *Nix*, the defendant told his lawyer that he intended to commit perjury. Here, there was no avowed perjury. English harbored no doubt that McCoy believed what he was saying; English simply disbelieved that account in view of the prosecution's evidence. Louisiana's ethical rules might have stopped English from presenting McCoy's alibi evidence if English knew perjury was involved, but Louisiana has identified no ethical rule requiring English to admit McCoy's guilt over McCoy's objection. Pp. 8–11.

(Pg. 8)



(c) The Court's ineffective-assistance-of-counsel jurisprudence, see *Strickland* v. *Washington*, 466 U. S. 668, does not apply here, where the client's autonomy, not counsel's competence, is in issue. To gain redress for attorney error, a defendant ordinarily must show prejudice. See *id.*, at 692. But here, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative. Violation of a defendant's Sixth Amendment-secured autonomy has been ranked "structural" error; when present, such an error is not subject to harmless-error review. See, *e.g.*, *McKaskle* v. *Wiggins*, 465 U. S. 168, 177, n. 8; *United States* v. *Gonzalez-Lopez*, 548 U. S. 140; *Waller* v. *Georgia*, 467 U. S. 39. An error is structural if it is not designed to protect defendants from erroneous conviction, but instead protects some other interest, such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Weaver*, 582 U. S., at __ (citing *Faretta*, 422 U. S., at 834). Counsel's admission of a client's guilt over the client's express objection is error structural in kind, for it blocks the defendant's right to make a fundamental choice about his own defense. See *Weaver*, 582 U. S., at ___. McCoy must therefore be accorded a new trial without any need first to show prejudice. Pp. 11–12.

2014–1449 (La. 10/19/16), 218 So. 3d 535, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined.

(pg. 9)

# Court Decisions

*Criminal Law*

Guilty

## Ineffective Counsel Argument Gets Murder Convictions Vacated

A death-row inmate's murder convictions must be vacated, the U.S. Court of Appeals for the Ninth Circuit ruled Dec. 29.

Trial counsel's failure to present evidence of the defendant's mental impairments was prejudicial and ineffective assistance, the court said in an opinion by Judge Stephen Reinhardt.

The defendant was being convicted of two counts of first degree murder, rape, and forcible sodomy.

During the trial, defense counsel relied on the relatively weak strategy that the defendant was drunk when he committed the crimes. Had he educated himself, however, counsel would have learned that the defendant had genetic mental impairments that were exasperated by being raised by abusive adoptive parents, the court said.

Based on the strong expert testimony explaining the defendant's diminished capacity and how it would have impacted his behavior when he committed the crimes, it's likely that at least one juror would have declined to convict the defendant of first degree murder, the court said, granting his writ for habeas corpus.

Judge Harry Pregerson was on the panel and concurred in the opinion prior to his death.

Dissenting Judge Jacqueline H. Nguyen argued that the defendant confessed and the evidence was overwhelming that he had specific intent to rape and kill.

The Federal Public Defender's Office, Los Angeles, represented the defendant. The California Attorney General's Office represented the state.

The case is (*Hernandez v. Chappell*, 2017 BL 467007, 9th Cir., No. 11-99013, 12/29/17).

BY BERNIE PAZANOWSKI

To contact the reporter on this story: Bernie Pazanowski in Washington at bpazanowski@bloomberglaw.com

To contact the editor responsible for this story: Jessie Kokrda Kamens at jkamens@bloomberglaw.com

*Full text at http://src.bna.com/vlD.*

*Right to Counsel*

## Right to Counsel Violated During Motion to Compel DNA Test

A criminal defendant had a Sixth Amendment right to counsel during proceedings to compel him to submit to a DNA test, the New York Court of Appeals ruled Dec. 19.

The trial court's refusal to allow Dwight Smith to confer with new counsel prior to submitting to the test violated that right, the court said in an opinion by Judge Jenny Rivera.

Smith wasn't in court but was represented by counsel when the prosecutor moved for him to submit to the DNA test. At that time, Smith's counsel asked to be removed from the case. Inferring consent from counsel's silence about the test, the court granted both motions.

When Smith appeared in court later, he was denied permission to speak to new counsel about the test. Instead, the judge said there was no legal basis to fight the test, adding, "I know the law." Smith took the test and pleaded guilty to first degree manslaughter.

"On these facts," the court said, the lower court correctly determined that the pretrial proceedings over the DNA test were "critical," and Smith was deprived of his right to counsel.

Dissenting, Judge Michael Garcia, joined by Judges Leslie Stein and Eugene M. Fahey, argued that all critical motions practice surrounding the DNA test was completed while Smith was represented by counsel. Thus, Smith's claim amounted to an inadequate representation claim beyond the scope of the appeal.

