(pg 1)

# RULE 61

# HARMLESS ERROR

Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

## 2007 AMENDMENTS ROADMAP

**STYLE PROJECT CHANGES:** The densely complex first sentence of this Rule was reworded. The bulky "inconsistent with substantial justice" standard was thinned to "justice requires".

**NON-STYLE CHANGES:** None.

*NOTE: The Federal Rules "Style Project" is explained in Part III-A.*

## AUTHORS' COMMENTARY ON RULE 61

### PURPOSE AND SCOPE

Rule 61 codifies the principle that "harmless" errors by the district court—those errors that do not affect the parties' substantial rights—will not justify a new trial, setting aside a verdict, or vacating, modifying, or otherwise disturbing the court's order.

### APPLICATIONS

#### Standard for "Harmlessness"

Rule 61 defines a harmless error as one that does not affect the substantial rights of the parties or does not defeat substantial justice.[1] But an error will not be discounted as harmless if the court is left with a grave doubt as to whether the error had a substantial influence in the ultimate result.[2] [redacted]

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McCOY *v.* LOUISIANA

CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 16–8255. Argued January 17, 2018—Decided May 14, 2018

Petitioner Robert McCoy was charged with murdering his estranged wife's mother, stepfather, and son. McCoy pleaded not guilty to first-degree murder, insisting that he was out of State at the time of the killings and that corrupt police killed the victims when a drug deal went wrong. Although he vociferously insisted on his innocence and adamantly objected to any admission of guilt, the trial court permitted his counsel, Larry English, to tell the jury, during the trial's guilt phase, McCoy "committed [the] three murders." English's strategy was to concede that McCoy committed the murders, but argue that McCoy's mental state prevented him from forming the specific intent necessary for a first-degree murder conviction. Over McCoy's repeated objection, English told the jury McCoy was the killer and that English "took [the] burden off of [the prosecutor]" on that issue. McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom. The jury found him guilty of all three first-degree murder counts. At the penalty phase, English again conceded McCoy's guilt, but urged mercy in view of McCoy's mental and emotional issues. The jury returned three death verdicts. Represented by new counsel, McCoy unsuccessfully sought a new trial. The Louisiana Supreme Court affirmed the trial court's ruling that English had authority to concede guilt, despite McCoy's opposition.

*Held*: The Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Pp. 5–13.

(a) The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." The defendant does not

(Pg 3)



Syllabus

surrender control entirely to counsel, for the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta* v. *California*, 422 U. S. 806, 819–820. The lawyer's province is trial management, but some decisions are reserved for the client—including whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. Autonomy to decide that the objective of the defense is to assert innocence belongs in this reserved-for-the-client category. Refusing to plead guilty in the face of overwhelming evidence against her, rejecting the assistance of counsel, and insisting on maintaining her innocence at the guilt phase of a capital trial are not strategic choices; they are decisions about what the defendant's objectives in fact *are*. See *Weaver* v. *Massachusetts*, 582 U. S. ___, ___. Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as English did here. But the client may not share that objective. He may wish to avoid, above all else, the opprobrium attending admission that he killed family members, or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. See Tr. of Oral Arg. 21–22. Thus, when a client makes it plain that the objective of "his defence" is to maintain innocence of the charged criminal acts and pursue an acquittal, his lawyer must abide by that objective and may not override it by conceding guilt. Pp. 5–8.

(b) *Florida* v. *Nixon*, 543 U. S. 175, is not to the contrary. Nixon's attorney did not negate Nixon's autonomy by overriding Nixon's desired defense objective, for Nixon "was generally unresponsive" during discussions of trial strategy and "never verbally approved or protested" counsel's proposed approach. *Id.*, at 181. He complained about counsel's admission of his guilt only after trial. *Id.*, at 185. McCoy, in contrast, opposed English's assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court. Citing *Nix* v. *Whiteside*, 475 U. S. 157, the Louisiana Supreme Court concluded that English's refusal to maintain McCoy's innocence was necessitated by a Louisiana Rule of Professional Conduct that prohibits counsel from suborning perjury. But in *Nix*, the defendant told his lawyer that he intended to commit perjury. Here, there was no avowed perjury. English harbored no doubt that McCoy believed what he was saying; English simply disbelieved that account in view of the prosecution's evidence. Louisiana's ethical rules might have stopped English from presenting McCoy's alibi evidence if English knew perjury was involved, but Louisiana has identified no ethical rule requiring English to admit McCoy's guilt over McCoy's objection. Pp. 8–11.

