IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTICT OF INDIANA

| | | |
|---|---|---|
| JEFFREY WILLIAM PAUL,<br><br>Petitioner,<br><br>V.<br><br>SUPERINTENDENT, USP-Terre Haute,<br>UNITED STATES OF AMERICA,<br><br>Respondents. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br>(Capital Habeas Corpus)<br><br>2:13-CV-00304-JMS-MJD<br><br>**Honorable Jane Magnus-Stinson** |

**SUPPLEMENTAL BRIEF BASED ON *UNITED STATES V. DAVIS*, 139 S. CT. 2319 (2019)**

Petitioner Jeffery William Paul, a prisoner in the custody of the United States sentenced to death and housed at the United States Penitentiary, Terre Haute, Indiana, respectfully offers this supplemental briefing relating to *United States v. Davis*, 139 S. Ct. 2319 (2019) in support of his Amended Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2241, as directed by the Court in its June 26, 2019 Order. Dkt. No. 224.

## INTRODUCTION

Counsel for Mr. Paul have filed an Amended Petition for Writ of Habeas Corpus, submitted pursuant to 28 U.S.C. § 2241 ("Habeas Petition"), which is currently pending before this Court. Dkt. No. 103. The Habeas Petition included, inter alia, a claim for relief which (1) asked this Court to vacate Mr. Paul's conviction under 18 U.S.C. § 924(c) as a clause of this statute was void for vagueness under *United States v. Johnson*, 135 S. Ct. 2551 (2015); and (2) challenged Mr. Paul's § 924(c) conviction and resulting death sentence because the conduct of which he was convicted did not constitute a crime under § 924(c), as the predicate crime of violence upon which the conviction was based was not tied to any criminal statute. In

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| JEFFREY WILLIAM PAUL,<br>Petitioner,<br><br>v.<br><br>SUPERINTENDENT, USP Terre Haute,<br>UNITED STATES OF AMERICA,<br><br>Respondents. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br>(Capital Habeas Corpus)<br><br>2:13-CV-00304-JMS-MJD<br><br>**Hon. Jane Magnus-Stinson** |

**AMENDMENT TO PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner, Jeffrey William Paul, through undersigned counsel, pursuant to this Court's October 6, 2021, Order (Filing No. 270), hereby amends his previously filed Petition for Writ of Habeas Corpus (Filing No. 103) ("Habeas Petition") to include Claim V as set forth below. The matters and claims set forth in all other sections of the Habeas Petition and its accompanying exhibits are incorporated as if set forth entirely herein.

## V. MR. PAUL'S 18 U.S.C. § 924(C) CONVICTION IS INVALID UNDER *BORDEN V. UNITED STATES.*

### A. Introduction

1. Mr. Paul was convicted of knowing use of a firearm in relation to a "crime of violence" in violation of 18 U.S.C. § 924(c). To qualify as a crime of violence under § 924(c), the predicate offense must satisfy § 924(c)(3)(A)'s "force clause."[1] A crime-of-

---

[1] Section 924(c)(3) defines "crime of violence" as follows:

(3) For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

# The wrongfully convicted should be able to sue cops

2/8/22



Laurie Roberts
Innocence Project

As America nears the grim milestone of its 3,000th exoneration, the causes of wrongful convictions are well understood. Sometimes a survivor misidentifies their attacker, or an incarcerated person provides false testimony in exchange for leniency. But too often, egregious police misconduct sends innocent people to prison for crimes they didn't commit.

From witness tampering and malfeasance in interrogations to fabricating evidence and committing perjury at trial, police misconduct contributed to 35% of known exonerations nationwide. This misconduct stole thousands of years of freedom and a lifetime of priceless memories from its victims. Yet the perpetrators of these injustices rarely face accountability because of the court-created defense of "qualified immunity."

This doctrine lets public officials escape civil liability after engaging in misconduct, unless a previous court decision has ruled that nearly identical conduct violates the Constitution – even when their actions put innocent people behind bars. In practice, this means officers can violate people's rights with impunity, as long as they do so in sufficiently unique ways.

That's why the Innocence Project has redoubled its efforts in state legislatures. Last year, we worked with dozens of organizations and grassroots activists from across the political spectrum to pass the New Mexico Civil Rights Act (NMCRA), which eliminates qualified immunity as a legal defense and allows New Mexicans whose constitutional rights have been violated to sue in state court.