The Bronx County District Attorney's Office represented the state. Matthew Bova, New York, represented Smith.

The case is *People v. Smith*, 2017 BL 452799, N.Y., No. 123, 12/19/17.

BY BERNIE PAZANOWSKI

To contact the reporter on this story: Bernie Pazanowski in Washington at bpazanowski@bloomberglaw.com

To contact the editor responsible for this story: Tom P. Taylor at ttaylor@bloomberglaw.com

*Full text at http://src.bna.com/u7U.*

*Evidence*

## 'Criminal Profile' Evidence Thwarts Murder Convictions

Wrongly admitting expert "criminal profile" testimony and other errors led to an unfair murder trial, the U.S. Court of Appeals for the Ninth Circuit held Dec. 19.

Citing the U.S. Supreme Court's admonition from last term's *Buck v. Davis*—which chastised racist expert testimony—that "our law punishes people for what they do, not who they are," the appeals court said the testimony here was improperly used to show James Michael Wells's guilt.

A jury convicted Wells of murdering two of his coworkers. He was sentenced to consecutive life terms.

But the trial judge shouldn't have allowed testimony on the characteristics of those who commit targeted workplace violence, the appeals court said. The testi-


COPYRIGHT © 2018 BY THE BUREAU OF NATIONAL AFFAIRS, INC. CRL
ISSN 0011-1341

PAUL JEFFERY 10517042

(pg. 10)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTICT OF INDIANA

| | |
|---|---|
| JEFFREY WILLIAM PAUL,<br><br>Petitioner,<br><br>V.<br><br>SUPERINTENDENT, USP-Terre Haute,<br>UNITED STATES OF AMERICA,<br><br>Respondents. | CIVIL ACTION<br>(Capital Habeas Corpus)<br><br>2:13-CV-00304-WTL-WGH<br><br>**Hon. William T. Lawrence**<br>**United States District Judge**<br><br>**Filed Under Seal** |

**PETITION FOR WRIT OF HABEAS CORPUS**

LEIGH SKIPPER
Federal Defender
SHAWN NOLAN
Chief, Capital Habeas Unit
PETER WILLIAMS
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner

Dated: October 18, 2016

offense. When the car was finally recovered, Ingle's fingerprint, not Mr. Paul's, was found inside. *Paul-1* at 994.

**C. Trinity Ingle's Declaration.** (Forensic Match) —

15. Trinity Ingle had proceeded to trial in advance of Mr. Paul, and was convicted of first-degree murder and related charges. Although the government sought a death sentence, Ingle received a life sentence after a contested penalty phase approximately two weeks before Mr. Paul's trial. His conviction and sentence were affirmed on October 8, 1998. *United States v. Ingle*, 157 F.3d 1147 (8th Cir. 1998) (*rehr'g. denied* on Nov. 9, 1998). On February 11, 2005, Ingle signed a declaration in which he took full responsibility for the murder of the decedent and exculpated Mr. Paul. In this declaration, Ingle reported that:

> On June 22, 1995 me and Jeff were downtown in Hot Springs by the Arlington Hotel. I was wanting to rob a shop downstairs. Jeff was high and was pretty much just following me where I was going to. I was high too otherwise I would not have been wanting to rob a shop in broad daylight. But so we're standing outside of the mall when Mr. Williams drove by. I had not slept for days and was high on Methamphetamine which can make you paranoid and was making me paranoid after ten days of it and not sleeping. It was one of those times where if things had gone different, if a cop car had come by or something like that, I would have just left, but when Mr. Williams drove by he looked at me and I just locked in on him. In my paranoia I knew he had seen the gun in my waistband and knew that now he knew that I was thinking to do by robbing the shop downstairs. So when he got out of the car I told Jeff to come and follow me. At this point Jeff did not know what I was doing and so he wasn't arguing about it yet. As far as I knew, Jeff did not know that I had a gun. I didn't tell Jeff about my suspicions of Mr. Williams, nor did I say anything to him about what I planned to do.
>
> I followed Mr. Williams up the trail and Jeff was following me. I stopped him by asking him if he had the time. After he told us the time I pulled the gun out and told him to give up everything he had. When he didn't, I hit him and kicked him on the ground. By this time, Jeff was getting very nervous. He was trying to get me to leave, saying, "come on, let's go." But I wasn't about to leave, but I still had the gun in my hand and Jeff knew it.
>
> I told Jeff to keep quiet and I tied the guy up with the tape. Then Jeff and I started back down the trail but when I looked back at him the guy was looking right at me. I turned to go back but Jeff grabbed me by the arm and said, "let's just leave him and get out of here." Jeff kept arguing with me but I yanked free of him