Syllabus

(c) The Court's ineffective-assistance-of-counsel jurisprudence, see *Strickland* v. *Washington*, 466 U. S. 668, does not apply here, where the client's autonomy, not counsel's competence, is in issue. To gain redress for attorney error, a defendant ordinarily must show prejudice. See *id.*, at 692. But here, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative. Violation of a defendant's Sixth Amendment-secured autonomy has been ranked "structural" error; when present, such an error is not subject to harmless-error review. See, *e.g., McKaskle* v. *Wiggins*, 465 U. S. 168, 177, n. 8; *United States* v. *Gonzalez-Lopez*, 548 U. S. 140; *Waller* v. *Georgia*, 467 U. S. 39. An error is structural if it is not designed to protect defendants from erroneous conviction, but instead protects some other interest, such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Weaver*, 582 U. S., at __ (citing *Faretta*, 422 U. S., at 834). Counsel's admission of a client's guilt over the client's express objection is error structural in kind, for it blocks the defendant's right to make a fundamental choice about his own defense. See *Weaver*, 582 U. S., at ___. McCoy must therefore be accorded a new trial without any need first to show prejudice. Pp. 11–12.

2014–1449 (La. 10/19/16), 218 So. 3d 535, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined.

(Pg. 5)

must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Walker v. United States*, 810 F.3d 568, 574 (8th Cir. 2016) (quoting *Whorton v. Bockting*, 549 U.S. 406, 418 (2007)) (internal quotation marks omitted). The Supreme Court has never identified a rule that meets this description and has called it "unlikely that any such rules have yet to emerge." *Id.* (quoting *Whorton*, 549 U.S. at 417) (internal quotation marks omitted).

The narrow rule announced in *McCoy* does not buck this trend. *McCoy* did not introduce a procedure "without which the likelihood of an accurate conviction is seriously diminished." *Teague*, 489 U.S. at 313 (plurality opinion). *McCoy* barred defense counsel from independently conceding a client's culpability at the guilt phase of a capital trial—a rule that "is not designed to protect the defendant from erroneous conviction." *McCoy*, 138 S. Ct. at 1511 (quoting *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017)). Rather, the rule guarantees "the defendant's right to make the fundamental choices about his own defense" and otherwise guards against effects "too hard to measure." *Id.*

*McCoy* protects a defendant's dignity and autonomy, not the accuracy of conviction. *See* 138 S. Ct. at 1508. The decision will not likely impact the accuracy of convictions: it appears apt to arise in capital cases in which the prosecution possesses such overwhelming evidence that defense counsel recognizes an admission of guilt best serves the client's interests at the penalty

8th!

(Pg. 6)

Pg. 285 - 501

COPY

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

UNITED STATES OF AMERICA PLAINTIFF

VS. NO. 96-60022-001

JEFFERY WILLIAM PAUL DEFENDANT

---

Before HONORABLE JIMM LARRY HENDREN, U. S. District Judge, as follows:

JURY TRIAL
June 17 - 27, 1997
Hot Springs, Arkansas

VOLUME 2

---

APPEARANCES:

MR. STEPHEN SNYDER
U. S. Attorney's Office
P. O. Box 1524
Fort Smith, Arkansas 72902

ON BEHALF OF THE UNITED STATES OF AMERICA

MR. MARK WEBB
U. S. Attorney's Office
P. O. Box 1524
Fort Smith, Arkansas 72902

MR. STEVEN D. OLIVER
Bachelor, Newell & Oliver, P.
P. O. Box 1620
Hot Springs, Arkansas 71913

ON BEHALF OF THE DEFENDANT

MR. LYNN WILLIAMS
Wood, Smith, Schnipper & Clay
123 Market Street
Hot Springs, Arkansas 71901

---

(pg 7)

Vol. 2

# INDEX


| | Page |
|---|---|
| Call to Order of the Court | 285 |
| Voir Dire of Jury Venire (continuing) | 285 |
| Selection of Jury | 447 |
| Court's Preliminary Instructions to Jury | 452 |
| Opening Statement on behalf of the Government By Mr. Snyder | 468 |
| Opening Statement on behalf of the Defendant By Mr. Oliver | 489 |


* * *

Vol. 2

(Pg. 8)



commission or perpetration of a robbery; that the said robbery and killing took place on federal property and that, therefore, such crimes amount to violations of federal law.