## 13-year-old falsely accused

The NMCRA's impact is bigger than the individual lawsuits it will facilitate. To avoid large civil settlements, the law incentivizes cities and counties to enact training and policies that will prevent misconduct before it happens. And ending qualified immunity won't impact municipalities where officers are conducting themselves professionally. Litigation will instead reveal civil rights violations going unaddressed. The fiscal impact of the legislation is a feature, not a bug, and it finally puts a price tag on injustice.

Qualified immunity revictimizes exonerees like 13-year-old Art Tobias, who falsely confessed to a California murder after police fabricated evidence and lied repeatedly about the consequences of confessing. The 9th Circuit acknowledged that the tactics used against the teen were "close to the level of 'psychological torture'" that clearly violates the 14th Amendment, but the court granted the officers qualified immunity because the child's interrogation didn't last as long as interrogations in [illegible] cases.

Congress had an opportunity to rein in [illegible] legal doctrine with the George Floyd Justice in Policing Act, but disappointingly, progress stalled largely due to disagreements over qualified immunity.

As long as government officials know they can escape meaningful accountability for misconduct through qualified immunity, new front-end laws, rules and regulations will have limited utility. In this way, the NMCRA actually amplifies the impact of other policing reforms by making it clear that law enforcement is never above the law.

Data presented to the commission that studied and recommended the NMCRA shows that just 5% of the federal civil rights cases filed in the District of New Mexico were dismissed because of qualified immunity. But these cases represent some of the most outrageous instances of misconduct and are often glaring examples of why Americans accurately perceive that police officers are held to different, lower, standards.

## New Mexico's example

From arresting a child for burping in gym class, stealing someone's rare coin collection to hiding evidence of a man's innocence leading to 13 years of incarceration, each of these decisions chips away at our faith in the criminal legal system. By foreclosing the possibility of these unjust outcomes, the NMCRA will help rebuild trust between law enforcement and the communities they serve.

Its passage was a collaborative effort that involved progressives, conservatives and libertarians, Americans for Prosperity and the American Civil Liberties Union, policing reform organizations and police themselves, exonerees and survivors of police shootings, racial justice advocates and local business leaders, and dozens more. The coming together of these disparate groups to address an obscure legal doctrine reflects a widespread consensus that qualified immunity is a primary stumbling block to true accountability in policing. Abolishing the defense will provide financial justice to victims, incentivize local governments to prevent misconduct in the first place and spur culture change.

Until Congress takes action, states across the country will have to take up the mantle. New Mexico's example shows that the only real barrier is political will.

*Laurie Roberts is a State Policy Advocate with the Innocence Project.*

## QUALIFIED IMMUNITY

This column is part of a series by USA TODAY Opinion on qualified immunity. The project is made possible in part by a grant from Stand Together. Stand Together does not provide editorial input. For more, visit **opinion.usatoday.com**

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McCOY *v.* LOUISIANA

CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 16–8255. Argued January 17, 2018—Decided May 14, 2018

Petitioner Robert McCoy was charged with murdering his estranged wife's mother, stepfather, and son. McCoy pleaded not guilty to first-degree murder, insisting that he was out of State at the time of the killings and that corrupt police killed the victims when a drug deal went wrong. Although he vociferously insisted on his innocence and adamantly objected to any admission of guilt, the trial court permitted his counsel, Larry English, to tell the jury, during the trial's guilt phase, McCoy "committed [the] three murders." English's strategy was to concede that McCoy committed the murders, but argue that McCoy's mental state prevented him from forming the specific intent necessary for a first-degree murder conviction. Over McCoy's repeated objection, English told the jury McCoy was the killer and that English "took [the] burden off of [the prosecutor]" on that issue. McCoy testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom. The jury found him guilty of all three first-degree murder counts. At the penalty phase, English again conceded McCoy's guilt, but urged mercy in view of McCoy's mental and emotional issues. The jury returned three death verdicts. Represented by new counsel, McCoy unsuccessfully sought a new trial. The Louisiana Supreme Court affirmed the trial court's ruling that English had authority to concede guilt, despite McCoy's opposition.

*Held*: The Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Pp. 5–13.