> holding me. I still had the gun in my hand and Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what it was I was going back up the mountain for, I made sure he knew if he put his hands on me again trying to stop me I would have shot him, too, and it would have been two people left up on that mountain.
>
> So I walked back up the trail and asked the guy if he was going to call the cops. He said no but of course I knew he was lying. So I stood over him and shot him in the chest but one shot was rat shot which I had forgot was in the chamber. I heard Jeff yelling at me to stop, but I turned back around and shot Mr. Williams with the real bullet in the head.
>
> Everything else I believe is already known which followed that.
>
> The gun I got from a burglary off Higden Ferry Road, New Oscar Point and Amity. It was a brown and yellow house and part of the yard was fences. It was in the morning that I broke into the house and found the guns in a closet. I think I recall that they were in a box on the closet floor. I also took some things out of the ice box and some change and silver dollars. Actually I had gotten two guns from there, a .357 and the .38 I used to shoot Mr. Williams. The .357 I had already sold.

Dec. Trinity Ingle at 1-3.

16. Section 2255 counsel averred, *inter alia*, that Mr. Paul's conviction and death sentence should be overturned because he was actually innocent of the decedent's homicide and because trial counsel were ineffective for failing to present Ingle's testimony to the jury. Because the § 2255 court had denied Mr. Paul's § 2255 petition on January 31, 2005, § 2255 counsel submitted the Ingle declaration in connection with a Motion to Reconsider Memorandum and Orders, or in the Alternative, to Vacate, Set Aside, or Correct Memorandum and Order Denying Relief Pursuant to Rule 59(e) and Rule 60(b). The § 2255 court did not comment on Ingle's declaration and denied Rule 59(e) and 60(b) relief without any analysis of Ingle's proffered testimony. On appeal, the *Paul-2* court did not contest the import of Ingle's proffered testimony and acknowledged that Ingle "asserts that Paul tried to convince Ingle to leave the park before Williams was killed, and avers that Ingle alone shot Williams while Paul yelled at him to stop," and that Ingle's proffered statement took "full responsibility for the murder of

(pg 13)

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2013 | 1 | PETITION for Writ of Habeas Corpus, filed by JEFFERY WILLIAM PAUL. (No fee paid with this filing) (Attachments: # 1 Exhibit Legal Notice, # 2 Exhibit Inmate Request, # 3 Exhibit Letter, # 4 Exhibit Declaration, # 5 Envelope)(JRT) (Entered: 08/21/2013) |
| 08/21/2013 | 2 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (JRT) (Entered: 08/21/2013) |
| 01/14/2014 | 3 | MOTION for Summary Judgment, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Various Documents, # 2 Envelope)(SWM) (Entered: 01/15/2014) |
| 01/24/2014 | 4 | MOTION for Due-Process amending Motion c/s, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Redacted Attachment, # 2 Envelope)(DW) (Entered: 01/27/2014) |
| 01/24/2014 | 5 | UNREDACTED DOCUMENT regarding 4 MOTION to Amend/Correct. (DW) (Entered: 01/27/2014) |
| 01/29/2014 ✓ | 6 | ENTRY - The petitioner shall have through February 14, 2014, in which to either pay the $5.00 filing fee for this action or demonstrate his financial inability to do so. The petitioner's motion for summary judgment 3 and motion to amend 4 are denied as inapt to the orderly development of case. Copy to petitioner via US Mail. Signed by Judge William T. Lawrence on 1/29/2014. (RSF) (Entered: 01/29/2014) |
| 02/10/2014 | 7 | MOTION for Leave to Proceed in forma pauperis and MOTION for Reconsideration of Court's 6 ENTRY, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Supporting Documents, # 2 Inmate Account Documents, # 3 Envelope)(JKS) (Entered: 02/11/2014) |
| 02/27/2014 ✓ | 8 | ENTRY - granting 7 Motion for Leave to Proceed in forma pauperis; denying 7 Motion for Reconsideration. (See Entry.) Copy to petitioner via US Mail. Signed by Judge William T. Lawrence on 2/27/2014. (RSF) (Entered: 02/27/2014) |
| 02/28/2014 | 10 | Statement B regarding Habeas Claims by JEFFERY WILLIAM PAUL. (Attachments: # 1 Envelope)(DW) (Entered: 03/03/2014) |
| 03/03/2014 | 9 | Statement A regarding Habeas Claims by JEFFERY WILLIAM PAUL. (Attachments: # 1 Envelope)(DW) (Entered: 03/03/2014) |
| 03/07/2014 | 11 | MOTION for Clerk's Entry of Default and MOTION for Discovery -, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Envelope)(JKS) (Entered: 03/10/2014) |
| 03/13/2014 ✓ | 12 | ENTRY - The respondent need not respond to the habeas petition unless ordered by the court to do so at some future point. However, the respondent is requested to appear by counsel in the case as promptly as possible. Copies distributed pursuant to distribution list. Signed by Judge William T. Lawrence on 3/13/2014.(RSF) (Entered: 03/13/2014) |
| 03/13/2014 ✓ | 13 | ENTRY - denying 11 Motion for Clerk's Entry of Default; denying 11 Motion for Discovery. Copy to petitioner via US Mail. Signed by Judge William T. Lawrence on 3/13/2014. (RSF) Modified on 3/18/2014 (RSF). (Entered: 03/13/2014) |
| 03/13/2014 | 15 | AFFIDAVIT in Support of Documents re 14 MOTION to Append Cause of Action & Exhibit, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Envelope)(JKS) (Entered: 03/14/2014) |
| 03/14/2014 | 14 | MOTION to Append Cause of Action & Exhibit, filed by Petitioner JEFFERY WILLIAM PAUL. |