The second count may be summarized by saying that it alleges that on or about the twenty-second day of June, 1995, the defendant, Jeffery William Paul, and another individual known to the grand jury, while aiding and abetting each other, did knowingly carry and use a firearm during and in relation to a robbery, a crime of violence; that he did so on about June 22, 1995, as set forth in count one of the indictment; that in the course of the robbery, he caused the death of Sherman Williams by shooting him with the firearm in the commission or perpetration of the said robbery and attempted commission or perpetration of the robbery that the said robbery, carrying and use of the firearm, and killing took place on federal property and that, therefore, such crime amounts to a violation of federal law.

Keep in mind that each count charges a separate crime. You must therefore consider each count separately and return a separate verdict for each count.

The defendant has plead not guilty to these charges. You will notice that both counts in the indictment allege that the defendant committed crimes mentioned therein while aiding and abetting another individual known to the grand jury. You were told that one Trinity Edward Ingle has been tried and convicted by another jury of similar charges relating to the death of the

(pg-9)

Vol. 4.



firearm in the perpetration of the robbery and attempted perpetration of the robbery in violation of Title 18, U.S. Code Section, 924(i)(1) and Title 18, U.S. Code, Section 2.

The defendant has plead not guilty to these charges.

As I told you at the beginning of the trial, an indictment is simply an accusation. It is not evidence of anything. To the contrary, the defendant is presumed to be innocent. Thus the defendant, even though charged, begins the trial with no evidence against him. The presumption of innocence alone is sufficient to find the defendant not guilty and can be overcome only if the Government proves beyond a reasonable doubt each essential element of one or more of the crimes charged.

There is no burden upon a defendant to prove that he is innocent. Thus, the defendant does not have to call any witnesses or present any evidence to prove innocence. Further, the law does not compel defendant to take the witness stand and testify. Accordingly, the fact that defendant did not testify must not be considered by you in any way or even discussed in arriving at your verdict.

Keep in mind that each count charges a separate crime. You must consider each count separately and return a separate verdict for each count.

A reasonable doubt is doubt based upon reason and common sense and not the mere possibility of innocence. A reasonable doubt is the kind of doubt that would make a reasonable person

(Pg. 10)

Vol. 4



trying to tell us that nothing they said was true or that Jeffery did not tell them anything? No, I'm not saying that. I think he did say something to one or more of these individuals, but I think it was in words that were an expression of guilt for his role in a robbery that unexpectedly got out of hand when Trint Ingle, a five time convicted felon, took charge and made a one man decision unplanned, impulsive, spur of the moment decision to end the life of Mr. Williams. But I think the words have grown in number, and I think the words of Jeffery Paul have grown in their meaning and in their interpretations as influenced by many factors and as a result of time, as a result of the possibility of rewards, as a result of fear of prosecution, and as a result of parental disapproval for being involved with a young man who's had this serious charge against him.

Now is what he told Special Agent LaVoie consistent with the facts? Just a thumbnail. He said that they made a plan to rob someone but that Trinity Ingle - not both of them - but that Trinity Ingle made the decision to kill Sherman Williams.

But is there anything in the testimony and the evidence that should make you or at least let you or compel you to believe what he told Special Agent LaVoie as opposed to what he told everybody else? And I say there is. Number 1, by the time that he was arrested, he had been on the run for over a year, 14 months. He had been to Florida, the Carolinas, New Jersey and Mississippi. He'd been away from his family. He had made

Vol. 4

(Pg. 11)



empts to conceal his identity. At the time of his arrest, he was as low as he could get. He was as vulnerable as he would ever be, stripped of all defenses. And what he had feared for over a year was before him in the visage and embodiment of Special Agent John LaVoie.

Special Agent John LaVoie, a law enforcement officer, an objective trained professional said that Jeffery was cooperative and candid. At the time he gave this statement, Jeffery's statement was stripped of any frills for exaggerations or elaborations, objectively and professionally recorded or written down by Special Agent LaVoie and recited to you as jurors.

When Jeffery was advised of his rights - his right to have an attorney present - Special Agent LaVoie testified that he waived his right to an attorney and he voluntarily, willingly and without a promise, gave a statement.