(a) The Sixth Amendment guarantees to each criminal defendant "the Assistance of Counsel for his defence." The defendant does not

USDC / SD -

pg. 2



surrender control entirely to counsel, for the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Faretta* v. *California*, 422 U. S. 806, 819–820. The lawyer's province is trial management, but some decisions are reserved for the client—including whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. Autonomy to decide that the objective of the defense is to assert innocence belongs in this reserved-for-the-client category. Refusing to plead guilty in the face of overwhelming evidence against her, rejecting the assistance of counsel, and insisting on maintaining her innocence at the guilt phase of a capital trial are not strategic choices; they are decisions about what the defendant's objectives in fact *are*. See *Weaver* v. *Massachusetts*, 582 U. S. ___, ___. Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as English did here. But the client may not share that objective. He may wish to avoid, above all else, the opprobrium attending admission that he killed family members, or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. See Tr. of Oral Arg. 21–22. Thus, when a client makes it plain that the objective of "his defence" is to maintain innocence of the charged criminal acts and pursue an acquittal, his lawyer must abide by that objective and may not override it by conceding guilt. Pp. 5–8.

(b) *Florida* v. *Nixon*, 543 U. S. 175, is not to the contrary. Nixon's attorney did not negate Nixon's autonomy by overriding Nixon's desired defense objective, for Nixon "was generally unresponsive" during discussions of trial strategy and "never verbally approved or protested" counsel's proposed approach. *Id.*, at 181. He complained about counsel's admission of his guilt only after trial. *Id.*, at 185. McCoy, in contrast, opposed English's assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court. Citing *Nix* v. *Whiteside*, 475 U. S. 157, the Louisiana Supreme Court concluded that English's refusal to maintain McCoy's innocence was necessitated by a Louisiana Rule of Professional Conduct that prohibits counsel from suborning perjury. But in *Nix*, the defendant told his lawyer that he intended to commit perjury. Here, there was no avowed perjury. English harbored no doubt that McCoy believed what he was saying; English simply disbelieved that account in view of the prosecution's evidence. Louisiana's ethical rules might have stopped English from presenting McCoy's alibi evidence if English knew perjury was involved, but Louisiana has identified no ethical rule requiring English to admit McCoy's guilt over McCoy's objection. Pp. 8–11.

USDC/SD-IN

Pg. 3



(c) The Court's ineffective-assistance-of-counsel jurisprudence, see *Strickland* v. *Washington*, 466 U. S. 668, does not apply here, where the client's autonomy, not counsel's competence, is in issue. To gain redress for attorney error, a defendant ordinarily must show prejudice. See *id.*, at 692. But here, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative. Violation of a defendant's Sixth Amendment-secured autonomy has been ranked "structural" error; when present, such an error is not subject to harmless-error review. See, *e.g.*, *McKaskle* v. *Wiggins*, 465 U. S. 168, 177, n. 8; *United States* v. *Gonzalez-Lopez*, 548 U. S. 140; *Waller* v. *Georgia*, 467 U. S. 39. An error is structural if it is not designed to protect defendants from erroneous conviction, but instead protects some other interest, such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Weaver*, 582 U. S., at __ (citing *Faretta*, 422 U. S., at 834). Counsel's admission of a client's guilt over the client's express objection is error structural in kind, for it blocks the defendant's right to make a fundamental choice about his own defense. See *Weaver*, 582 U. S., at ___. McCoy must therefore be accorded a new trial without any need first to show prejudice. Pp. 11–12.

2014–1449 (La. 10/19/16), 218 So. 3d 535, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined.

B-4

## FACTUAL BACKGROUND

In June 1997, Mr. Paul was convicted of aiding and abetting murder in the perpetration of a robbery, in violation of 18 U.S.C. § 1111(a) & 2 (Count 1). For the same killing, Mr. Paul, who was eighteen at the time of the crime, was also convicted of using a firearm during a federal "crime of violence…, to wit: a robbery in the national park, Hot Springs, Arkansas, on or about June 22, 1995," in violation of 18 U.S.C. § 924(c) & § 924(i)(1), *subsection redesignated as* § 924(j)(1)(1996)(Count 2). The indictment provided no notice as to which if any robbery statute constituted the underlying § 924(c) crime of violence. Nor is it apparent from the trial record that an extant robbery statute was even employed as the § 924(c) predicate. Both counts in the indictment carried a maximum sentence of death.