(Pg. 14)

| | | |
|---|---|---|
| 04/09/2018 | 193 | Letter from Jeffery Paul addressed to Judge Lawrence and Judge Dinsmore (Attachments: # 1 Envelope) (CBU) (Entered: 04/10/2018) |
| 04/23/2018 | 194 | SEALED REPLY in support of Motion re 103 SEALED MOTION *for Writ of Habeas Corpus* , filed by Petitioner JEFFERY WILLIAM PAUL. (Nolan, Shawn) (Entered: 04/23/2018) |
| 04/23/2018 | 195 | MOTION to Maintain Document Under Seal 194 SEALED Reply in support of Motion , filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Text of Proposed Order)(Nolan, Shawn) (Entered: 04/23/2018) |
| 05/29/2018 | 196 | Submission of Exhibits, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Envelope)(DW) (Entered: 05/31/2018) |
| 06/11/2018 | 197 | MOTION to Reiterate Compelling Action to Relieve Petitioner in Further Action due to Prima-Facie both Conviction & Sentence, filed by Petitioner JEFFERY WILLIAM PAUL. (Attachments: # 1 Lead Reports, # 2 Envelope)(JKS) (Entered: 06/12/2018) |

WITNESSES (Pg. 15)

Jurisprudence

HAYES V. WOODFORD, 301 F3d 1054 (9th Cir. 2002)
BYRD V. COLLINS, 209 F3d 486 (6th Cir. 2000)
US V. AGURS, 427 US 97, 49 LEd2d 342, 96 SCt 2392 (1976)

(1) When the prosecution is or should be aware that it is presenting perjured testimony, a strict standard of materiality will be applied, and/or conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Conviction obtained by knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the trial. A new trial is required if perjured testimony could in any reasonable likelihood have affected the judgment of the jury.

RYAN V. MILLER, 303 F3d 231 (2nd Cir. 2002)

(2) Essence of a violation of the Confrontation Clause is the presentation of an accusation against the defendant without presenting the accuser.

US V. ANGWIN, 271 F3d 786 (9th Cir. 2001)
LILLY V. VIRGINIA, ____ US ____, ____ LEd2d ____, 119 SCt 1887 (1999)
BRUTON V. US, 391 US 123, 20 LEd2d 476, 88 SCt 1620

(3) (1968) Post-arrest statements made by non-testifying co-defendants that facially incriminate defendant are inadmissible because such statements violate defendant's Sixth Amendment right to cross-examine adverse witnesses.

US V. LOPEZ-LOPEZ, 282 F3d 1 (1st Cir. 2002)
BRUTON V. US, 391 US 123, 20 LEd2d 476, 88 SCt 1620

(4) (1968) Admission of testimony by a nontestifying defendant inculpating a condefendant in a joint trial is prohibited.

US V. SESCHILLIE, 310 F3d 1208 (9th Cir. 2002)

(5) In those rare cases of an evenly balanced record, issue of whether defendant was prejudiced by erroneous exclusion of witness from courtroom must be resolved in defendant's favor.

US V. UNIVERSAL REHABILITATION SERVICES, INC., 167 F3d 171 (3rd Cir. 1999)

(6) Plea agreements of co-conspirators cannot be used as evidence of defendant's guilt.

ELLSWORTH V. WARDEN, NEW HAMPSHIRE STATE PRISON, 318 F3d 285 (1st Cir. 2003)

(7) Criminal defendant's entitlement to cross-examine witness increases in sensitivity in direct proportion to witness's importance to prosecution's case.

SPLUNGE V. PARKE, 160 F3d 369 (7th Cir. 1998)

(8)
1) Mistaken curtailment of cross-examination constitutes trial error.
2) Defendant is entitled to cross-examine witnesses about potential sources of bias, including the prospect that witness will receive a benefit, such as lower sentence in exchange for favorable testimony.