Now his statement said nothing -- that he had nothing to do with it. His statement was very upright and candid and he stated we did plan a robbery, but that he did not intend to kill Sherman Williams, that they did not intend to kill anyone. And the termination of this statement only came, not because he was tired of the questions, it was only terminated when Special Agent LaVoie started asking him questions about what his father had done to help him elude capture. He was not going to testify, he was not going to snitch on his father, and that's when he terminated this interview, and not before.

Vol. 2

(Pg. 12)



Paul helped pull the body off the trail but even after that, the keys were given to Mr. Ingle and he's the one that took the car and decided to drive it with Mr. Paul as a passenger.

Now Jeff has been charged with a two count indictment. You've heard it twice already but I'm going to say it again: That on or about June 22, 1995, Jeff and Trinity Ingle, while aiding and abetting each other, committed the offense of murder in the first degree.

To sustain this charge, the Government must prove beyond a reasonable doubt the elements of this offense, and I'm not going to go through that at this point.

Also in Count 2 it is charged that on or about June 22, that Jeffery Paul and Trinity Ingle, while aiding and abetting each other, committed the offense of knowingly carrying a firearm in relation to a crime of violence.

And once again, the burden on the Government is to prove each element of both of these offenses beyond a reasonable doubt. But as you already know and as you, obviously from reading this--what they're charged with, Jeff is not charged alone. It is not alleged that Jeff Paul committed this offense by himself. It is alleged that Jeff Paul and Trinity Ingle did commit these offenses together.

Now you already know that Trinity Ingle has been tried and convicted and sentenced to life in prison without possibility of release. And today you will have to decide, or in the days to

Vol. 2

(Pg. 13)



come you will have to decide whether Jeff did aid and abet Trinity Ingle in the commission of his offenses. That will be your burden, that will be your job, and you will be instructed as to that jury instruction. I'm going to read that just briefly.

> "In order to have aided and abetted the commission of a crime, the person must before or at the time of the crime was committed; Number 1, had known the crime was being committed or going to be committed; and two, knowingly have acted in some way for the purpose of causing, encouraging or aiding in the commission of a crime."

Now the Government, once again, must prove these elements beyond a reasonable doubt. And as you read that instruction, as you consider arguments at the conclusion of the guilt phase, I want you to consider his statement where he did plan on robbing this man but did not intend and did not plan on killing anyone.

Now when you listen to the testimony and you've observed the exhibits and when you're instructed as to the law by Judge Hendren, I want you to remember the promises that you made during jury selection; Number 1, that each and every one of you will promise that you will listen attentively to evidence in this case and that you will follow the law as stated, whether you agree with it or not; that you will not allow prejudice or emotion to influence you; and that you will listen to the case with a fair and open mind. And at the conclusion of the trial, all I can

(pg. 14)



# CHAPTER 51—HOMICIDE

Sec.


1111. Murder.
1112. Manslaughter.
1113. Attempt to commit murder or manslaughter.
1114. Protection of officers and employees of the United States.
1115. Misconduct or neglect of ship officers.
1116. Murder or manslaughter of foreign officials, official guests, or internationally protected persons.
1117. Conspiracy to murder.
1118. Murder by a Federal prisoner.
1119. Foreign murder of United States nationals.
1120. Murder by escaped prisoners.
1121. Killing persons aiding Federal investigations or State correctional officers.
1122. Protection against the human immunodeficiency virus.


## § 1111. Murder

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

(c) For purposes of this section—

(1) the term "assault" has the same meaning as given that term in section 113;

(2) the term "child" means a person who has not attained the age of 18 years and is—

(A) under the perpetrator's care or control; or

(B) at least six years younger than the perpetrator;

(3) the term "child abuse" means intentionally or knowingly causing death or serious bodily injury to a child;

(4) the term "pattern or practice of assault or torture" means assault or torture engaged in on at least two occasions;

(5) the term "serious bodily injury" has the meaning set forth in section 1365; and

(6) the term "torture" means conduct, whether or not committed under the color of law, that otherwise satisfies the definition set forth in section 2340(1).