Prior to trial, the Government offered Mr. Paul a life sentence in exchange for a guilty plea. Petitioner rejected the offer despite trial counsel's repeatedly advising him that going to trial and denying guilt would increase the likelihood of the jury returning a sentence of death. Petitioner was adamant and unwavering, and, in trial counsel's view, completely nonsensical and irrational in his refusal to plead guilty and accept a life sentence. The manner in which Mr. Paul rejected trial counsel's advice to plead guilty was so bizarre and intense, trial counsel questioned whether or not he was competent to make this decision and go to trial.

must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Walker v. United States*, 810 F.3d 568, 574 (8th Cir. 2016) (quoting *Whorton v. Bockting*, 549 U.S. 406, 418 (2007)) (internal quotation marks omitted). The Supreme Court has never identified a rule that meets this description and has called it "unlikely that any such rules have yet to emerge." *Id.* (quoting *Whorton*, 549 U.S. at 417) (internal quotation marks omitted).

The narrow rule announced in *McCoy* does not buck this trend. *McCoy* did not introduce a procedure "without which the likelihood of an accurate conviction is seriously diminished." *Teague*, 489 U.S. at 313 (plurality opinion). *McCoy* barred defense counsel from independently conceding a client's culpability at the guilt phase of a capital trial—a rule that "is not designed to protect the defendant from erroneous conviction." *McCoy*, 138 S. Ct. at 1511 (quoting *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017)). Rather, the rule guarantees "the defendant's right to make the fundamental choices about his own defense" and otherwise guards against effects "too hard to measure." *Id.*

*McCoy* protects a defendant's dignity and autonomy, not the accuracy of conviction. *See* 138 S. Ct. at 1508. The decision will not likely impact the accuracy of convictions: it appears apt to arise in capital cases in which the prosecution possesses such overwhelming evidence that defense counsel recognizes an admission of guilt best serves the client's interests at the penalty

Trial Transcripts Vol. 4 of 5 pg 6

USAO/MARK WEBB -



he went back up? Did he stay down there when they had walked off? No. He went right back with Trint Ingle up to that body or, excuse me, up to Mr. Williams where the trigger was pulled. Then depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him.

But you know, ladies and gentlemen, it really doesn't matter at this point which version is correct because it's aiding and abetting. It doesn't matter which one pulled the trigger because they were both there, they were both involved in the robbery, and the decision was made.

Clearly, Mr. Oliver admitted to you he was involved in the robbery, he was involved in the planning of the robbery, and the murder occurred during the commission of the robbery.

So ladies and gentlemen, I submit to you that even under the aiding and abetting theory, no matter which way you do it, Jeff Paul is guilty of first degree murder.

Also, both Mr. Paul and Mr. Ingle were carrying guns and they must have known that if they were carrying a gun it was possible that the gun may have been used during the course of the robbery. If he decided to fight with it, that's what you have a gun there for is to show force and if somebody tries to give force, you may be forced to shoot.

[illegible], as I mentioned earlier, if you recall, Chris Rogers said he gave Jeff Paul a .38 caliber pistol the week before the murder that had been returned when it was given on June 8. And

## CHAPTER 51—HOMICIDE


Sec.
1111. Murder.
1112. Manslaughter.
1113. Attempt to commit murder or manslaughter.
1114. Protection of officers and employees of the United States.
1115. Misconduct or neglect of ship officers.
1116. Murder or manslaughter of foreign officials, official guests, or internationally protected persons.
1117. Conspiracy to murder.
1118. Murder by a Federal prisoner.
1119. Foreign murder of United States nationals.
1120. Murder by escaped prisoners.
1121. Killing persons aiding Federal investigations or State correctional officers.
1122. Protection against the human immunodeficiency virus.


## § 1111. Murder

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

(c) For purposes of this section—

(1) the term "assault" has the same meaning as given that term in section 113;

(2) the term "child" means a person who has not attained the age of 18 years and is—

(A) under the perpetrator's care or control; or
(B) at least six years younger than the perpetrator;

(3) the term "child abuse" means intentionally or knowingly causing death or serious bodily injury to a child;

(4) the term "pattern or practice of assault or torture" means assault or torture engaged in on at least two occasions;

(5) the term "serious bodily injury" has the meaning set forth in section 1365; and

(6) the term "torture" means conduct, whether or not committed under the color of law, that otherwise satisfies the definition set forth in section 2340(1).