DAVIS V. ALASKA, 415 US 308, 39 LEd2d 347, 94 SCt 1105 (1974)
POINTER V. TEXAS, 380 US 400, 13 LEd2d 923, 85 SCt 1065 (1965)

(9) Violation of the confrontation clause require reversal unless they are harmless beyond a reasonable doubt.

(Pg. 26)

(pg 16)

# RULE 61

## HARMLESS ERROR

Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

### 2007 AMENDMENTS ROADMAP

**STYLE PROJECT CHANGES:** The densely complex first sentence of this Rule was reworded. The bulky "inconsistent with substantial justice" standard was thinned to "justice requires".

**NON-STYLE CHANGES:** None.

*NOTE: The Federal Rules "Style Project" is explained in Part III-A.*

## AUTHORS' COMMENTARY ON RULE 61

### PURPOSE AND SCOPE

Rule 61 codifies the principle that "harmless" errors by the district court—those errors that do not affect the parties' substantial rights—will not justify a new trial, setting aside a verdict, or vacating, modifying, or otherwise disturbing the court's order.

### APPLICATIONS

#### Standard for "Harmlessness"

Rule 61 defines a harmless error as one that does not affect the substantial rights of the parties or does not defeat substantial justice.[1] But an error will not be discounted as harmless if the court is left with a grave doubt as to whether the error had a substantial influence in the ultimate result.[2] A more exacting definition is

1. Rule 61. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752 (7th Cir.1994)(harmless error calls into question the fundamental fairness of the trial).

2. *See Krulewitch v. United States*, 336 U.S. 440, 444–45, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949)(defining harmlessness in criminal context); *Sims v. Great American*

Wiggins initially turned down deals carrying a 15-year sentence and another of 10 years to life. He opted for trial where he was convicted and sentenced to life.

He won relief, claiming he went to trial only because his lawyer was ineffective by failing to inform him that he faced a mandatory life sentence, if convicted.

He was offered and accepted the deal of 10 years to life and received 20. He appealed that, saying the district court should've given him the 15-year option.

Wiggins's relief needn't allow him to chose between the two offers when regardless of the ineffective assistance he would've rejected the one that provided a certain 15 years, the court said.

Wiggins said before trial that he wanted to see his daughter graduate from high school and wouldn't accept an offer that could result in a sentence of over 10 years.

Judges Roger L. Wollman and Ralph R. Erickson concurred.

The case is *Wiggins v. United States*, 2018 BL 293502, 8th Cir., 16-4540, 8/16/18

By Alisa Johnson

To contact the reporter on this story: Alisa Johnson in Washington at ajohnson@bloomberglaw.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bloomberglaw.com

*Civil Rights*

## Prisoner's 6th Request for Pro Bono Lawyer Improperly Denied

A trial court should have tried to recruit a pro bono lawyer for a prisoner's civil rights suit against guards, despite properly denying the previous five requests, the U.S. Court of Appeals for the Seventh Circuit said Aug. 20.

The sixth denial was an abuse of discretion because of changed circumstances, the opinion by Judge Amy C. Barrett said.

Fredrick Walker has an elementary school education and a 76 IQ. He claimed several guards beat him and, with the help of another prisoner, sued them for excessive force. A jury ruled in favor of the guards.

Civil plaintiffs don't have a right to appointed counsel, but they can ask a court to recruit a pro bono lawyer for them. The court must decide whether the plaintiff made a reasonable attempt to obtain counsel and, given the difficulty of the case, whether he is competent to litigate it.

Walker's first five requests were denied because the court didn't deem his case difficult and his pleadings were fairly well written. But the analysis should have changed once the video trial was set and Walker's jailhouse lawyer was transferred, the appeals court said.

Even if Walker's claims were simple, putting on a jury trial is far more complicated than filing pleadings, the court said. Video trials also have special considerations, including the loss of physical presence and the juror's ability to read a witness's body language, it said.

In addition, the trial court should have given more weight to Walker's cognitive abilities. His performance at trial was incoherent, the court said.

Judges Daniel A. Manion and Robert W. Gettleman, sitting by designation, joined the opinion.

Sarah O'Rourke Schrup represented Walker. The Illinois Attorney General's Office represented the guards.

The case is *Walker v. Price*, 2018 BL 297692, 7th Cir., No. 17-1345, 8/20/18.

By Bernie Pazanowski

To contact the reporter on this story: Bernie Pazanowski in Washington at bpazanowski@bloomberglaw.com

To contact the editor responsible for this story: Jessie Kokrda Kamens at jkamens@bloomberglaw.com

*Guilty Pleas*

## Appeal Waiver Won't Stop Ineffective Counsel Claim at Sentencing

A defendant's generic waiver of the right to appeal doesn't waive the right to claim ineffective assistance of counsel at sentencing, the U.S. Court of Appeals for the District of Columbia Circuit held Aug. 17.