(June 25, 1948, c. 645, 62 Stat. 756; Oct. 12, 1984, Pub.L. 98–473, Title II, § 1004, 98 Stat. 2138; Nov. 10, 1986, Pub.L. 99–646, § 87(c)(4), 100 Stat. 3623; Nov. 14, 1986, Pub.L. 99–654, § 3(a)(4), 100 Stat. 3663; Nov. 18, 1988, Pub.L. 100–690, Title VII, § 7025, 102 Stat. 4397; Sept. 13, 1994, Pub.L. 103–322, Title VI, § 60003(a)(4), 108 Stat. 1969; Apr. 30, 2003, Pub.L. 108–21, Title I, § 102, 117 Stat. 652.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1986 Acts.** Amendment by section 87 of Pub.L. 99–646 effective 30 days after Nov. 10, 1986, see section 87(e) of Pub.L. 99–646, set out as a note under section 2241 of this title.

## § 1112. Manslaughter

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than 15 years, or both;

Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

(June 25, 1948, c. 645, 62 Stat. 756; Sept. 13, 1994, Pub.L. 103–322, Title XXXII, § 320102, Title XXXIII, § 330016(1)(H), 108 Stat. 2109, 2147; Oct. 11, 1996, Pub.L. 104–294, Title VI, § 604(b)(13), 110 Stat. 3507; Jan. 7, 2008, Pub.L. 110–177, Title II, § 207, 121 Stat. 2538.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1996 Acts.** Amendment by section 604 of Pub.L. 104–294 effective Sept. 13, 1994, see section 604(d) of Pub.L. 104–294, set out as a note under section 13 of this title.

Vol. 4

(Pg-15)



then you must proceed, as the jury instruction for lesser included offenses say, to determine whether or not the Government has proven the guilt of the defendant beyond a reasonable doubt for any less serious offense included in that charge.

If the Government has not proved to your satisfaction -- if the Government has not proved to your satisfaction that Jeffery Paul wanted to kill Sherman Williams during the robbery, then you must and I ask you, please, consider the less serious charge of murder in the second degree and find Jeffery guilty of murder in the second degree.

Thank you.

BY THE COURT: All right. Thank you, Mr. Oliver. All right. For no more than 15 minutes please, Mr. Webb?

BY MR. WEBB: Thank you, Your Honor.

You know, ladies and gentlemen, this is the chart we prepared to give you some idea of the facts that we showed that occurred during the course of Thursday, June 22; Friday, June 23; Saturday, June 24; Sunday, June 25; and Monday, when the body was discovered; Tuesday, when the billfold discovered; and when they discovered that it was, in fact, Mr. Williams that had actually been killed; and Friday, when Mr. Maples notified the FBI of the discovery of the car, about the story about the FBI recovering the car of an elderly victim; and then what Jeff Paul told Kris Rogers and Chris LaPaglia on that day. On July 4, he leaves Hot Springs.

(Pg 16)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTICT OF INDIANA

| | | |
|---|---|---|
| JEFFREY WILLIAM PAUL, Petitioner, | : | CIVIL ACTION (Capital Habeas Corpus) |
| v. | : | 2:13-CV-00304-WTL-WGH |
| SUPERINTENDENT, USP-Terre Haute, UNITED STATES OF AMERICA, | : | **Hon. William T. Lawrence** **United States District Judge** |
| Respondents. | : | **Filed Under Seal** |

# PETITION FOR WRIT OF HABEAS CORPUS

LEIGH SKIPPER
Federal Defender
SHAWN NOLAN
Chief, Capital Habeas Unit
PETER WILLIAMS
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner

Dated: October 18, 2016

(Pg 17)

[redacted]

**B. The Evidence Presented against Mr. Paul at Trial.**

10. The Government's case against Mr. Paul was minimal and consisted primarily of statements made by Mr. Paul himself. The decedent's body was found on June 26, 1995 by a hiker in the Hot Springs National Park. He had been bound with duct tape at his hands and ankles and shot in the head. Mr. Paul left Hot Springs soon after the decedent's body was recovered and was eventually arrested at his parents' home in Mississippi in August 1996. FBI Agent John Lavoie testified that he took a statement from Mr. Paul after his arrest. Per Agent Lavoie, Mr. Paul stated that, on June 22, 1995, he and Ingle saw the decedent in a parking lot that was adjacent to Hot Springs National Park. At Ingle's suggestion, he and Mr. Paul followed the decedent into the park and robbed the decedent of his keys and wallet using a gun that Ingle pulled from his pocket. Mr. Paul taped the decedent's arms and legs at Ingle's instruction, at

Vol. 5 (Pg. 18)



uing and serious threat to society? The answer is yes. It is properly signed by the foreperson.