(June 25, 1948, c. 645, 62 Stat. 756; Oct. 12, 1984, Pub.L. 98–473, Title II, § 1004, 98 Stat. 2138; Nov. 10, 1986, Pub.L. 99–646, § 87(c)(4), 100 Stat. 3623; Nov. 14, 1986, Pub.L. 99–654, § 3(a)(4), 100 Stat. 3663; Nov. 18, 1988, Pub.L. 100–690, Title VII, § 7025, 102 Stat. 4397; Sept. 13, 1994, Pub.L. 103–322, Title VI, § 60003(a)(4), 108 Stat. 1969; Apr. 30, 2003, Pub.L. 108–21, Title I, § 102, 117 Stat. 652.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1986 Acts.** Amendment by section 87 of Pub.L. 99–646 effective 30 days after Nov. 10, 1986, see section 87(e) of Pub.L. 99–646, set out as a note under section 2241 of this title.

## § 1112. Manslaughter

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than 15 years, or both;

Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

(June 25, 1948, c. 645, 62 Stat. 756; Sept. 13, 1994, Pub.L. 103–322, Title XXXII, § 320102, Title XXXIII, § 330016(1)(H), 108 Stat. 2109, 2147; Oct. 11, 1996, Pub.L. 104–294, Title VI, § 604(b)(13), 110 Stat. 3507; Jan. 7, 2008, Pub.L. 110–177, Title II, § 207, 121 Stat. 2538.)

### HISTORICAL AND STATUTORY NOTES

**Effective and Applicability Provisions**

**1996 Acts.** Amendment by section 604 of Pub.L. 104–294 effective Sept. 13, 1994, see section 604(d) of Pub.L. 104–294, set out as a note under section 13 of this title.

# RULE 61

# HARMLESS ERROR

Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

## 2007 AMENDMENTS ROADMAP

**STYLE PROJECT CHANGES:** The densely complex first sentence of this Rule was reworded. The bulky "inconsistent with substantial justice" standard was thinned to "justice requires".

**NON-STYLE CHANGES:** None.

***NOTE: The Federal Rules "Style Project" is explained in Part III-A.***

## AUTHORS' COMMENTARY ON RULE 61

### PURPOSE AND SCOPE

Rule 61 codifies the principle that "harmless" errors by the district court—those errors that do not affect the parties' substantial rights—will not justify a new trial, setting aside a verdict, or vacating, modifying, or otherwise disturbing the court's order.

### APPLICATIONS

#### Standard for "Harmlessness"

Rule 61 defines a harmless error as one that does not affect the substantial rights of the parties or does not defeat substantial justice.[1] But an error will not be discounted as harmless if the court is left with a grave doubt as to whether the error had a substantial influence in the ultimate result.[2] A more exacting definition is

USDC/SD INDIANA

Pg. 9

⇔10517-042⇔
F B I - Office
21 Wabash CT
Terre Haute, IN 47807
United States

✓

⇔10517-042⇔
Receiver Dpt-Of Justice
DOJ Pennsylvania AVE NW
Washington, DC 20530
United States

✓

⇔10517-042⇔
Office Of Inspector Gen-
PO BOX 27606
Washington, DC 20001
United States

✓

10

recklessly and the government's acknowledgment of such laws does not create a realistic probability that it would prosecute a defendant for reckless behavior under § 2111.

Given the countervailing authority and the fact that Paul cannot point to any non-theoretical case in which the United States would actually prosecute a defendant for a robbery committed via the reckless use of force under § 2111, the petitioner fails to establish any basis for invalidating his conviction under § 924(c).

III. Vacatur of Death Sentence

Finally, even if this Court were to vacate Paul's § 924(c) conviction, the Court should leave in place Paul's death sentence under Count One. The federal habeas corpus statute provides that when a federal court finds that a judgment was rendered without jurisdiction or is legally infirm, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Gardiner v. United States*, 114 F.3d 734, 736 (8th Cir.1997) (*quoting* § 2255). "Section 2255 affords the court broad and flexible power in correcting invalid convictions or sentences." *Id.* (*citing Andrews v. United States*, 373 U.S. 334, 339 (1963); *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir.1997)).

Paul argues that "[w]ithout a sentencing verdict on each count, it is impossible to know whether the jurors found death based on the murder conviction pursuant to § 1111(a) alone, on the claimed invalid conviction pursuant § 924(c) alone, or on a combination of both." Since the conduct underlying both offenses was the same, if the Court were to vacate the 924(c) conviction, this Court should exercise its discretion and leave in place Paul's death sentence under Count One.

Zachary A. Myers USAO
for: Jeffrey B. Kahan Chief
Capital Case Section -
Washington, D.C.

Resp.
12/16/21

offense. When the car was finally recovered, Ingle's fingerprint, not Mr. Paul's, was found inside. *Paul-1* at 994.