The unnamed defendant in this sealed case can appeal, on the basis of ineffective assistance, the sentence he received after pleading guilty, the court said in an opinion by Judge Srikanth Srinivasan.

The federal circuits are spit on this issue. Several have held that a generic waiver does encompass any errors counsel might make at sentencing.

However, the issue may not come up again since the Department of Justice directed federal prosecutors to refrain from having defendants waive ineffective assistance claims.

The case was sent back to the district court so it can look at the merits of the claim.

Judges Robert Leon Wilkins and David B. Sentelle also sat on the panel.

The case is *In re sealed case*, D.C. Cir., 16-3005, 8/17/18.

By Alisa Johnson

To contact the reporter on this story: Alisa Johnson in Washington at ajohnson@bloomberglaw.com

To contact the editor responsible for this story: C. Reilly Larson at rlarson@bloomberglaw.com

*Civil Rights Actions*

## Service Animals Can't Be Denied in Most Cases, Court Says

Programs receiving federal funds must almost always accommodate service animals, the U.S. Court of Appeals for the Third Circuit held Aug. 14.

This is the first time a federal appeals court has addressed the issue.

The Rehabilitation Act provides the same protections for service animals as the Americans With Disabilities Act, which says that the accommodation of a disabled person's service animal is legally reasonable, Judge Cheryl Ann Krause said for the court.

The ADA prohibits discrimination on the basis of disability in employment, government, public accommodations, commercial facilities, transportation, telecommu-



PAUL, JEFFERY 10517042

(pg. 18)



# Best columns: Business

## Stock market: Apple's trillion-dollar milestone

"Apple has crossed a psychological threshold as much as a numerical one," said **Brad Stone** in ***Bloomberg Businessweek***. Last week the company, already "the most valuable business in modern history," attained a market capitalization of $1 trillion, a remarkable number for the personal-computing upstart founded in a Silicon Valley garage by Steve Jobs and his buddy Steve Wozniak in 1976. Twenty years later, Apple almost died: *Businessweek*'s 1996 Apple cover had the words "The Fall of an American Icon" on an all-black field. That was the year Apple brought back Jobs. His homecoming presaged the introduction of the iMac, iPod, iPad, and the iPhone as Jobs and his lieutenants "parlayed their uncommon obsession with design and ease of use into a historic run." Today, under Jobs' successor, Tim Cook, Apple's valuation is in line with the total economic output of Indonesia, the world's 16th-largest economy; its annual revenue is about the same as the gross domestic product of Finland. This is a corporate scale so great that Apple could acquire any emerging competitor, and no government has the appetite to take it on.



*Can Cook's Apple still surprise?*

Things would be different were it not for the success of the iPhone and "the smartphone era it birthed," said **Tripp Mickle** and **Amrith Ramkumar** in ***The Wall Street Journal***. The iPhone's triumph—1.4 billion sold and counting—led to "a broader tech boom that has made a handful of giant companies central in people's daily lives and investment portfolios." The iPhone changed how we interact with tech and powered the giant mobile advertising businesses at Google and Facebook. But economists worry that Apple and its brethren are "contributing to the lackluster wage growth, shrinking middle class, and rising income inequality in the U.S.," said **Matt Phillips** in ***The New York Times***. Apple's rise coincides with "a profound shift" in "the distribution of corporate profits among American companies." In 1975, 109 companies banked half of all the profits produced by publicly traded businesses. Today, only 30 companies capture that share. Just five banks control almost half of all assets in the American financial system. Four companies rule 98 percent of the American wireless market. "Consolidation begets profits." For the markets, that's fine, just "as long as profits keep pouring in."

Cook isn't crowing about his company's trillion-dollar milestone, says **Guadalupe Gonzalez** in ***Inc.com***. As Cook wrote in a memo to employees, the financial returns are "simply the result of Apple's innovation." But can this supersize Apple keep innovating? asked **Zachary Karabell** in ***Wired.com***. It's massively profitable and still growing, yet "its products appear set and essentially static." The areas in which it is investing research and development—such as AI, cars, robotics, and voice—are already brimming with "a host of deep-pocketed competitors and hungry upstarts." Previous market leaders, such as Exxon and IBM, generated huge profits but eventually lost momentum and dominance as the world changed. Still, these are problems Apple's rivals can only envy. Even if it turns out that $1 trillion "is at or near its apex," Apple will "still be one of the most successful companies the world has ever seen."