(2) that the defendant has committed, attempted to commit, and/or threatened to commit other acts of violence in addition to the capital offenses committed in this case including, but not limited to, the following: Attempted armed robbery/murder at the Tri States Liquor Store in Hot Springs, Arkansas on or about June 8, 1995. The answer is no. And it is signed properly signed by the foreperson.

(3) That the defendant successively eluded capture by the Federal Bureau of Investigation until his arrest in Mississippi on August 22, 1996? The answer is yes, and that is properly signed by the jury foreperson.

(4) That the defendant has demonstrated a lack of remorse for the capital offenses committed in this case by statements and/or actions including, but not limited to, one or more of the following:

(a) That the defendant stated that he did not feel bad about the murder.

(b) The defendant stated the victim begged for his life.

and (c) The defendant referred to the victim in vulgar terms. It is answered yes, and the verdict is properly signed by the foreperson.

(pg. 19)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTICT OF INDIANA

| | |
|---|---|
| JEFFREY WILLIAM PAUL,<br>Petitioner,<br>v.<br>SUPERINTENDENT, USP-Terre Haute, UNITED STATES OF AMERICA,<br>Respondents. | CIVIL ACTION<br>(Capital Habeas Corpus)<br>2:13-CV-00304-WTL-WGH<br>**Hon. William T. Lawrence**<br>**United States District Judge**<br>**Filed Under Seal** |

# PETITION FOR WRIT OF HABEAS CORPUS

LEIGH SKIPPER
Federal Defender
SHAWN NOLAN
Chief, Capital Habeas Unit
PETER WILLIAMS
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner

Dated: October 18, 2016

offense. When the car was finally recovered, Ingle's fingerprint, not Mr. Paul's, was found inside. *Paul-1* at 994.

### C. Trinity Ingle's Declaration.

15. Trinity Ingle had proceeded to trial in advance of Mr. Paul, and was convicted of first-degree murder and related charges. Although the government sought a death sentence, Ingle received a life sentence after a contested penalty phase approximately two weeks before Mr. Paul's trial. His conviction and sentence were affirmed on October 8, 1998. *United States v. Ingle*, 157 F.3d 1147 (8th Cir. 1998) (*rehr'g. denied* on Nov. 9, 1998). On February 11, 2005, Ingle signed a declaration in which he took full responsibility for the murder of the decedent and exculpated Mr. Paul. In this declaration, Ingle reported that:

> On June 22, 1995 me and Jeff were downtown in Hot Springs by the Arlington Hotel. I was wanting to rob a shop downstairs. Jeff was high and was pretty much just following me where I was going to. I was high too otherwise I would not have been wanting to rob a shop in broad daylight. But so we're standing outside of the mall when Mr. Williams drove by. I had not slept for days and was high on Methamphetamine which can make you paranoid and was making me paranoid after ten days of it and not sleeping. It was one of those times where if things had gone different, if a cop car had come by or something like that, I would have just left, but when Mr. Williams drove by he looked at me and I just locked in on him. In my paranoia I knew he had seen the gun in my waistband and knew that now he knew that I was thinking to do by robbing the shop downstairs. So when he got out of the car I told Jeff to come and follow me. At this point Jeff did not know what I was doing and so he wasn't arguing about it yet. As far as I knew, Jeff did not know that I had a gun. I didn't tell Jeff about my suspicions of Mr. Williams, nor did I say anything to him about what I planned to do.
>
> I followed Mr. Williams up the trail and Jeff was following me. I stopped him by asking him if he had the time. After he told us the time I pulled the gun out and told him to give up everything he had. When he didn't, I hit him and kicked him on the ground. By this time, Jeff was getting very nervous. He was trying to get me to leave, saying, "come on, let's go." But I wasn't about to leave, but I still had the gun in my hand and Jeff knew it.
>
> I told Jeff to keep quiet and I tied the guy up with the tape. Then Jeff and I started back down the trail but when I looked back at him the guy was looking right at me. I turned to go back but Jeff grabbed me by the arm and said, "let's just leave him and get out of here." Jeff kept arguing with me but I yanked free of him