**C. Trinity Ingle's Declaration.**

15. Trinity Ingle had proceeded to trial in advance of Mr. Paul, and was convicted of first-degree murder and related charges. Although the government sought a death sentence, Ingle received a life sentence after a contested penalty phase approximately two weeks before Mr. Paul's trial. His conviction and sentence were affirmed on October 8, 1998. *United States v. Ingle*, 157 F.3d 1147 (8th Cir. 1998) (*rehr'g. denied* on Nov. 9, 1998). On February 11, 2005, Ingle signed a declaration in which he took full responsibility for the murder of the decedent and exculpated Mr. Paul. In this declaration, Ingle reported that:

> On June 22, 1995 me and Jeff were downtown in Hot Springs by the Arlington Hotel. I was wanting to rob a shop downstairs. Jeff was high and was pretty much just following me where I was going to. I was high too otherwise I would not have been wanting to rob a shop in broad daylight. But so we're standing outside of the mall when Mr. Williams drove by. I had not slept for days and was high on Methamphetamine which can make you paranoid and was making me paranoid after ten days of it and not sleeping. It was one of those times where if things had gone different, if a cop car had come by or something like that, I would have just left, but when Mr. Williams drove by he looked at me and I just locked in on him. In my paranoia I knew he had seen the gun in my waistband and knew that now he knew that I was thinking to do by robbing the shop downstairs. So when he got out of the car I told Jeff to come and follow me. At this point Jeff did not know what I was doing and so he wasn't arguing about it yet. As far as I knew, Jeff did not know that I had a gun. I didn't tell Jeff about my suspicions of Mr. Williams, nor did I say anything to him about what I planned to do.
>
> I followed Mr. Williams up the trail and Jeff was following me. I stopped him by asking him if he had the time. After he told us the time I pulled the gun out and told him to give up everything he had. When he didn't, I hit him and kicked him on the ground. By this time, Jeff was getting very nervous. He was trying to get me to leave, saying, "come on, let's go." But I wasn't about to leave, but I still had the gun in my hand and Jeff knew it.
>
> I told Jeff to keep quiet and I tied the guy up with the tape. Then Jeff and I started back down the trail but when I looked back at him the guy was looking right at me. I turned to go back but Jeff grabbed me by the arm and said, "let's just leave him and get out of here." Jeff kept arguing with me but I yanked free of him

> holding me. I still had the gun in my hand and Jeff was looking at it as I held it in his direction. Even though Jeff didn't know what it was I was going back up the mountain for, I made sure he knew if he put his hands on me again trying to stop me I would have shot him, too, and it would have been two people left up on that mountain.
>
> So I walked back up the trail and asked the guy if he was going to call the cops. He said no but of course I knew he was lying. So I stood over him and shot him in the chest but one shot was rat shot which I had forgot was in the chamber. I heard Jeff yelling at me to stop, but I turned back around and shot Mr. Williams with the real bullet in the head.
>
> Everything else I believe is already known which followed that.
>
> The gun I got from a burglary off Higden Ferry Road, New Oscar Point and Amity. It was a brown and yellow house and part of the yard was fences. It was in the morning that I broke into the house and found the guns in a closet. I think I recall that they were in a box on the closet floor. I also took some things out of the ice box and some change and silver dollars. Actually I had gotten two guns from there, a .357 and the .38 I used to shoot Mr. Williams. The .357 I had already sold.

Dec. Trinity Ingle at 1-3.

16. Section 2255 counsel averred, *inter alia*, that Mr. Paul's conviction and death sentence should be overturned because he was actually innocent of the decedent's homicide and because trial counsel were ineffective for failing to present Ingle's testimony to the jury. Because the § 2255 court had denied Mr. Paul's § 2255 petition on January 31, 2005, § 2255 counsel submitted the Ingle declaration in connection with a Motion to Reconsider Memorandum and Orders, or in the Alternative, to Vacate, Set Aside, or Correct Memorandum and Order Denying Relief Pursuant to Rule 59(e) and Rule 60(b). The § 2255 court did not comment on Ingle's declaration and denied Rule 59(e) and 60(b) relief without any analysis of Ingle's proffered testimony. On appeal, the *Paul-2* court did not contest the import of Ingle's proffered testimony and acknowledged that Ingle "asserts that Paul tried to convince Ingle to leave the park before Williams was killed, and avers that Ingle alone shot Williams while Paul yelled at him to stop," and that Ingle's proffered statement took "full responsibility for the murder of