## Big Tech keeps getting bigger

**Farhad Manjoo**
*The New York Times*

The backlash against tech's Frightful Five—Apple, Amazon, Google, Facebook, and Microsoft—hasn't hurt their bottom lines a bit, said Farhad Manjoo. Each of them reported earnings "brimming with fantastic news" for investors. Even after Facebook lost $120 billion in market value in one day, it's still the fifthmost valuable corporation in America. Big Tech has been hit with calls for antitrust investigations, accused of political bias, criticized for a lack of diversity, and bashed for feeding an unprecedented increase in income inequality. Company leaders have sounded contrite and "remorseful," and have admitted "moral responsibility" as well as a commitment to "rehabilitation." Yet all the while, they've "expanded their foothold in our lives." If they face real competition, it's mainly from one another. And thanks to growing sales of high-margin web services, including Amazon's cloud-computing business, the Frightful Five are making money even more rapidly. All that cash gets reinvested in tech "that will dominate the future, from artificial intelligence to voice services to self-driving cars." Get used to the Frightful Five. Their footprint on the culture is only growing, and they're still finding a lot more new ways to make money. Despite the outcry, don't expect their power to fade anytime soon.

## CBS needs a new chief

**Holman Jenkins**
*The Wall Street Journal*

It's time for Les Moonves to go, said Holman Jenkins. "Moonves has been a great executive, but then Kevin Spacey was a great actor, Charlie Rose was a great interviewer, Matt Lauer was a great morning-show host." Pressure for Moonves to exit comes at a convenient time for CBS shareholders. Moonves has been "engaged in a power struggle with his controlling shareholder, Shari Redstone." Redstone has pushed for a merger between CBS and Viacom, two companies that were both part of her father Sumner Redstone's empire. Moonves' efforts to block the merger have been messy, expensive, and so far futile. So even without the allegations of sexual misconduct that trail him, it would "have required a heroic effort to patch things up and preserve him in his job anyway." It's a tumultuous time for network television as it transitions to the world of streaming. Once the CBS-Viacom merger happens, the combined company will be a significant acquisition target. CBS-Viacom will need a partner, perhaps Amazon, to thrive in a landscape of media giants. But no deal will happen with Moonves there. Which is one reason for him to exit quickly. Remember: As good as Rose, Spacey, and Lauer were in their respective roles, "the world has hardly stopped turning because of their absence."

AP



IN DEPTH

ECONOMICS

# *Stealing industrial secrets pays off—at first*

## East German records show economic espionage is like R&D "on cocaine" for perpetrators

By **Catherine Matacic**

Deep in debt and struggling to provide for his family, Hans Rehder got an offer he couldn't refuse: to steal key files from his employer, West German electronics firm Telefunken, for a monthly payoff from East German agents. Soon the former Nazi party member and physicist was on board, and he delivered a staggering volume of material: hundreds of invaluable documents each year, including the complete plans for the radiation-resistant Leopard 1 tank. His side hustle lasted 28 years—from 1957 to 1985—and he was never caught.

But although spying clearly paid off for Rehder, scholars have long wondered whether industrial espionage is worth it for the country subsidizing all the spying. Now, in the first study of its kind, researchers have analyzed more than 150,000 previously classified documents from the former East German Ministry for State Security (also known as the Stasi) to reach a surprising conclusion: Stealing can boost economic productivity in the short term, but it cannibalizes long-term investment in research and development.

"It's R&D on cocaine," says author Erik Meyersson, a political economist at the Stockholm School of Economics. "Maybe you can have a little bit of fun with it, but it's not good for you in the long run."

Industrial, or economic, espionage has a rich history. It helped the Soviet Union get the atomic bomb in the mid-20th century. In the early 19th century it launched the United States onto the world stage after U.S. agents stole technology—and skilled workers—from factories across Europe. And as far back as the sixth century C.E., it helped the Byzantine Empire break China's monopoly on silk production, when monks smuggled out silkworms. But thanks in part to the very nature of such secrets, no one has ever had a bird's eye view of how stolen information can affect an entire economic system.

### Closing the gap

Far behind the West in economic productivity, East Germany relied on espionage to narrow the gap in many sectors, especially computing and electronics (shown).




Meyersson's opportunity came in 2011, when he stumbled across a news story about Stasi spying and sensed there were untapped databases on the topic. Fellow economist—and German speaker—Albrecht Glitz of Pompeu Fabra University in Barcelona, Spain, agreed and launched their investigation. He soon called back with good news: "The data is there. All we have to do is go get it."

After several years of negotiation, Meyersson and Glitz got their hands on 151,627 dispatches on scientific secrets collected by thousands of spies between 1970 and 1988. The duo couldn't see the content of the reports, but they could see the metadata, including who collected the information and when, how valuable the information was, and keywords related to each item's content.