(pg 21)

> holding me. I still had the gun in my hand and Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what it was I was going back up the mountain for, I made sure he knew if he put his hands on me again trying to stop me I would have shot him, too, and it would have been two people left up on that mountain.
>
> So I walked back up the trail and asked the guy if he was going to call the cops. He said no but of course I knew he was lying. So I stood over him and shot him in the chest but one shot was rat shot which I had forgot was in the chamber. I heard Jeff yelling at me to stop, but I turned back around and shot Mr. Williams with the real bullet in the head.
>
> Everything else I believe is already known which followed that.
>
> The gun I got from a burglary off Higden Ferry Road, New Oscar Point and Amity. It was a brown and yellow house and part of the yard was fences. It was in the morning that I broke into the house and found the guns in a closet. I think I recall that they were in a box on the closet floor. I also took some things out of the ice box and some change and silver dollars. Actually I had gotten two guns from there, a .357 and the .38 I used to shoot Mr. Williams. The .357 I had already sold.

Dec. Trinity Ingle at 1-3.

16. Section 2255 counsel averred, *inter alia*, that Mr. Paul's conviction and death sentence should be overturned because he was actually innocent of the decedent's homicide and because trial counsel were ineffective for failing to present Ingle's testimony to the jury. Because the § 2255 court had denied Mr. Paul's § 2255 petition on January 31, 2005, § 2255 counsel submitted the Ingle declaration in connection with a Motion to Reconsider Memorandum and Orders, or in the Alternative, to Vacate, Set Aside, or Correct Memorandum and Order Denying Relief Pursuant to Rule 59(e) and Rule 60(b). The § 2255 court did not comment on Ingle's declaration and denied Rule 59(e) and 60(b) relief without any analysis of Ingle's proffered testimony. On appeal, the *Paul-2* court did not contest the import of Ingle's proffered testimony and acknowledged that Ingle "asserts that Paul tried to convince Ingle to leave the park before Williams was killed, and avers that Ingle alone shot Williams while Paul yelled at him to stop," and that Ingle's proffered statement took "full responsibility for the murder of

Vol. 4 (Pg. 22)



Q. Did he tell you what they did with the body?
A. Drug it off in the woods and covered it up.
Q. During that conversation, did Jeff Paul show you one of his shoes?
A. Yes.
Q. And why did he show you his shoe?
A. Because it had been splattered with blood.
Q. Is that what he told you?
A. Yeah.
Q. What did it look like when he showed it to you?
A. It looked like it had been splattered with blood.
Q. I show you what's been marked as Government's Exhibit 27, and I would ask if those look familiar to you?
A. Yes.
Q. And how do they look familiar?
A. They're Jeff's shoes.
Q. You need to speak up --
A. They're Jeff's shoes.
Q. Do you know if anybody besides Jeff Paul wore these shoes the summer of 1995?
A. Yes.
Q. Who else would wear those shoes?
A. Trint.
Q. Why would Trint Ingle need to wear Jeff Paul's shoes?
A. Because couldn't wear sandals to work and Trint had to go to

Paul v. USA 8th circ. 14-1832 USSCt
Vol. 5

(Pg 23)



Q. Let me also show you Government's Exhibit 27, and I'd ask it you have seen that exhibit before?
A. Yes, sir. These are a pair of Reebok athletic shoes which I obtained from National Park Service Ranger Jim O'Donnell and forwarded to the F.B.I. laboratory for examination.
Q. Okay. Do you recall approximately when you took custody of those shoes?
A. Took custody of the shoes on January 11, 1995.
Q. Are sure it was January?
A. Well, not January. I apologize. July 11, 1995.
Q. And did you send the shoes somewhere?
A. I sent them to the F.B.I lab in Washington for examination.
Q. What sort of examination?
A. Serology; specifically, blood.

BY MR. SNYDER: Pass the witness, Your Honor.