They used the 2000 most common keywords to divide the reports into 16 economic sectors, from machine building to chemicals to office appliances, computers, and electronics. They then looked at how each of those sectors fared in something called total factor productivity (TFP), a measure of how efficiently an economy uses its capital equipment—from forklifts to computerized control systems—and labor. (Higher TFP growth is typically associated with innovation.) Finally, they compared growth in TFP for each sector in East and West Germany for every year in the data set.

After controlling for the effects of trade and research and development, the team found that economic espionage boosted TFP growth in East Germany, helping it close the gap with West Germany by some 8.6% in 1989, they report in a working paper published by the Institute of Labor Economics, an economics research institute in Bonn, Germany. The effect was especially pronounced in computing and electronics, where espionage reduced the gap by almost 26%.

CREDITS: (PHOTO) © LEONARD FREED/MAGNUM PHOTOS; (GRAPH) G. GRULLÓN/SCIENCE; (DATA) A. GLITZ AND E. MEYERSSON

(Pg 20)

INV. Title, Rotagy / Roto "G" ①

Summary for: Rotary Motion Inverter -

This proposal would adapt the existing technology for Rotary-Motion inversion generators, (i.e) Windmills &, Hydroelectrics; currently used to produce electricity Nationally & internationally to a determinable extent.

fig. (1.)




fig. (2)




Specialty gearbox!




fig (3)

Rotagy (Roto "G") (T)

This plan calls for a test of (3) adaptations of existing technology (fig 1.) to produce a Constant flow of energy; by using a specialty-gearbox to decrease the effort required to increase the production; see (fig. 2) & (fig 3), the gearbox would increase the rate of rotation by a Coupler & offset differential setup, the Rotary Motion would be constant through (1) of (3) forward-assist options to be developed & tested for efficiency; the first is (Equilibrium) a set of weights affixed to the Rod w/ axle would work w/ hydraulics to achieve a perpetual Rotation & produce a predictable rate of energy, the second, is (Magneto-Forward-Assist) the same perpetual Rotation would be produced w/ a impetus working w/ the Magnetic attraction of the Rod/axle & weight system to achieve a predictable rate of Rotation & flow... The third; is a proposal for a self-charging battery-array that would actually use a power forward assist to rotate the Coupler to charge itself in a closed-circuit... see (fig. 4); the concept for a specialty-gearbox for couplers adaptations initiated for Rotary Motion inversion is ready for testing as a Municipal, Residential & vehicle adaptation & the perpetual Motion, forward-assist is Cold fusion.

(pg 22)

Rotary (Rote "G") ①

(fig. 4)




The sensor should automatically switch the battery array to allow (1) battery to drive the motor while the capacitor remains full & runs the powertransmission –

This could be adapted Horizontally to scale & eliminate the need to stop & power up a car or other vehicle & could be used for space stations!

Rights Reserved to Adapt a Rotary Motion Inverter for Commercial production.

[signature]

10/2018 –

# EXPLORE

IN THIS SECTION


Shaping the Globe
Moving Mountains
She Stalks Sharks
Armadillo *Amour*


ILLUMINATING THE MYSTERIES AND WONDERS AROUND US EVERY DAY
NATIONAL GEOGRAPHIC | VOL. 234 NO. 1



# CLEAN ENERGY IN A COAL MINE

**THE CHALLENGE:** Renewable energy from the wind and sun is abundant; storing it for future use has been a persistent puzzle. An Australian project uses a giant lithium-ion battery, while one in Nevada employs molten salt. Germany, which aims to run on 80 percent renewable power by 2050, is turning to the infrastructure of the very industry the country aims to replace—coal. The plan: Transform the Prosper-Haniel mine in Bottrop into a battery. This would be among the first underground projects using pumped hydropower, which has proved to be an efficient energy storage technology. But even if clean, it's expensive—and still in search of funding.

1 **On the surface, wind turbines and solar panels** generate renewable energy. The coal mine, which is set to close this year, is underneath.

*Water pumped to surface*

**Without energy storage,** renewable energy is wasted when demand is low.




2 **When there is more energy supply than demand,** excess power is used to pump water upward from the underground reservoir through existing shafts to the surface reservoir.

Pg. 24)




**PLACE** Prosper-Haniel coal mine

**LOCATION** Bottrop, North Rhine-Westphalia, Germany

**DISTINCTION** A soon-to-be-closed coal mine may find new life as a storage facility for renewable energy.

DECODER | BY JASON TREAT

That Sucks! HA!




KELSEY NOWAKOWSKI. ART: STEFAN FICHTEL. SOURCE: ANDRÉ NIEMANN, UNIVERSITY OF DUISBURG-ESSEN