CROSS-EXAMINATION

A. For scientific examination for hairs, fibers and blood tissue.

Paul v. USA 8th Circ. 14.1832 USSCt. (Pg 24)

DEC 27 '95 1 05 A PAGE.03

7-1 (Rev. 2-21-91)

FBI LABORATORY

# FEDERAL BUREAU OF INVESTIGATION
WASHINGTON, D. C. 20535

Date: December 20, 1995

To: SAC, Little Rock

GOVERNMENT EXHIBIT

FBI File No. 70A-LR-36698

Lab No. 50731011 S ZS UF

Reference: Communication dated July 19, 1995

Your No. 70A-LR-36698 (SQ 5) (P)

Re: TRINITY EDWARD INGLES, aka Trint;
JEFFERY WILLIAM PAUL, aka Jeff;
SHERMAN WILLIAMS - VICTIM (DECEASED);
HOT SPRINGS NATIONAL PARK,
HOT SPRINGS, ARKANSAS;
CGR - MURDER

OO: Little Rock

Specimens received: July 31, 1995

Result of examination:

This report supplements and completes the FBI Laboratory Report dated October 26, 1995. For a detailed listing of the submitted items, please refer to that report.

Human blood, which was not further characterized, was identified on specimen Q1. No blood was found on specimen Q3 or Q4.

Samples have been removed from the submitted items for possible future biochemical analysis. These samples are being returned to you along with the other submitted items. The integrity of biological samples which may be subjected to additional analysis is best maintained when the samples are kept dry and frozen. Should DNA testing be requested, please resubmit these samples, as well as blood samples from the victim(s) and suspect(s).

Specimen Q2, the ALSO SUBMITTED item and the results of latent fingerprint examinations will be furnished by a separate report. Specimens Q1, Q3 and Q4 will be returned under separate cover by registered mail.

Paul v. USA 8th cir. 14 1882 U.S.S. (+

(Pg. 25)

Expert witness. D. Reem



BY MR. WEBB: Okay. Your Honor, at this time we would move to introduce Government Exhibit Number 27.

BY MR. OLIVER: No objection.

BY THE COURT: Be received without objection, Number 27.

[Whereupon, Government's Exhibit 27 was received into evidence.]

BY MR. WEBB:

Q. And were you able to find any blood on these particular pair of shoes?

A. No. My tests indicated there was no blood present on these sneakers.

Q. Okay. If the shoes had been washed shortly after the blood got on them, would this affect your findings?

A. Yes, it would.

Q. Okay. And if the shoes had not been obtained until approximately 19 days after any blood got on them and had been worn during that time, would that also affect your findings?

A. Yes, it would.

Q. Okay. In what respect?

A. It all depends if they worn day in and day out and where they went.

BY MR. WEBB: Okay. Pass the witness, Your Honor.

BY THE COURT: Cross?

CROSS-EXAMINATION

Curtailment

Paul v. USA 8th Cir. 14.1882 6SSC4

(pg-26)

Other evidence linking Mr. Paul to the offense included a pair of "Reebok" brand sneakers, which were apparently owned by Mr. Paul, but had been loaned to Mr. Ingle and were recovered from Ingle at the time of his arrest. T. 567-68. Although examined, no blood was found on the sneakers. T. 608.



The government also contended that Appellant had blood on his shoes and/or clothes on the day of the offense. However, two government witnesses who saw him that day did not see any blood whatsoever on Mr. Paul. T. 670, 683,

While the government contended that Mr. Paul said he had kicked the victim in the head, T. 472, other evidence belied this fact. First, FBI Agent Tom Ross testified, and the government's serologist confirmed, that the Reebok shoes, GE 27 (T. 608), which Mr. Paul was supposedly wearing at the time of the offense had no trace of blood on them. T. 567-68, 608.

Vol. 5

(Pg. 27)



Q. Were you able to determine the approximate time of death?
A. Well, the only thing we can do is give a range. You can't pinpoint it like they do on TV. I can just give you in a range for the time of death.
Q. And what would that be?
A. Between three and seven days.
Q. Did the examination show that Mr. Williams was wearing a watch at the time of his death?
A. Yes, it did.
Q. And did it work?
A. Yes. It was running and showed the correct time and date at the time of the autopsy.

BY MR. SNYDER: Pass the witness, Your Honor.

BY THE COURT: Cross?

CROSS-EXAMINATION

BY MR. OLIVER:
Q. Dr. Peretti, I have just a few questions. Now during your review of the autopsy -- I believe it was performed by another medical examiner; is that correct?
A. Yes, sir.
Q. Was there any evidence that Mr. Williams' neck was broken?
A. There was no evidence at the time of autopsy.
Q. Was there any evidence of any other trauma other than the gunshot wound?
A. No.